UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TOWN & COUNTRY LINEN, CORP.,                         :

                    Plaintiff,                    :    (ECF Case -- Filed Electronically)

      -against-                              :    Case No.: 07 CV 3159 - MGC

                                     :

P/KAUFMANN, INC.,                                     :

                  Defendant.                    :

-------------------------------------------------------------x

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULES 12(b)(1), 12(b)(6) AND 9(b)

*PHILLIPS NIZER LLP*
*666 Fifth Avenue*
*New York, N.Y. 10103-0084*
*(212) 977-9700*
*Attorneys for Defendant*
*P/Kaufmann*

Table of Contents

Page

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ......................................................................................1

THE COMPLAINT .........................................................................................................2

T&C Admits To Copying The P/Kaufmann Zephyr Fabric Design ...............................2

The Parties Resolved The Dispute Over T&C's Copying In An April 19, 2002
Agreement Under Which P/Kaufmann Sold The Parachute Shower Curtain To T&C .................4

There Is No Copyright Registration For The Zephyr Fabric ..........................................6

ARGUMENT....................................................................................................................7

POINT I          THE STANDARD FOR DISMISSAL UNDER RULE 12(b)(6) ..........................7

POINT II         COUNT I SHOULD BE DISMISSED AS THERE IS NO ACTUAL
                 CONTROVERSY OVER A COPYRIGHT CLAIM, AND THERE
                 IS THUS NO SUBJECT MATTER JURISDICTION, THEREBY
                 REQUIRING DISMISSAL OF THIS ACTION IN ITS ENTIRETY ...................8

POINT III        COUNT II FOR FRAUD UNDER NEW YORK LAW SHOULD BE
                 DISMISSED FOR FAILURE TO PLEAD THE JUSTIFIABLE
                 RELIANCE ELEMENT OF FRAUD WITH REQUIRED
                 PARTICULARITY ...............................................................................12

POINT IV         PLAINTIFF'S CONTRACT AND QUASI-CONTRACT CLAIMS
                 OF BREACH OF WARRANTY, UNJUST ENRICHMENT AND
                 FAILURE OF CONSIDERATION SHOULD BE DISMISSED .......................16

CONCLUSION .................................................................................................................18

i

## TABLE OF AUTHORITIES

### CASES

*Abrahami v. UPC Constr. Co., Inc.*, 224 A.D.2d 231, 638 N.Y.S.2d 11 (1st Dep't 1996) ........... 13

*Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40 (2d Cir. 1991), cert. denied, 525 U.S. 1041 (1998)........................................................................................................................ 7

*Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp.2d 609 (S.D.N.Y. 2003) ................................ 5

*Barrett v. Huff*, 6 A.D.3d 1164, 776 N.Y.S.2d 678 (4th Dep't 2004)............................................ 14

*Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955 (May 21, 2007) ...................... 7, 12

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir. 1993) ................................................. 12

*Capital Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 797 N.Y.S.2d 352 (2005) ................. 5

*Chase Manhattan Bank (Nat'l Ass'n) v. Banque Intra, S.A.*, 274 F.Supp. 496 (S.D.N.Y. 1967)........................................................................................................................ 16

*Citibank, N.A. v. Itochu Int'l, Inc.*, 2003 WL 1797847 (S.D.N.Y. April 4, 2005).......................... 7

*Cohen v. Cerier*, 243 A.D.2d 670, 663 N.Y.S.2d 643 (2d Dep't 1997)......................................... 13

*Compudyne Corp. v. Shane*, 453 F.Supp.2d 807 (S.D.N.Y.2006) ................................................. 16

*Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)( ......................................................................................................... 5

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989)................................................................................ 7

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599 (1959) ................................... 13

*Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp 1347 (S.D.N.Y. 1987)..................................... 16

*East End Owners Corp. v. Roc-East End Assoc.*, 128 A.D.2d 366, 516 N.Y.S.2d 663 (1st Dep't 1987) ................................................................................................................. 13

*Fabozzi v. Coppa*, 5 A.D.3d 722, 774 N.Y.S.2d 555 (2d Dep't 2004) ........................................... 15

*GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234 (S.D.N.Y. 2000) ....................... 8

*Global Network Communications, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) ............ 3

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp.2d 228 (S.D.N.Y. 1999)................... 12

*Grumman Allied Indus., Inc. v. Rohr Indus.*, Inc., 748 F.2d, 729 (2d Cir. 1984).......................... 12

ii

*H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893 (1989) ............................. 8

*Hertz Corp. v. City of New York*, 1 F.3d 121 (2d Cir. 1993), cert. denied, 510 U.S. 1111 (1994) ................................................................................................................................................. 7

*Kay v. Pollak*, 305 A.D.2d 637, 761 N.Y.S.2d 664 (2d Dep't 2003) ............................................. 14

*Kelly v. L.L. Cool J.*, 145 F.R.D. 32 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994) ............. 10

*Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir. 1994) ................................................................. 14

*Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541 (4th Cir. 1987) ........................ 11

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996) ......................................................................................... 7

*LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492 (S.D.N.Y. 2002) .................................................... 5

*Lutin v. New Jersey Steel Corp.*, 1996 WL 636037 (S.D.N.Y. November 1, 1996) ...................... 11

*Mailer v. Zolotow*, 380 F.Supp. 894 (S.D.N.Y. 1974) .................................................................... 11

*Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387 (2d Cir. 2001) .................................................. 12

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510 (1941) ........................ 9

*Matthew Bender & Co., Inc. v. West Publ'g Co.*, 1996 WL 223917 (S.D.N.Y. May 2, 1996) ................................................................................................................................................. 9, 10

*May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138 (2d Cir. 1993) ......................... 11

*Metropolitan Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (Sup. Ct. N.Y. Co. 1950), aff'd, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951) ..................................................................................................................................................... 5

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747 (2d Cir. 1996) .............................................................................................................................................. 8

*Ricciuti v. New York City Transit Authority*, 941 F.2d 119 (2d Cir. 1991) .................................... 7

*Ritz Hotel, Ltd. v. Shen Mfg. Co.*, 384 F.Supp.2d 678 (S.D.N.Y. 2005) ......................................... 9

*Rodas v. Manitaras*, 159 A.D.2d 341, 552 N.Y.S.2d 618 (1st Dep't 1990) .................................. 13

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247 (CA7 1994) ................. 8

*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683 (1974) .................................................................. 7

*Schumaker v. Mather*, 133 N.Y. 590, 30 N.E. 755 (1892) ............................................................ 13

iii

1007463.TOA

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir. 1996).............................................................9

*Tanzman v. La Pietra*, 8, A.D.3d 706, 778 N.Y.S.2d 199 (3d Dep't 2004)...................................14

*UST Private Equity Invs. Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 733 N.Y.S.2d 385 (1st Dep't. 2001) ........................................................................................14

*Valassis Communications, Inc. v. Weimer*, 304 A.D.2d 448, 758 N.Y.S.2d 311 (1st Dep't 2003)...........................................................................................................................14

*Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452 (2d Cir. 1989)............................10

*Windsurfing Int'l., Inc. v. AMF Inc.*, 828 F.2d 755 (Fed. Cir. 1987)..............................................9

**STATUTES**

Fed.R.Civ.P. 9(b)....................................................................................................1, 11, 12

Fed. R. Civ. P. 12(b)(6) .........................................................................................1, 5, 7, 8

Fed. R. Civ. P 12(b)(i) ...........................................................................................................1

17 U.S.C. § 411(a) ................................................................................................................10

28 U.S.C. § 2201 ....................................................................................................................8

**MISCELLANEOUS**

22 N.Y.Jur.2d, Contracts, § 500 ...........................................................................................16

.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO DISMISS PURSUANT TO FEDERAL RULES 12(b)(1), 12(b)(6) AND 9(b)

### PRELIMINARY STATEMENT

Defendant P/Kaufmann, Inc. ("P/Kaufmann") hereby moves for an order dismissing the

Complaint of plaintiff Town & Country Linen Corp. ("T&C") pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  P/Kaufmann also seeks

dismissal of Counts I, III, IV and V of the Complaint pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure for failure to state a claim upon which relief can be granted, and as to

Count II pursuant to Rule 9(b) of the Federal Rules of Civil Procedure for failure to plead an

essential element of fraud with requisite particularity.

The T&C Complaint asserts five claims for relief:  (I) declaratory judgment premised on

T&C's alleged fear of a copyright infringement claim by P/Kaufmann over a fabric design

known as "Zephyr" that T&C admittedly copied over five years ago to create a competitive

design known as "Parachute"; (II) common law fraud with respect to an alleged

misrepresentation by P/Kaufman that it owned a copyright in the Zephyr fabric design which

alleged misrepresentation induced T&C to enter into an April 19, 2002 agreement (the

"Agreement") with P/Kaufmann resolving a dispute over the T&C copying of Zephyr; (III)

breach of a "warranty of title" under New York law with respect to products purchased by T&C

pursuant to the Agreement; (IV) unjust enrichment for profits made by P/Kaufmann under the

Agreement; and (V) rescission based on a claimed "failure of consideration" for the Agreement.

While each of the T&C claims warrant dismissed under Rules 12(b)(6) and 9(b) (for the

reasons detailed below), the Court need not necessarily address those claims, as it is clear that

this Court must dismiss the case for lack of subject matter jurisdiction, which is premised upon

an alleged copyright claim which does not exist.  The facts alleged in the Complaint confirm that

1007463.1

T&C has no legitimate concern of a copyright suit by P/Kaufmann and therefore no basis to seek a declaratory judgment under the Copyright Act in Count I. The lack of any alleged claim of copyright infringement by P/Kaufmann in the past five years, and the documented absence of a copyright in the Zephyr fabric at issue, compels dismissal of the only claim under which subject matter jurisdiction could exist.

## THE COMPLAINT

The Complaint describes a 2002 business dispute between two New York area home furnishings business (¶¶ 2, 3, 4, 7, 8, 9) [1] -- both T&C and P/Kaufmann are identified as wholesale suppliers of products such as draperies, linens, tablecloths, and the product at issue here, shower curtains. (¶¶ 7, 9)  The dispute involved T&C's <u>admitted</u> copying of a P/Kaufmann fabric design known as "Zephyr",  which after being discovered by P/Kaufmann was quickly settled by the Agreement memorialized in an e-mail dated April 19, 2002, a copy of which is annexed to the Fischman Affidavit at Exhibit 2. <u>After five years of operating under the e-mail Agreement</u>, T&C now brings this action claiming fraud in order to set it aside, avoid its financial obligations to P/Kaufmann and actually seek reimbursement for moneys paid for products purchased and received (and sold presumably at a profit) by T&C under the Agreement during the past five years, in addition to punitive damages.

**T&C Admits To Copying The P/Kaufmann Zephyr Fabric Design**

As alleged in the Complaint, T&C representatives visited P/Kaufmann in February 2002, and requested a price quote for a P/Kaufmann fabric known as "Zephyr" for possible manufacture as a shower curtain for sale to retail stores. (¶ 11)  The T&C Complaint describes the Zephyr fabric as

---

[1]  All references herein to paragraph numbers in parentheses are to the Complaint dated April 19, 2007, a copy of which is annexed to the Affidavit of Michael Fischman, sworn to June 1, 2007 ("Fischman Affidavit") at Exhibit 1.

2

> a wrinkled fabric woven into a grid pattern of rectangles, with
> borders that did not line up exactly with the borders of adjacent
> triangles or rectangles. (Id.)

T&C admits soon after contacting P/Kaufmann about possibly purchasing the Zephyr

fabric for its own use in shower curtains, T&C's own design personnel proceeded to create a

similar fabric they called the "Parachute Fabric", also for use as a shower curtain. (¶ 13)  Of

course, at the time T&C did not inform P/Kaufmann that it had created the Parachute Fabric,

which T&C describes being somewhat different from the Zephyr fabric that it was admittedly

copied from:

> in the case of the Parachute Fabric, the grid pattern was larger
> [than in Zephyr] and [unlike Zephyr] is comprised of squares, with
> borders that lined up exactly with the borders of the Parachute
> Fabric. (¶ 13)

T&C presumably believed that its copying of the Zephyr fabric did not infringe on a

P/Kaufmann copyright, either because Zephyr was not copyrighted or was not copyrightable.

(T&C is quite knowledgeable of copyrights matters, having filed for and received over 3,300

copyright registrations since 1978, including approximately 100 in the months surrounding the

April 19, 2002 Agreement.  See Fischman Affidavit, Exhibit.[2] )

At some time not identified in the Complaint, T&C showed a sample shower curtain made

from the Parachute Fabric to the nationwide retailer Bed, Bath & Beyond.  (¶ 14)  T&C had also

arranged for manufacture of the product, using the Parachute Fabric, at a factory in Turkey.

(¶ 13)  Bed, Bath & Beyond and T&C ultimately reached an agreement "on price and other

terms" for Bed, Bath and Beyond to purchase the Parachute shower curtain from T&C. (¶ 14)

---

[2]  Although not referred to in the Complaint, this Court may take judicial notice of the copyright registrations.  E.g.,
*Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  There is no record of
T&C having registered the Parachute Fabric.

3

**The Parties Resolved The Dispute Over T&C's Copying In An April 19, 2002 Agreement**
**Under Which P/Kaufmann Sold The Parachute Shower Curtain To T&C**

As alleged in the Complaint, on or about April 17, 2002, a P/Kaufmann representative

visited the T&C showroom and saw a shower curtain using the Parachute Fabric, which the

P/Kaufmann representative recognized as essentially identical to the Zephyr fabric shown to

T&C just a few months earlier. (¶ 15) The Complaint describes a meeting one day later, on

April 18, 2002, "held between Lee Kabat [a Kaufmann executive] and T&C executives, David

Beyda and David Grazi" at which meeting T&C contends that "Mr. Kabat demanded that T&C

stop selling the Parachute Shower Curtain because P/Kaufmann already copyrighted the Zephyr

fabric." (¶ 16) It is further alleged that Mr. Kabat "threatened to sue T&C for copyright

infringement and [to] interfere with T&C's contract with [Bed, Bath & Beyond] by notifying

[Bed, Bath & Beyond] that T&C was an infringer." (¶ 17)

On April 19, 2002, P/Kaufmann and T&C entered into the Agreement, described in the

Complaint as the "License Agreement" (¶ 19), by which the parties resolved their dispute over

T&C's admitted copying of the Zephyr fabric. The Agreement was memorialized in an e-mail

between the parties, a copy of which is annexed to the Fischman Affidavit at Exhibit 2. The text

of the Agreement, as drafted by T&C executive David Beyda, reads as follows:

> In an effort to sold this issue in a positive and cost effective
> manner we have discussed and tentatively agreed to the following
> terms:
>
> (1) P/Kaufmann would manufacture a finished product for T&C at
> our factory [Leno, in Turkey].
>
> (2) Based on an L.D.P. to the port of [$]8.05 – P/Kaufmann would
> charge T&C [$]10.06 from the port or a 20% margin on the landed
> port price.
>
> (3) T&C would divulge the name of our factory [in Turkey] to
> P/Kaufmann under the understanding that P/Kaufmann would not

4

manufacture competitive product to Town & Country at this factory.

I hope this solves this issues and look forward to working with you in the future.  Thank you, David Beyda.[3]

The April 19, 2002 Agreement makes no mention of "copyright", "license" or "royalty" payments, although those terms are used extensively in the Complaint.[4]  (Compare Agreement at Fischman, Exhibit 2 and description of claimed "License Agreement at Complaint, ¶ 19) Operating under the Agreement for the past five years, T&C issued purchase orders to P/Kaufmann for the Parachute shower curtain (Fischman Affidavit, Exhibit 3), and P/Kaufmann arranged for production of the product in Turkey (per the Agreement, at the same factory T&C used to manufacture the sample Parachute shower curtain) and shipped the product to T&C. P/Kaufmann issued approximately 65 invoices for thousands of the Parachute shower curtains, and each such invoice was paid by T&C.  (See Fischman Affidavit, Exhibit 4.[5])  With over $3.5 million in total orders from T&C, P/Kaufmann has, according to the Complaint, received

---

[3] This document is not included with the Complaint, but is relied on by T&C and forms an integral part of its claim. *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)(Court may consider on motion to dismiss under Rule 12(b)(6) documents on which plaintiff "solely relies and which [are] integral to the complaint.")

[4] The copyright allegation is not relevant, as T&C's conduct would have been actionable in any event as unfair competition without regard to any copyright -- "one may not misappropriate the results of the labor, skill, and expenditures of another in bad faith." *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp.2d 609, 619 (S.D.N.Y. 2003), quoting *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 500 (S.D.N.Y. 2002).  New York permits plaintiffs who were injured by the misappropriation of their proprietary designs to sue for damages if the designs were misappropriated through immoral commercial conduct. The language of *Metropolitan Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796, 101 N.Y.S.2d 483, 492 (Sup. Ct. N.Y. Co. 1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951), is often quoted:  "The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrong-doer." See also, *Capital Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 564, 797 N.Y.S.2d 352, 368-69 (2005)(distinguishing copyright infringement and unfair competition).

[5] The purchase orders and invoices memorialize the transactions by which T&C alleges that it "performed all of its obligations under the ….Agreement." (Complaint ¶ 21)

5

1007463.1

approximately $650,000 as its "20% margin" provided for under the Agreement. (Complaint, ¶ 21; Fischman Affidavit, Exhibit 4)

**There Is No Copyright Registration For The Zephyr Fabric**

There is no question that the Zephyr fabric that T&C admittedly received through P/Kaufmann and then attempted to recreate was not and is not copyrighted. The Complaint alleges, and it is not disputed, that the copyright office rejected an application for the copyright of the fabric pattern on May 31, 2001, and again sometime in 2004 (¶¶ 23 and 24) -- the Complaint even annexes a copy of the rejection letter from the copyright office notifying P/Kaufmann, through Western Textile, of the rejection in 2001. (Complaint, Exhibit C) Notwithstanding these facts, and T&C's high level of sophistication in copyright matters, T&C nonetheless claims that it is fearful of a copyright suit by P/Kaufmann over the non-existent copyright in the Zephyr fabric, and unnecessarily seeks a declaratory judgment from this Court that there is no copyright. (¶ 30)

T&C also claims that the alleged April 18, 2002 statement by Mr. Kabat about a copyright in Zephyr was fraudulent and that T&C justifiably relied on that fraudulent statement when it entered into the April 19, 2002 Agreement. (¶¶ 38-42) Finally, T&C claims that the alleged statement about a copyright in the Zephyr fabric constituted a "warranty of title" for the Parachute shower curtains ultimately purchased by T&C, and that the profits earned by P/Kaufmann from sales of thousands of Parachute shower curtain to T&C should be paid over to T&C as damages for breach or unjust enrichment relating to alleged claims of copyright in Zephyr, and that the Agreement be rescinded for a claimed failure of consideration.

## ARGUMENT

### POINT I

### THE STANDARD FOR DISMISSAL UNDER RULE 12(b)(6)

Rule 12 of the Federal Rules of Civil Procedure provides for the dismissal of a Complaint

for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A district

court should grant a motion to dismiss under Rule 12(b)(6) if it is "apparent that [the] plaintiff is

unable to prove any set of facts which would entitle him to relief." *Ricciuti v. New York City*

*Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991). On a Rule 12(b)(6) motion to dismiss, the

factual allegations of the complaint are presumed to be true and all factual inferences are to be

drawn in the plaintiff's favor and against the defendant. *See Scheuer v. Rhodes*, 416 U.S. 232,

236, 94 S.Ct. 1683, 1686 (1974); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.

1993) , cert. denied, 510 U.S. 1111 (1994); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989).

Accordingly, the factual allegations set forth in the T&C Complaint do not constitute findings of

fact by the Court. They are presumed to be true solely for the purpose of deciding the present

motion to dismiss.

In determining the adequacy of a claim, the Court may consider those facts "stated on the

face of the complaint, in documents appended to the complaint or incorporated in the complaint

by reference, and to matters of which judicial notice may be taken." *Allen v. Westpoint-*

*Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991), cert. denied, 525 U.S. 1041 (1998). "However,

bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded

allegations, and will not suffice to defeat a motion to dismiss." *Citibank, N.A. v. Itochu Int'l,*

*Inc.*, 2003 WL 1797847 at *1 (S.D.N.Y. April 4, 2005)(citing *Leeds v. Meltz*, 85 F.3d 51, 53 (2d

7

Cir. 1996)). Quoting the recent Supreme Court decision in *Bell Atlantic Corp. v. Twombly,* ____

U.S. ___, 127 S.Ct. 1955, 1964-65 (May 21, 2007):[6]

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss
> does not need detailed factual allegations; *ibid.; Sanjuan v.*
> *American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251
> (CA7 1994), a plaintiff's obligation to provide the 'grounds' of his
> 'entitle[ment] to relief' requires more than labels and conclusions,
> and a formulaic recitation of the elements of a cause of action will
> not do … (citations omitted)

It is the movant's obligation to demonstrate that "it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations.'" *H.J., Inc. v.*

*Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50, 109 S.Ct. 2893, 2906 (1989) (citation

omitted); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984). P/Kaufman

is confident that it can satisfy that obligation. As demonstrated below, the factual allegations of

the Complaint, even if accepted as true, and drawing all inferences in plaintiff's favor, require

dismissal of the claims asserted therein.

## POINT II

### COUNT I SHOULD BE DISMISSED AS THERE IS NO ACTUAL CONTROVERSY OVER A COPYRIGHT CLAIM, AND THERE IS THUS NO SUBJECT MATTER JURISDICTION, THEREBY REQUIRING DISMISSAL OF THIS ACTION IN ITS ENTIRETY

Plaintiff seeks to bring this action in the Federal Court, pursuant to the jurisdiction

granted to this Court to decide Federal questions arising under the Copyright Act. However, it is

clear that there is no copyright in the Zephyr mark (or the Parachute mark), that plaintiff is quite

aware of that fact (as evidenced by the essence of its Complaint) and that plaintiff's alleged fear

of a potential copyright infringement action by P/Kaufmann is nothing more than a spurious and

---

[6] Copies of all unreported decisions are annexed hereto.

8

transparent attempt to disguise a business dispute as a copyright dispute, for the sole purpose of seeking confer jurisdiction on this Court. Such tactics should not be countenanced.

Under Article III of the United States Constitution, the judicial power of the United States extends only to "cases" and "controversies." The federal courts have no power to issue advisory opinions, or to intervene where there is no controversy. The Declaratory Judgment Act, 28 U.S.C. § 2201, enforces the mandate of Article III. It provides that a declaratory judgment may be issued by a court only "in a case of actual controversy within its jurisdiction." It is well-settled that the Declaratory Judgment Act is not itself an independent basis for subject matter jurisdiction. *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 244 (S.D.N.Y. 2000), citing *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996). In this case, subject matter jurisdiction rests exclusively upon the claim of an actual controversy involving "a Federal question under the Copyright Laws of the United States." (Complaint, ¶ 5) Without a valid claim in Court of the Complaint, this court lacks subject matter jurisdiction over the supplemental common law claims.

As this Court recognized in *Ritz Hotel, Ltd. v. Shen Mfg. Co.,* 384 F.Supp.2d 678 (S.D.N.Y. 2005), in determining whether an "actual controversy" exists, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941)). Under Second Circuit law, "[i]n a declaratory judgment action involving [intellectual property rights], the test for an 'actual case or controversy' has two prongs, both of which must be satisfied in order to establish declaratory judgment jurisdiction: (1) has the defendant's conduct created a real and reasonable apprehension

9

of liability on the part of the plaintiff, and (2) has the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant." *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996) (citing, *Windsurfing Int'l., Inc. v. AMF Inc.*, 828 F.2d 755, 757-58 (Fed. Cir. 1987)) See also, *Ritz Hotel, Ltd. v. Shen Mfg. Co.*, 384 F. Supp.2d at 683; *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 1996 WL 223917 at *1 (S.D.N.Y. May 2, 1996) Both elements also must exist as of the time the declaratory judgment complaint is filed. *Starter Corp.*, 84 F.3d at 595.

The "reasonable apprehension" prong "of the justiciability inquiry is satisfied by a showing of ... direct threats or indirect threats or actions that place the declaratory plaintiff in reasonable apprehension of suit. In the absence of express threats, the 'totality of circumstances' surrounding defendant's conduct will determine if the plaintiff had reasonable apprehension of suit." *Matthew Bender*, 1996 WL 223917 at *2 (internal citations and quotation marks omitted). For T&C to demonstrate an actual case or controversy sufficient to sustain a claim against P/Kaufmann for a declaratory judgment, it must be able to prove that at the <u>time it filed the Complaint</u> on April 19, 2007, P/Kaufmann's conduct created a reasonable apprehension of a copyright suit against T&C. Since the only threat about a copyright claim allegedly made by P/Kaufmann is said to have occurred <u>more than five years ago</u>, on or about April 18, 2002 (Complaint, ¶ 17), Count I of the Complaint must be dismissed for lack of case or controversy (and the entire Complaint dismissed for lack of subject matter jurisdiction). The Complaint simply fails to describe conduct by P/Kaufmann that would make T&C reasonably apprehensive about a copyright infringement suit in 2007. To seek a declaratory judgment on the basis of such claimed facts is fatuous and a complete waste of the Court's time and resources.

The Complaint further confirms that even if it wanted to do so, P/Kaufmann could not bring a copyright claim against T&C as there is no enforceable copyright registration for Zephyr (Complaint, Exhibit C), and therefore no "real and reasonable apprehension of liability" for copyright infringement.[7] Without an effective copyright registration, P/Kaufmann is precluded from suing under the Copyright Act -- "[c]opyright registration is a jurisdictional prerequisite to an infringement suit." *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 37 (S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994). See also, 17 U.S.C. § 411(a); *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452, 455 (2d Cir. 1989) ("The elements of a copyright infringement action are (1) ownership of a valid copyright and (2) copying by the alleged infringer") (emphasis supplied). The declaratory judgment claim asserted by T&C is thus so "contingent and speculative [,at best,] that this Court must necessarily decline to exercise jurisdiction." *Mailer v. Zolotow*, 380 F.Supp. 894, 896, (S.D.N.Y. 1974).

Even should this Court find that an "actual controversy" exists with respect to the Zephyr (non)copyright, and determines that Count I can proceed, the Complaint must nonetheless be dismissed as the remaining claims are deficient. With respect to the fraud claim, Count II, T&C fails to plead a critical element of that claim with required particularity; a flaw that cannot be cured because T&C cannot, as a matter of law, assert facts to support the claim.

---

[7] As the complaint portrays, T&C sampled a P/Kaufmann fabric for a shower curtain and promptly created its own version to avoid purchasing the product from P/Kaufmann. When it was caught unfairly competing with Kaufmann, T&C promptly agreed to settle the matter and purchase the product through P/Kaufmann as confirmed in an e-mail dated April 19, 2002. The parties operated under the settlement for approximately five years. P/Kaufmann has a claim for breach (or anticipatory repudiation) of the agreement, but that claim is not related to the existence of a copyright, and could not be brought in a federal court.

11

**POINT III**

**COUNT II FOR FRAUD UNDER NEW YORK LAW SHOULD BE
DISMISSED FOR FAILURE TO PLEAD THE JUSTIFIABLE
<u>RELIANCE ELEMENT OF FRAUD WITH REQUIRED PARTICULARITY</u>**

There are five basic elements of a valid claim of fraud under New York law: (1) misrepresentations of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir. 1993). Under Rule 9(b) of the Federal Rules of Civil Procedure, there is a heightened pleading standard for fraud claims. That Rule mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). A plaintiff asserting a fraud claim must comply with the heightened pleading standard of Rule 9(b).

As "an essential element of a cause of action for fraud ... [justifiable] reliance must be pleaded with particularity' pursuant to Fed.R.Civ.P 9(b)." *Lutin v. New Jersey Steel Corp.,* 1996 WL 636037, at *7 (S.D.N.Y. November 1, 1996) ("the bare allegation, without supporting facts, that AMS and MBI relied on defendants' alleged misrepresentations and omissions does not suffice") (*citing Learning Works, Inc. v. The Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir. 1987)). See also, *Manning v. Utilities Mut. Ins. Co.,* 254 F.3d 387, 400-1 (2d Cir. 2001) (affirming District Court's dismissal of New York fraud claim for failure to plead reasonable reliance with sufficient particularity as required by Rule 9(b)). Whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject of a motion to dismiss. *See, Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032-3 (2d Cir. 1993); *Granite Partners, L.P. v. Bear, Stearns & Co.,* 58 F. Supp.2d 228, 259 (S.D.N.Y. 1999). T&C's allegation is nothing more than the "formulistic recitation" rejected in *Bell Atlantic v. Twombly, supra,* and against which Rule 9(b) seeks to guard. According to the Complaint:

12

> T&C justifiably relied upon Kaufmann's false representations and, as a result, entered into the License Agreement and has paid Kaufmann, as per the terms of the License Agreement, a twenty percent (20%) royalty in exchange for using its alleged copyright. (Complaint, ¶40)

The omission of detail to support justifiable reliance was no oversight, but rather an impossibility. In evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider the sophistication and expertise of the plaintiff, the relationship of the parties as well as plaintiff's access to the relevant information and opportunity to detect the claimed fraud. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d at1032 (2d Cir. 1993) (citations omitted). "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus., Inc. v. Rohr Indus.*, Inc., 748 F.2d, 729, 737 (2d Cir. 1984). As evidenced by the documents annexed to the Fischman Affidavit, at Exhibits 5 and 6, <u>T&C has thousands of copyright registrations, and even specialized intellectual property counsel to advise it on copyrights and related matters</u>. When it comes to copyrights, therefore, T&C most clearly is and must be treated as a "sophisticated" party and therefore held to the highest standard for pleading (and proving) the type of fraud alleged in the Complaint.

Similarly, "[w]here a party has means available to him for discovering, 'by the exercise of ordinary intelligence', the true nature of a transaction he is about to enter into, "he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *East End Owners Corp. v. Roc-East End Assoc.*, 128 A.D.2d 366, 370-71, 516 N.Y.S.2d 663, 665 (1st Dep't 1987) (*citing Schumaker v. Mather*, 133 N.Y. 590, 596, 30 N.E. 755, 757 (1892)); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 603 (1959) ("[If] the facts represented are not matters peculiarly within the party's

13

knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth…, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation."); *Rodas v. Manitaras*, 159 A.D.2d 341, 343, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)("a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament"); *Cohen v. Cerier,* 243 A.D.2d 670, 672, 663 N.Y.S.2d 643, 644 (2d Dep't 1997)("[a] claim of fraud will not lie if, <u>inter alia</u>, the misrepresentation allegedly relied upon was not a matter within the peculiar knowledge of the party against whom the fraud is asserted, and could have been discovered by the party allegedly defrauded through the exercise of due diligence"). The burden to exercise due care is particularly high when those allegedly relying on the representations are sophisticated businessmen. *Abrahami v. UPC Constr. Co., Inc.*, 224 A.D.2d 231, 234, 638 N.Y.S.2d 11, 14 (1st Dep't 1996).

T&C's Complaint is silent as to how it could justifiably rely on the claimed misrepresentation concerning a copyright in Zephyr. Given T&C's sophistication, its executives must have had some questions or doubts when confronted on April 18, 2002 with Mr. Kabart's purported claim that P/Kaufmann had a copyright in Zephyr and that T&C was infringing on it. Such issues could have and should have been quickly resolved for T&C either by questioning P/Kaufmann further, by searching publicly-available copyright registrations, or by asking advise from its retained intellectual property counsel. As a sophisticated party, T&C clearly had the knowledge and ready resources to recognize whether there was a copyright in Zephyr before facilly entering into the "License Agreement" to use it. Again, New York courts have repeatedly held, as a matter of law, that a plaintiff cannot establish reasonable reliance when that plaintiff is a "sophisticated plaintiff" who "fail[s] to make use of the means of verification that were

14

available to it." *Valassis Communications, Inc. v. Weimer*, 304 A.D.2d 448, 449, 758 N.Y.S.2d 311, 312 (1st Dep't 2003) (quoting *UST Private Equity Invs. Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 733 N.Y.S.2d 385, 386 (1st Dep't. 2001));  *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) ("When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those representations, but must make additional inquiry to determine their accuracy.")(emphasis supplied).

Other New York cases have similarly held that sophisticated plaintiffs who fail to exercise due diligence cannot later claim fraud for oral representations about which they knew or should have known, and failed to take steps to protect against.  See *Barrett v. Huff*, 6 A.D.3d 1164, 1167, 776 N.Y.S.2d 678, 681 (4th Dep't 2004) (no justifiable reliance, for purposes of fraud claim, when plaintiff fails to make use of means to discover true nature of transaction by exercise of ordinary intelligence); *Kay v. Pollak*, 305 A.D.2d 637, 638, 761 N.Y.S.2d 664, 665 (2d Dep't 2003) (no fraud claim when plaintiff could have discovered truth of alleged misrepresentation through due diligence), *Tanzman v. La Pietra*, 8, A.D.3d 706, 707, 778 N.Y.S.2d 199, 200 (3d Dep't 2004) (precluding fraud claim "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means"); *Fabozzi v. Coppa*, 5 A.D.3d 722, 724, 774 N.Y.S.2d 555, 557 (2d Dep't 2004) (precluding fraud claim where plaintiffs had means of discovering truth of alleged representations not within peculiar knowledge of defendants).

There can be no disputing here that T&C had the opportunity to discover facts about the claimed copyright in Zephyr (even assuming, as required for the purposes of this motion, that such a claim was ever asserted), and that it had the knowledge of how to go about confirming the registered status of Zephyr.  On such a record, even if Mr. Kabat did make the alleged

15

representation of the existence of a copyright, any claimed reliance by T&C on such a representation would be unreasonable and unjustifiable as a matter of law. The fraud claim must be dismissed.

## POINT IV

### PLAINTIFF'S CONTRACT AND QUASI-CONTRACT CLAIMS OF BREACH OF WARRANTY, UNJUST ENRICHMENT AND FAILURE OF CONSIDERATION SHOULD BE DISMISSED

Finally, Counts III, IV and V of the Complaint represent nothing more than an attempt to bootstrap upon the fatally flawed (non)copyright allegation and are, thus, themselves fatally flawed, both legally and factually. Count III claims that the alleged assertion of a copyright in Zephyr constituted a breach of warranty. Count IV claims that the absence of a copyright in Zephyr resulted in P/Kaufmann receiving the benefit of the License Agreement without T&C having received any consideration therefore. Count V asserts that the absence of a copyright in Zephyr resulted in P/Kaufmann having been unjustly enriched.

Firstly, the "warranty of title" referred to by T&C (Count III) relates to whether or not P/Kaufmann possessed true title to the product it sold to T&C. There is nothing in the Complaint about a claim by any third party that the shower curtains at issue infringed on its copyright(s), or that title to the product imported by P/Kaufmann from the overseas factory selected by T&C was in any way suspect. *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp 1347 (S.D.N.Y. 1987) (applying warranty of U.C.C. §2-312) Nor can a quasi-contract claim of unjust enrichment (Count V) be asserted here. The elements of such a claim under New York law are that: (1) the defendant was enriched; and (2) defendant's enrichment came at the expense of plaintiff; and (3) the circumstances are such that in equity and good conscience, defendant should make restitution. *Compudyne Corp. v. Shane*, 453 F.Supp.2d 807, 833 (S.D.N.Y.2006); *Chase Manhattan Bank (Nat'l Ass'n) v. Banque Intra*, S.A., 274 F.Supp. 496, 499 (S.D.N.Y. 1967).

16

The parties here operated for approximately five years under a contract by which T&C repeatedly purchased exactly what it ordered -- Parachute shower curtains from which it presumably made significant profit through resale to Bed Bath & Beyond. (Fischman Affidavit. Exhibits 3 and 4) Nothing in such transactions could compel P/Kaufmann to "make restitution" to T&C. The claim of failure of consideration (Count IV) is similarly belied by the numerous transactions reflected in the purchase orders and invoices attached to the Fischman Affidavit, which confirm the significant value of what T&C received from P/Kaufmann, having nothing to do with a Zephyr copyright. 22 N.Y.Jur.2d, Contracts, § 500 (partial failure of consideration is not sufficient to justify rescission).

The second difficulty that T&C must face is that each of the aforesaid Counts relates to an alleged impropriety with respect to Zephyr though it is clear from the Complaint (¶19), the purchase orders and the invoices that it was not Zephyr that was sold by P/Kaufmann to T&C but, as agreed, it was the Parachute fabric that was created at the agreed upon mill in Turkey, pursuant to the Agreement reached when P/Kaufmann discovered that T&C had improperly stolen P/Kaufmann's design. As such, whether or not anyone at P/Kaufmann ever stated that Zephyr was copyrighted is irrelevant to Counts III, IV and V since there is no claim that the parties at any time sold a Zephyr shower curtain under their Agreement.

## CONCLUSION

Neither the substance of the individual referenced Counts, nor the Complaint as a whole, can successfully bear the scrutiny of this Court. P/Kaufmann therefore respectfully requests that the Complaint in this matter be dismissed in its entirety.

Dated: New York, New York
      June 1, 2007

                       PHILLIPS NIZER LLP

                       By:    S/ Michael Fischman
                           Michael S. Fischman (MSF 7245)

                           666 Fifth Avenue
                           New York, NY 10103-0084
                           (212) 977-9700

                       Attorneys for Defendant *P/Kaufmann, Inc.*

18

**Unreported Decision**

704784.1

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
**(Cite as: Not Reported in F.Supp.)**

**H**

Matthew Bender & Co., Inc. v. West Publishing Co.
S.D.N.Y.,1996.

United States District Court, S.D. New York.
MATTHEW BENDER & COMPANY, INC.,
Plaintiffs,
andHyperlaw, Inc. Intervenor-Plaintiff,
v.
WEST PUBLISHING COMPANY, Defendant.
MATTHEW BENDER & COMPANY, INC.,
Plaintiffs,
v.
WEST PUBLISHING COMPANY, Defendant.
**Nos. 94 Civ. 0589 (JSM), 95 Civ. 4496 (JSM).**

May 2, 1996.

Morgan Chu, Irell & Manella, Los Angeles,
California, for Plaintiff Bender.
Paul J. Ruskin, Douglaston, New York, for Plaintiff
HyperLaw.
Jeffrey Kessler, Katherine Daniels, Weil, Gotshal &
Manges, New York City, for Defendant.

MEMORANDUM OPINION AND ORDER
MARTIN, District Judge:
*1 This order and opinion addresses two related cases
-- the "New York product action" (94 Civ. 0589), and
the "Texas product action" (95 Civ. 4496). Plaintiffs
in both cases publish legal materials in CD-ROM
("Compact Disc Read-Only-Memory") format, and
both seek declaratory judgments with respect to West
Publishing Company's ("West's") copyright in
various features contained in West state and federal
reporters.

Plaintiff Matthew Bender & Company ("Bender")
filed the New York product action seeking a
declaration that West does not possess a federal
statutory copyright in the page numbers of certain of
its reporters and that, therefore, Bender's use of those
numbers in its New York product will not infringe
any West copyright. HyperLaw, Inc. ("HyperLaw")
intervened as a plaintiff in the New York product
action, and seeks a declaration of non-infringement
with respect to the use of various West features in its
product. Bender is the only plaintiff in the Texas
product action.

West now moves to dismiss the three complaints in
these two actions under Federal Rule of Civil
Procedure 12(b)(1) for failure to state an actual case
or controversy as required by the Declaratory
Judgment Act, 28 U.S.C. § 2201, and Article III of
the United States Constitution.

*I. Justiciability Requirement for Declaratory
Judgment Actions*

Under the Declaratory Judgment Act, an action for
declaratory relief is proper only where there is "a
case of actual controversy" between interested
parties. 28 U.S.C. § 2201. The statutory requirement
that a "definite and concrete" dispute exist between
adverse parties, see Aetna Life Ins. Co. v. Hayworth,
300 U.S. 227, 240-41, 57 S.Ct. 461, 464 (1937), is
driven by the constitutional limitation on the exercise
of the federal judicial power to "cases or
controversies." U.S. Const. art III, § 2.

In the patent and copyright area, courts employ a
"pragmatic two-part test" to determine whether a
plaintiff seeking a declaratory judgment fulfills
statutory and constitutional justiciability
requirements. Under this test,
[t]here must be both (1) an explicit threat or other
action by the [copyright holder], which creates a
reasonable apprehension on the part of the
declaratory plaintiff that it will face an infringement
suit, and (2) present activity which could constitute
infringement or concrete steps taken with the intent
to conduct such activity.

BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d
975, 978 (Fed. Cir. 1993); see also Wembley v.
Superba Cravats, 315 F.2d 87, 90 (2d Cir. 1963). [FN1]
In making the determination of whether an actual
controversy exists, "[t] here is no simple rule that
addresses all shades of relationships between
disputants." BP Chemicals, 4 F.3d at 978. Rather, this
is a fact-specific inquiry that requires an examination
of all of the circumstances. Maryland Casualty Co. v.
Pacific Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512
(1941).

The burden is on the plaintiff to establish that
jurisdiction over the action for a declaratory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
(Cite as: Not Reported in F.Supp.)

judgment existed when the complaint was filed, and has continued to exist since that time. *Intern. Medical Prosthetics v. Gore Enterprise,* 787 F.2d 572, 575 (Fed. Cir. 1986). The showing that the plaintiff must make to satisfy this burden varies depending on the procedural posture of the case. Where the defendant challenges plaintiff's jurisdictional allegations with a Rule 12(b) motion, and where there has been discovery on the jurisdictional issue, the plaintiff must support its prima facie case for jurisdiction with "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150 (1990). Normally, when the defendant contests plaintiff's factual allegations, a hearing is required to resolve the jurisdictional dispute. *Id.* at 197 n.3; *see also BP Chemicals Ltd v. Union Carbide Corp.,* 757 F.Supp. 303, 305 (S.D.N.Y. 1991), *aff'd,* 4 F.3d 975, 978 (Fed. Cir. 1993). At that hearing, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. *Ball* at 197.

*2 Bender, HyperLaw and West have conducted extensive discovery on the jurisdictional issues in the New York product action. No evidentiary hearing is necessary on West's motion to dismiss Bender's complaint in the New York action. This is because, although West contests certain of Bender's jurisdictional allegations, the contested facts are not essential to Bender's case for jurisdiction. For the reasons set forth in more detail below, Bender has proven jurisdiction by a preponderance of the evidence based upon undisputed facts. An evidentiary hearing is necessary on West's motion to dismiss HyperLaw's complaint in the New York action, because facts essential to HyperLaw's jurisdictional allegations are in dispute.

Although there has not yet been discovery in the Texas product action, both Bender and West have submitted and rely on the extensive discovery materials from the New York product action in their arguments with respect to the "reasonable apprehension" prong. Again, because Bender has shown jurisdiction by a preponderance of the evidence based on undisputed facts, no hearing is necessary on this prong of the justiciability test. Finally, although discovery from the New York product action is not relevant on the "intent and ability" prong in the Texas product action, West has withdrawn its argument with respect to that prong of the case and therefore -- for the reasons set forth in

more detail below -- an evidentiary hearing at this time is unnecessary on this issue.

### A. The "Reasonable Apprehension" Prong

This prong of the justiciability inquiry is satisfied by a showing of either direct threats or "[i]ndirect threats or actions that place the declaratory plaintiff in reasonable apprehension of suit." *BP Chemicals,* 4 F.3d at 979. In the absence of express threats, the "totality of circumstances" surrounding defendant's conduct will determine if the plaintiff had reasonable apprehension of suit. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 737 (Fed. Cir. 1988). Courts should take "business realities" into account when making this "pragmatic judgment." *Sherwood Medical Industries, Inc. v. Deknatal, Inc.,* 512 F.2d 724, 728 (8th Cir. 1975).

The parties do not disagree about the legal standard for this prong of the justiciability inquiry. Rather, they differ over the reasonableness of the plaintiffs' alleged apprehension of suit.

### B. The "Intent and Ability to Produce" Prong

The parties disagree over the standard that the Court should apply in determining whether plaintiffs fulfill this prong of the two-part justiciability test. Defendant cites the 1963 case of *Wembley v. Superba Cravats,* 315 F.2d 87 (2d Cir. 1963), where the Second Circuit stated that a plaintiff must show that he is "either engaged in manufacturing, using or selling the invention, or that he has the *immediate intention and ability* to do so." *Id.* at 89 (emphasis added). Plaintiffs point to more recent cases from the Federal Circuit, which hold that a plaintiff "must be engaged in an actual making, selling, or using activity subject to an infringement charge, or must have *made meaningful preparation* for such activity." *Arrowhead Indus. Water,* 846 F.2d at 736 (emphasis added); *see also Serco Servs. Co., L.P. v. Kelley Co.,* 51 F.3d 1037, 1038 (Fed. Cir. 1995). Recent cases in this Court have also focused on whether the plaintiff "made meaningful preparation" for activity subject to an infringement charge, *see, e.g., Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,* 1996 WL 71492 (S.D.N.Y. February 20, 1996); *BP Chemicals Ltd. v. Union Carbide Corp.,* 757 F.Supp. 303, 304 (S.D.N.Y. 1991), *aff'd,* 4 F.3d 975 (Fed. Cir. 1993), or simply on whether the plaintiff "has prepared" to produce a potentially infringing product. *See, e.g.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
**(Cite as: Not Reported in F.Supp.)**

*Nintendo of America v. Magnavox Co.,* 659 F.Supp. 894, 895 (S.D.N.Y. 1987); *Nynex Corp. v. Reuben H. Donnelley Corp.,* 688 F.Supp. 128, 130 (S.D.N.Y. 1988).

**\*3** In *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207 (7th Cir. 1980), the Seventh Circuit offered yet another articulation of the test, finding that the infringement prong would be fulfilled where the plaintiff had "engaged in preparations for production such that 'but for a finding that the product infringes ... the plaintiff would and could begin production immediately.'" *Id.* at 1210-1211 (quoting *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.,* 439 F.2d 871, 875 (1st Cir. 1971)).

Although the wording of these tests differs somewhat, they share the basic purpose of ensuring that the plaintiff truly intends and is able to undertake a potentially infringing activity, while acknowledging that "it would be economically wasteful to require a plaintiff to embark on an actual program of manufacture, use or sale which may turn out to be illegal." *Wembley,* 315 F.2d at 90. Furthermore, "[w]hether a declaratory plaintiff's ability and definite intention to undertake a potentially infringing activity constitutes sufficient 'preparation' is a question of degree to be resolved on a case-by-case basis." *Arrowhead Indus. Water,* 846 F.2d at 736; *see also Wembley,* 315 F.2d at 90 ("ability or potential varies from product to product and industry to industry"); *Re-Alco v. National Center for Health Education,* 812 F.Supp. 387, 395 (S.D.N.Y. 1993) ("Intention and ability must be decided on a case by case basis"). In sum, where the plaintiff has not yet manufactured the product but instead is preparing to do so, the court must consider the particular facts and circumstances of the case to determine whether plaintiff has evinced an intent to actually produce the product and the ability to do so.

### II. West's Three Motions to Dismiss

Because the justiciability inquiry is fact-specific, it is necessary to examine each of the three motions to dismiss -- against Bender and HyperLaw in the New York case, and Bender in the Texas case -- separately. Both plaintiffs in both actions have alleged in their complaints that they have produced or intend to produce their respective products, and that they reasonably believed that West would initiate suit over those products should they include the various West features at issue in these actions. Plaintiffs and

defendant have submitted affidavits and other materials relevant to this motion, and the Court will consider this evidence outside of the pleadings in resolving this jurisdictional dispute. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986).

### A. Bender's New York Product

Bender filed the New York product action in connection with its "Search Master New York Practice Library With Cases" CD-ROM (the "New York product"), which contains published and unpublished decisions of the Second Circuit Court of Appeals and the four United States district courts within the state of New York for the last five years. A forthcoming second version of the New York product will also contain published and unpublished decisions of the New York Court of Appeals, New York Appellate Division, New York Supreme Court, and other lower New York courts for the last five years. Future releases of the product will include opinions from earlier years. The published opinions in the New York product contain the volume and pagination of the opinions as they appear in West's federal and New York reporters.[FN]

**\*4** Alleging that West has threatened to initiate suit against it if it includes star pagination to West's reporters in its CD-ROM publications, Bender filed this declaratory judgment action. Bender seeks a declaration that West does not possess a federal statutory copyright in the page numbers of its federal and New York reporters and that, therefore, Bender's star pagination to those reporters will not infringe any West copyright.

In its motion to dismiss, West argues that Bender has not fulfilled either prong of the two-part justiciability test. Furthermore, West claims that Bender's request for a declaration with respect to West's federal reporters is moot because West has represented that it will never sue Bender over the first version of the New York product, which contained only federal court opinions.

### 1. Intent and Ability to Produce

By detailing its substantial and meaningful preparations, Bender has met its burden of showing that it had both the intention and ability to produce the New York product.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
**(Cite as: Not Reported in F.Supp.)**

Page 4

In the affidavits submitted in opposition to West's motion to dismiss, Bender shows that it took the following actions in preparation for production of the New York product prior to filing a complaint in this action in February 1994:
- retained a management consultant to study the feasibility of the New York product in August 1993;
- put out a September 1993 request for proposals, seeking bids from vendors for a test product;
- decided to go forward with the New York product and to include star pagination to internal page numbers of West's federal reporters by early November 1993;
- retained Beta Business Products in November 1993 to perform work necessary for the test product, and commenced production;
- collected thousands of opinions for the New York product and arranged for the collection of other cases.

In addition, Gary Goldstein, Bender's Vice President for Marketing, Sales, and Product Planning, represented in a declaration that at the time Bender filed the complaint, it anticipated an April 1, 1994 completion of the New York product. This date was ultimately delayed due to settlement discussions between Bender and West, and because of unexpected technical problems.

In its First Supplemental Complaint, filed in June 1995, Bender asserted that it "has completed production of ... the 'New York product,'" and that this product included the volume number and pagination of opinions as they appear in West's federal reporters. Therefore, even though the Court finds that Bender has shown an intention to produce the New York product prior to filing the original complaint, the First Supplemental Complaint certainly cured any jurisdictional defects that West believes to have existed when the complaint in this action was filed. *See Basic Books, Inc. v. Kinko's Graphics Corp., 758 F.Supp. 1522, 1541 (S.D.N.Y. 1991).* Furthermore, even though Bender had not completed the New York product prior to filing the original complaint, "subsequent events can reinforce the correctness of the [justiciability] conclusion." *BP Chemicals, 4 F.3d at 980.* This is because later events -- here, completion of the allegedly infringing product -- are relevant to plaintiff's intent at the time it filed suit. *See Heerema Marine Contractors v. Santa Fe Intern., 582 F.Supp. 445, 451 n.6 (C.D. Ca. 1984).*

*5 Bender has fulfilled its burden of showing a

preponderance of the evidence that it had the intention and ability to produce the New York product at the time it filed the complaint, and Bender has now in fact completed that product.

2. Reasonable Apprehension of Suit

The issue here is whether -- given the product, the industry and other relevant facts and circumstances -- West's conduct created a reasonable apprehension of an infringement suit in Bender. This test is an objective one. *See Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 883 (Fed. Cir. 1985), cert. denied, 479 U.S. 820, 107 S.Ct. 84 (1986).*

In support of their claims that they had a reasonable apprehension of being sued by West when they filed these actions, both plaintiffs in the New York and Texas product actions point to West's litigation against other publishers in connection with star pagination and other West features. Plaintiffs cite *West Publishing Co. v. Mead Data Central, Inc., 799 F.2d 1219 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987),* in which West was granted a preliminary injunction based on its infringement claim against Mead Data Central for its use of star pagination to West reporters. Plaintiffs also point to six cases filed between 1988 and 1993 in which West claimed a copyright violation in connection with the use of star pagination as well as other West reporter features, and to deposition testimony by various West employees in which they state that they do not know of any companies that have used West's star pagination that West has not sued.

Although it is true, as West argues, that a party's "record in past suits does not by itself show that it has charged infringement ... in this suit," *Premo Pharm. Labs v. Pfizer Pharm., Inc., 465 F.Supp. 1281, 1283-84 (S.D.N.Y. 1979),* the party's "willingness and capacity to enforce its [copyright] rights is pertinent to the inquiry for an actual controversy." *West Interactive Corp. v. First Data Resources, 972 F.2d 1295, 1298 (Fed. Cir. 1992).* Furthermore, "in determining whether a charge [of infringement] could be reasonably inferred the court must look at the *entire course of action* and *all* of the defendant's relevant conduct." *Sherwood Medical Industries, 512 F.2d at 728.* For example, in *Super Products Corp. v. D P Way Corp., 546 F.2d 748 (7th Cir. 1976),* the Seventh Circuit found a reasonable apprehension on the part of the plaintiff in the absence of a direct accusation of infringement "because of the similarity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 5
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
(Cite as: Not Reported in F.Supp.)

of [plaintiff's] own product to the defendant's patented product and because of the defendant's expressed determination to defend its rights." *Id.* at 754. Here, West's history of litigation against other legal publishers and its claims of a copyright in star pagination to its reporters, although not dispositive, is certainly relevant to the plaintiffs' apprehension of suit.

Bender also claims that West explicitly threatened to sue it for its use of star pagination on two occasions. The first alleged threat occurred at a lunch meeting at the annual Association of American Law Libraries meeting in Boston in July 1993. Present at that meeting were Gary Goldstein, a Bender vice president responsible for CD-ROM publications, Alex Sann, Bender's president, Gerald Peterson, West's manager for CD-ROM publishing, and James Schatz, outside legal counsel for West. Peterson testified in his deposition that this meeting was the first time that counsel for West had participated in a meeting between Peterson and Bender, and that Schatz "may have" expressed West's claims to general proprietary rights in various West features during that meeting. Also during the meeting, West proposed licensing and other arrangements with Bender that would allow Bender to avoid a "dispute" or a "public dispute" with West. When Sann responded that such a dispute could turn into the "mother of all lawsuits," Schatz stated that his firm "always wins all of its lawsuits." [FN3]

*6 The second alleged threat came during a phone conversation between Goldstein and Peterson in December 1993. Goldstein summarized that conversation in a memorandum dated December 20, 1993, which he wrote based on his handwritten notes that he later destroyed. In the memo, Goldstein states that after he rejected the various West proposals discussed at the Boston meeting, Peterson asserted that West would sue to protect its copyright in star pagination if Bender built databases containing judicial opinions on its own. Peterson, in his affidavit and deposition, offers a different version of events. He states that, as best he can remember, star pagination never came up in the phone conversation and that litigation by West came up only when Goldstein raised the issue. [FN4]

Although the parties disagree about the exact content of the Boston conversation and about the basic exchange of the Goldstein/Peterson phone conversation, under either party's version of events, Bender would have been objectively reasonable in its belief that West might file suit should Bender use features that West considered proprietary. The facts supporting Bender's reasonable apprehension of suit include the presence of West's counsel at the Boston lunch, his assertion of West's general proprietary rights in various West features, his comment that his firm wins all of its lawsuits, and West's offer to negotiate a license so as to avoid a dispute with Bender. These facts, in the context of West's litigation against other legal publishers with respect to star pagination and other West features, is sufficient evidence in support of Bender's jurisdictional allegations.

### 3. Mootness

As noted above, Bender's First Supplemental Complaint alleged completion of the New York product. Shortly after Bender filed the First Supplemental Complaint, and after West had the opportunity to review the first version of Bender's New York product, West represented for the first time that it had no intention of suing Bender over the current New York product "or any future version of that product produced in the same manner." West's Reply Memo. in Supp. of Def's Mot. to Dismiss Pl.'s Compl. at 2. West then argued that its offer to stipulate to the above mooted Bender's request for a declaratory judgment. However, in a Memorandum Opinion and Order dated November 22, 1995, this Court granted Bender permission to file a Second Supplemental Complaint, in which Bender alleges that it "is currently completing production of the second release of the New York product." Second Suppl. Complt. ¶ 16. The second version, as described above, will contain cases from all levels of New York state courts for the last five years in addition to the federal cases included in the first version. The published state cases, like the federal cases in the first version, will include star pagination to West's New York reporters.

West has not represented that it will not sue Bender over the second version of the New York product. Instead, West now argues that the portion of Bender's Second Supplemental Complaint requesting a declaratory judgment with respect to West's alleged copyright in star pagination to its federal reporters is moot, while Bender's similar request with respect to West's state reporters fails to state a case or controversy and should therefore be dismissed for lack of subject matter jurisdiction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
**(Cite as: Not Reported in F.Supp.)**

*7 In support of the latter argument, West claims that Bender cannot have a reasonable apprehension of suit over the second version of the New York product because the threats that Bender alleges predate West's knowledge of the second product by more than eighteen months. As noted above, the "reasonable apprehension" inquiry is fact-specific, and the Court must examine the defendant's conduct as a whole to determine whether the plaintiff's apprehension is a reasonable response. West need not have made explicit threats to sue Bender over the second version of the New York product for Bender to have such apprehension. Bender's apprehension arises in connection with its star pagination to West reporters, and is not specific to federal or state reporters. Instead, Bender's general belief that West might sue it for using star pagination in its CD-ROM products is reasonable with respect to both the first and second versions of the New York product.

West also claims that the second version of the New York product is not "sufficiently close to commercial production" to fulfill the "intent and ability to produce" prong of the justiciability test. However, the test requires that plaintiff be "either engaged in *manufacturing, using or selling the invention.*" *Wembley,* 315 F.2d at 90 (emphasis added). Commercial distribution is not required. Bender has manufactured the first version of the New York product, and alleged in the Second Supplemental Complaint that it was "currently completing production" of the second version. Under the caselaw, this is sufficient. Therefore, the Court finds that there is an actual controversy with respect to the Second Supplemental Complaint.

Finally, the Court denies West's request to declare the federal reporter portion of the case moot. West's statement that it will not sue Bender over publication of the first version of the New York product was specific to that version of the product and does not serve to moot this case, or any portion thereof, as it now stands.

An actual controversy exists with respect to Bender's New York product, and West's motion to dismiss is therefore denied.[FN5]

### B. *Bender's Texas Product*

In the Texas product action, Bender -- the sole plaintiff -- seeks a declaration with respect to its CD-ROM entitled "Search Master Texas Practice Library" (the "Texas product"). The Texas product is a compendium of Bender publications related to practice in the Texas courts, which Bender is preparing to enhance by adding published decisions of the Texas courts for the past 40 years so that users can move from a citation in a Bender treatise to the actual judicial opinion. The opinions in the Texas product will contain star pagination to the Texas court opinions in West's *South Western Reporter.*

Many of the opinions that Bender collected for the planned enhancement of the Texas product were purchased in database form from Curtis Hill Publishing. West has contended that the Curtis Hill database includes certain textual additions copied from West's *South Western Reporter,* including parallel citations, case titles, docket number, judge and attorney names, and rehearing information (the "West textual additions").

*8 In its complaint, Bender alleges that West has threatened to sue it if it includes star pagination to West reporters in Bender products, and that West has also threatened suit over use of the West textual additions contained in the Curtis Hill database. Bender thus seeks a declaration that its use of these features in the enhanced Texas product does not infringe any West copyright.

### 1. Intent and Ability to Produce

At the time that it filed the complaint in the Texas product action in June 1995, Bender had published the Texas product for four years, and was preparing to publish the enhanced version with the West features. In its complaint, Bender alleged that it had collected all of the relevant judicial opinions, converted most of them to electronic form, and planned to add the volume number and pagination of the Texas court opinions as they appear in West's *South Western Reporter.* Bender purchased many of the opinions designated for use in the enhanced Texas product from Curtis Hill Publishing, and these opinions contained the West textual additions described above.

In opposition to West's motion to dismiss, Bender also offers the following evidence through submission of declarations and other documentary evidence:
- By early April 1995, Bender began to insert star pagination to West's *South Western Reporter* into the enhanced Texas product, and has now added such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 8
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
(Cite as: Not Reported in F.Supp.)

HyperLaw, the intervenor-plaintiff in the New York product action, has published two CD-ROM products. HyperLaw first published *Supreme Court on Disc*, which contained recent opinions of the United States Supreme Court, in February 1992. HyperLaw released an updated version of *Supreme Court on Disc* in February 1993. Neither version included any reference to any West publications. In July 1993, HyperLaw began publishing *Federal Appeals on Disc*, which contained recent opinions of the United States Courts of Appeals with no reference to West publications. Beginning with the September or December 1993 update of *Federal Appeals on Disc*, HyperLaw included a separate table which provided a cross-reference to the initial page and volume citation for West's *Federal Reporter*. The most recent version of *Federal Appeals on Disc* was released in October 1994, and offers both Supreme Court and Court of Appeals decisions as well as the United States Code.[FN8] This version includes the cross-reference table and -- for some of the opinions -- reference to the first page citation of West's *Federal Reporter* at the beginning of the opinion as it appears in the HyperLaw product. The HyperLaw product includes no other reference to West publications.

**\*10** In its complaint, HyperLaw states that it "desires" to add further West information into its product, including the text of opinions not provided to HyperLaw by the courts, corrections and amendments that appear only in West reporters, and names of counsel ("West factual information"), and star pagination to West's *Federal Reporter* and *Supreme Court Reporter*. HyperLaw also alleges in its complaint that, in response to HyporLaw's request that West clarify its copyright assertions with respect to various West features, West warned HyperLaw that there would be legal consequences if HyperLaw used such features in its product. HyperLaw intervened in this action to seek a declaration that West's factual information, first page citation, and internal reporter pagination are not subject to copyright protection and that, therefore, HyperLaw's use of these West features will not infringe any West copyright.

### 1. Intent and Ability to Produce

As noted above, to meet justiciability requirements HyperLaw must show that it has taken "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chemicals*, 4 F.3d at 978. Here, the product at issue is a version of the HyperLaw product, *Federal Appeals on Disc*, which would include West factual information as well as first page citation and star pagination to West reporters. HyperLaw concedes that it has not yet produced a product with all of these features. The question is thus whether, through concrete steps in meaningful preparation for production, HyperLaw has evinced an intent and ability to produce a product with the West features at issue. As the court noted in *Arrowhead Indus. Water*, "[w]hether a declaratory plaintiff's ability and definite intention to undertake a potentially infringing activity constitutes sufficient 'preparation' is a question of degree to be resolved on a case-by-case basis." 846 F.2d at 736.

HyperLaw president Alan G. Sugarman testified at various points in his deposition, and HyperLaw represents in its briefs, that HyperLaw will not actually add the West features at issue in this action unless and until this Court grants it declaratory relief. Noting that justiciability standards in declaratory actions do not require actual manufacture of the allegedly infringing product, HyperLaw argues that it has taken every preparatory step possible short of actual infringement. This is because, HyperLaw claims, the methodology that HyperLaw already uses for its product allows it to add text to existing opinions without preparation, and to complete such additions rapidly. In other words, HyperLaw argues that it can use existing methods to add quickly any West information that this Court finds to be unprotected by copyright, and that there are no further steps that HyperLaw could take to prepare for such additions.

West contests these factual allegations, arguing that insertion of the various West features involves substantially more preparation and time than HyperLaw claims. Given this factual dispute, and given the unique nature of CD-ROM production, an evidentiary hearing is necessary for the Court to determine whether HyperLaw has shown the requisite intent and ability to incorporate the various West features in its product.[FN9] At this hearing, HyperLaw will bear the burden of proving jurisdiction by a preponderance of the evidence. *Ball v. Metallurgie Hoboken-Overpelt*, 902 F.2d at 197.

### 2. Reasonable Apprehension of Suit

**\*11** In addition to West's conduct with respect to other publishers -- which as explained above is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 9
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
(Cite as: Not Reported in F.Supp.)

relevant but not dispositive on this prong of the justiciability test -- HyperLaw describes a series of contacts between HyperLaw and West in support of its claim that it reasonably feared suit by West. HyperLaw claims that West threatened litigation during the exchanges, which HyperLaw initiated to request clarification from West over West's alleged claims of copyright in various West features. West characterizes these same exchanges as repeated attempts by HyperLaw to manufacture a threat of suit to enable it to file this declaratory judgment action.

Unlike the allegations of reasonable apprehension in connection with the Bender product, the Court cannot determine whether HyperLaw reasonably apprehended suit by West over its product from the current record. Therefore, an evidentiary hearing is necessary to resolve the factual disputes with respect to this prong of the justiciability inquiry.

### Conclusion

Defendant's motions to dismiss plaintiff Bender's complaints in the New York and Texas product actions are denied. The Court will hold an evidentiary hearing on West's motion to dismiss intervenor-plaintiff HyperLaw's complaint in the New York product action.

SO ORDERED.

> FN1. Although *BP Chemicals,* like much of the caselaw in this area, is a patent case, "[t]he same principles that control patent cases are applicable ... if a declaratory judgment is sought about a copyright." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A *Federal Practice and Procedure* § 2761 (1983); *see also Sony Corp. v. Universal City Studios,* 104 S.Ct. 774, 787 (1984) (noting the "historic kinship between patent law and copyright law" in using patent standards for vicarious liability in copyright case); *Re-Alco v. National Center for Health Education,* 812 F.Supp. 387, 395 (S.D.N.Y. 1993) (applying patent standards articulated in *Wembley v. Superba Cravats,* 315 F.2d 87 (2d Cir. 1963) to copyright case).

> FN2. In the legal publishing industry, the practice of inserting the page number of one

publication into the text of another publication for cross-reference purposes is known as "star paging." In this opinion, "star pagination" is used to refer to plaintiffs' inclusion in their respective publications of the pagination of opinions as they appear in West's reporters.

> FN3. West argues that Schatz made this last comment as an offhand remark with the simple intention of changing the topic of conversation. Bender argues that it believed the comment was a direct threat of litigation. However, the parties' subjective characterization of the facts does not control. The "reasonable apprehension" test is objective, and the issue is whether a reasonable person in Bender's position would have viewed Schatz's comment, given the other relevant facts and circumstances, as threatening.

> FN4. In its motion to dismiss, West argues that because the above conversations did not focus on the New York product (and because West did not even have knowledge of the New York product when the conversations took place), these exchanges cannot support Bender's alleged fear of being sued. West thus asserts that "without knowing of the specific nature of the product Bender intended to publish, West could not have threatened any suit." Mem. in Support of Mot. to Dismiss. at 28. However, West need not have threatened litigation with respect to a specific product in order for Bender to have a reasonable apprehension of suit. As stated above, Bender need not even allege explicit threats of litigation.

> FN5. As noted above in section I, an evidentiary hearing at which Bender would have to prove jurisdiction by a preponderance of the evidence is unnecessary. This is because Bender has met that burden on the extensive materials now before the Court, by showing both intent and ability to produce, and reasonable apprehension of suit -- even on the facts as alleged by West.

> FN6. In its motion to dismiss, West sought sanctions against Bender pursuant to Rule

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                     Page 10
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media
L. Rep. 1972
(Cite as: Not Reported in F.Supp.)

11 of the Federal Rules of Civil Procedure for falsely alleging that this case met justiciability requirements and for allegedly filing this action in order to gain leverage in ongoing business negotiations between Bender and West. In a separate opposition brief to the Rule 11 motion, Bender pointed out that the motion must fail because West had failed to fulfill the Rule's procedural requirements. Bender then went on to address the merits of the Rule 11 motion. In reply, West withdrew its Rule 11 motion, acknowledging that it had failed to comply with procedural requirements. Bender has now requested that the Court award it full fees and costs incurred in defending against the Rule 11 motion.

However, the bulk of Bender's opposition to West's Rule 11 motion addressed the merits of West's argument. Only a few pages were devoted to the procedural issue that led to West withdrawing its motion. Furthermore, as West points out, Bender filed its opposition papers without informing West about the procedural inadequacies, which would have given West the opportunity to withdraw its motion before Bender incurred significant costs. Therefore, Bender's request for fees and costs is denied.

FN7. West also relies on discovery from the New York product action, arguing that the "extensive discovery" in that case demonstrates that Bender cannot fulfill the "reasonable apprehension" requirement in this action.

FN8. An evidentiary hearing on this issue is unnecessary, as the Court has reached this determination after examining extensive documents from discovery in the New York action, which both parties agree are relevant to the "reasonable apprehension" prong in this action. Furthermore, this finding is based on the facts as alleged by West or on undisputed facts.

FN9. Because *Federal Appeals on Disc* now contains both Supreme Court and Court of Appeals opinions, HyperLaw has not updated its *Supreme Court on Disc* product. This opinion will therefore refer to *Federal Appeals on Disc* as "the HyperLaw product."

FN10. HyperLaw's argument for intent and ability, which is based on methodology, differs substantially from Bender's argument, which was based on evidence that Bender had, among other things, studied the feasibility of the planned product, hired a company to produce a test version, and thereafter produced the product at issue.

S.D.N.Y.,1996.
Matthew Bender & Co., Inc. v. West Publishing Co.
Not Reported in F.Supp., 1996 WL 223917 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,505, 39 U.S.P.Q.2d 1079, 24 Media L. Rep. 1972

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
**(Cite as: Not Reported in F.Supp.)**

C
Lutin v. New Jersey Steel Corp.
S.D.N.Y.,1996.

United States District Court, S.D. New York.
Gary LUTIN, Plaintiff,
v.
NEW JERSEY STEEL CORPORATION, Von Roll
Ltd. a/k/a Von Roll A.G., and Unknown Parties 1-10,
Defendants.
Gary LUTIN, Plaintiff,
v.
NEW JERSEY STEEL CORPORATION, Von Roll
Ltd. a/k/a Von Roll A.G., Walter H. Beebe, Heinz
Frech, H. Georg Hahnloser, Harvey L. Karp, Robert
J. Pasquarelli, Thomas W. Jackson, Paul Roik, and
Unknown Parties 1-10, Defendants.
**Nos. 93 CIV. 6612 (AGS), 95 CIV. 4965 (AGS).**

Nov. 1, 1996.

*OPINION and ORDER*
SCHWARTZ, District Judge:
**\*1** Plaintiff in these actions Gary Lutin, currently
proceeding *pro se*, asserts claims against defendants
for tortious conspiracy, tortious interference with
contracts and prospective business relations, fraud,
and violation of the Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*
("RICO"). These matters are before the Court upon
four pending motions. Defendants in *Lutin v. New
Jersey Steel Corp., et al.*, 93 Civ. 6612(AGS)
(hereinafter "Lutin I") move to dismiss the Complaint
or for summary judgment; plaintiff moves to amend
the Complaint. In *Lutin v. New Jersey Steel Corp.,
et al.*, 95 Civ. 4965(AGS) (hereinafter "Lutin II"),
defendants move to dismiss the Complaint or for
summary judgment; plaintiff cross moves for partial
summary judgment seeking a determination that
various entities, including AMS and Excel, were
"entities" as that term is defined under RICO. For
the reasons that follow, defendants' motion to dismiss
the Complaint in Lutin I is granted to the extent set
forth below, plaintiff's motion to amend the
Complaint is denied, defendants' motion to dismiss
the Complaint in Lutin II is granted, and plaintiff's
cross motion for partial summary judgment is denied.

*BACKGROUND*

Procedural History

The following facts are undisputed or otherwise
reflected in the record.

Lutin held a majority of the common stock of
Advanced Mining Systems, Inc. ("AMS") indirectly
through other corporations and partnerships. In
1991, AMS and its subsidiary Mountaineer Bolt, Inc.
("MBI") commenced the action herein referred to as
Lutin I, which was originally brought in the Circuit
Court of Brooke County, West Virginia against
Bruce A. Cassidy, Frederick R. Munson and Excel
Mining Systems, Inc. ("Excel"), a company
organized by Munson and Cassidy (collectively, the
"Excel Defendants"), asserting claims for breach of
fiduciary duty, fraud, negligent misrepresentation and
conversion. The original complaint in Lutin I
alleged that defendants Cassidy and Munson, former
employees of AMS, breached their fiduciary duties
by setting up defendant Excel as a competitor of
AMS and driving AMS out of business.

In 1992, AMS and MBI moved to amend the
Complaint in Lutin I to add New Jersey Steel
Corporation ("NJSC") and Von Roll Ltd. ("Von
Roll") as defendants, alleging that NJSC and Von
Roll were co-conspirators with the Excel Defendants.
On May 14, 1992, Judge Tsapis of the Brooke
County court granted plaintiffs' motion to amend the
Complaint from the bench, with a written order to
follow as submitted and approved by counsel for both
parties. On July 16, 1992, two days after defendants
belatedly mailed the approved written order to the
court for Judge Tsapis' signature and six days before
the written order was entered by the court, defendants
removed the action to the Northern District of West
Virginia, pursuant to 28 U.S.C. § 1452 and Federal
Rule of Bankruptcy Procedure 9027. The previous
month, AMS and MBI had filed for bankruptcy under
Chapter 11 of the United States Bankruptcy Code in
the United States Bankruptcy Court for the Southern
District of New York.

**\*2** After being served with the Amended Complaint,
NJSC and Von Roll moved to dismiss it on several
grounds, including that they were never properly
added as defendants since the action was removed to
federal court before Judge Tsapis' written order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

granting the motion to amend the Complaint was entered on the docket. Before the motion was decided in the Northern District of West Virginia, the action was transferred to the Southern District of New York.

In 1992, the Excel defendants commenced a separate civil action in the Court of Common Pleas in Harrison County, Ohio against AMS, Lutin, and Standard Industrial Systems, Inc., a company allegedly controlled by Lutin, entitled *Excel Mining Systems, Inc., et al. v. Advanced Mining Systems, Inc., et al.*, 91-166-18023. AMS, MBI and Lutin were represented by the law firm Rogers & Wells in that action, in Lutin I and in the bankruptcy proceeding.

In September 1993, a Settlement Agreement was reached and approved by the Bankruptcy Court between AMS, Lutin and certain non-debtor affiliates, in which AMS agreed to assign Lutin I to Lutin. The Assignment of Litigation assigns to Lutin all of AMS' right, title and interest in Lutin I. On March 30, 1994, a Stipulation and Order was entered in Lutin I dismissing with prejudice any and all claims against Cassidy, Munson and Excel.[FN1] Thereafter, AMS and MBI moved to substitute Lutin as plaintiff in the action, and Rogers & Wells moved to withdraw as counsel for MBI and AMS. Both motions were granted by the Court in an Order dated February 27, 1995. The Court directed that Lutin retain new counsel within 45 days, and warned that if Lutin did not retain counsel within the time allotted, the Court would entertain a motion to dismiss the action for failure to prosecute. On April 11, 1995, Lutin filed a Notice of Appearance in the action *pro se*.

FN1. The Stipulation was signed by counsel for defendants and AMS, as well as by Lutin on behalf of himself.

In June 1995, Lutin moved to amend the Complaint a second time in Lutin I, in order to add certain individually named defendants and assert claims under RICO. Concerned about "possible statute of limitations issues," [FN2] Lutin then filed a new action, herein referred to as Lutin II, which is comprised of allegations virtually identical to those Lutin wishes to add by means of the proposed Second Amended Complaint in Lutin I.

FN2. Plaintiff's Memorandum in Support of

Request for Leave to Amend Complaint, ¶ 3. Not being an attorney, Lutin was apparently unaware of Federal Rule of Civil Procedure 15(c) concerning the relation back of amendments.

Plaintiff's Allegations

The original Lutin I Complaint against the Excel Defendants alleges that while defendants Cassidy and Munson were still directors and officers of MBI and/or AMS, they began "[t]he planning and preparation for the organization and operation of [Excel]." Compl. ¶ 7. In so doing, Cassidy and Munson allegedly committed acts for the purpose of sabotaging AMS, including the following: falsely representing to the boards of directors of AMS and MBI that it was in the companies' best interests to shut down MBI's plant, suspending critical equipment expenditures at AMS, creating false or misleading financial records, transferring AMS and MBI's assets for personal benefit and the benefit of Excel, establishing a business that would compete directly with AMS and MBI, and converting corporate property of AMS and MBI to Excel and/or themselves. As noted above, the Complaint asserts claims for breach of fiduciary duty, fraud, negligent misrepresentation and conversion.

*3 The Amended Complaint in Lutin I added as defendants NJSC, Von Roll and Unknown Parties 1-10. The Amended Complaint alleges that the Swiss company Von Roll, as the 61% owner of NJSC (a publicly traded company), controls NJSC to such an extent that NJSC is the alter ego of Von Roll. It is alleged that NJSC, acting under the direction of Von Roll, entered into "contracts, agreements and tortious conspiracies" with the Excel Defendants to "cause, procure, and promote" the alleged breaches of fiduciary duty committed by Cassidy and Munson, in order to "wrongfully usurp and appropriate the business of [MBI] and interfere with the business and prospective business relationships of plaintiffs" with customers, suppliers and third parties. First Amendment to Complaint ¶ ¶ 59, 64. It is further alleged that NJSC and Von Roll failed to disclose to plaintiffs or the public that NJSC formed, owns and controls Excel. The Amended Complaint asserts claims against NJSC and Von Roll for tortious conspiracy, tortious interference with contracts and prospective business relations, and fraud.

The Complaint in Lutin II as well as the proposed Second Amended Complaint in Lutin I, alleges, in essence, that NJSC, Von Roll and seven individually

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

named directors and officers of NJSC and/or Von Roll violated § § 1962(a), (b), (c) and (d) of RICO, as well as New Jersey state racketeering law, by establishing Excel for the purpose of driving AMS out of business. Lutin alleges that defendants NJSC, Jackson, Roik, Pasquarelli "and others" committed predicate acts of bribery, extortion, and mail fraud and that all defendants took actions "to willfully cause, or to aid, abet, counsel, command, induce or procure the commission by Munson, Cassidy or others of bribery, extortion, fraud, theft and other activities designed to injure AMS and benefit defendants...." Lutin II Compl. ¶ 117; Lutin I Proposed Second Amended Compl. ¶ 188. Plaintiff further alleges that "[e]ach of the defendants either committed or aided, abetted, counseled, commanded, induced, or procured the commission of each of the [alleged predicate acts], or willfully caused another to do so...." Lutin II Compl. ¶ 123; Lutin I Proposed Second Amended Compl. ¶ 194.

### DISCUSSION

Defendants move to dismiss the Complaints in both Lutin I and II or, in the alternative, for summary judgment. In ruling on a motion to dismiss, "a court must construe in plaintiff's favor any well-pleaded factual allegations in the complaint.... Dismissal of the complaint is proper only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). With respect to the Complaint in Lutin II, which action Lutin has brought *pro se*, the Court is also mindful of its duty to construe *pro se* pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 963 (1972).

### The Lutin I Complaint

*4 NJSC and Von Roll move to dismiss the Amended Complaint in Lutin I on the grounds that (1) they were never properly added as defendants because the action was removed before Judge Tsapis' written order granting the motion to amend the Complaint was entered; (2) personal jurisdiction over Von Roll is lacking because AMS and MBI failed to effect proper service on Von Roll; and (3) the allegations in the Amended Complaint are insufficient to state a claim for relief.

First, defendants argue that Lutin I was effectively

removed on July 16, 1992 and that thereafter the United States District Court for the Northern District of West Virginia had exclusive jurisdiction over the action. Therefore, claim the defendants, Judge Tsapis' order granting leave to amend the Complaint to add NJSC and Von Roll as defendants, which was entered on July 22, 1992, was void and the defendants are not parties to this action.

The Court finds this argument to be meritless. Even though the action was removed before the written order granting AMS and MBI's motion was entered by the Brooke County court, Judge Tsapis made a ruling from the bench granting the motion on May 14, 1992, long before the removal took place. Moreover, defendants' delay in approving the written order to be submitted to Judge Tsapis is clear from the record. There is no reason, other than defendants' delay, that the written order should not have been entered prior to the removal. Since the motion to amend was adjudicated by the Brooke County court before the action was removed, and the delay in entering a written order may be attributed to defendants, in the interest of justice, the Court recognizes the otherwise valid order of the Brooke County court granting AMS and MBI's motion to amend the Complaint.

Defendants next contend that the action should be dismissed as against Von Roll because AMS and MBI did not properly serve Von Roll with process. The Court finds this argument to be lacking in merit as well.

AMS and MBI served Von Roll by delivering process to John Sullivan, Vice President of NJSC, and to Blake Marshall, President of Von Roll Inc., a subsidiary of Von Roll. In addition, plaintiff delivered process to the Secretary of State of West Virginia, addressed to "Von Roll Ltd. a/k/a Von Roll A.G. c/o Von Roll Inc., 3080 Northwoods Circle, Norcross, GA 30071-1562."

Defendants argue that AMS and MBI failed to serve Von Roll according to Federal Rule of Bankruptcy Procedure 7004(b)(3) or Federal Rule of Civil Procedure 4(d)(3). Specifically, defendants state that Messrs. Sullivan and Marshall are not employees, officers, directors, or managing or general agents of Von Roll and are not duly authorized as agents to accept service on behalf of Von Roll. Defendants further state that neither NJSC nor Von Roll Inc. are duly authorized to accept service on behalf of Von Roll. In addition, defendants argue that the Secretary of State was not authorized to accept

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

service on behalf of Von Roll because Von Roll is not authorized to transact business in West Virginia, has no commercial contacts with the state, and has not committed a tort in the state.[FN3] Defendants claim that "it is impossible to locate where the injury in this case, if any, occurred" because it was not an injury to property or person. Defendants' Mem. of L. at 16.

> FN3. Under the West Virginia Code, service upon a foreign corporation not authorized to do business in the state may be had by service upon the Secretary of State if the corporation (1) makes a contract to be performed in the state, (2) commits a tort in the state, or (3) manufactures, sells, offers for sale or supplies any product in a defective condition and the product causes injury to any person or property in the state. *See* W.Va.Code § 31-1-15 (1991).

*5 However, the Complaint alleges that NJSC and Von Roll and/or their agents and co-conspirators committed various torts against AMS and MBI in West Virginia that injured MBI, a West Virginia company. Clearly, the torts, as well as at least some of the injury, is alleged to have occurred in that state, so that the Secretary of State was authorized to accept service of process on behalf of defendant Von Roll according to West Virginia law.

Moreover, Von Roll has not claimed that it did not actually receive notice. "Where there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process." *Maryland Nat'l Bank v. M/V Tanicorp I,* 796 F.Supp. 188, 190 (D.Md.1992); *see also United States v. Carney,* 796 F.Supp. 700, 704 (E.D.N.Y.1992) (Rule 4 is "a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint"); *United Food & Commercial Workers Union v. Alpha Beta Co.,* 736 F.2d 1371, 1382 (9th Cir.1984) (same); *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.,* 733 F.2d 1087, 1089 (4th Cir.1984) ("When the process gives the defendant actual notice of the pendency of the action, the rules, in general, are entitled to a liberal construction"). Accordingly, the Complaint may not be dismissed as against Von Roll on this ground.

Defendants also argue that the Amended Complaint fails to state a claim for tortious conspiracy, tortious interference with contracts and business relationships, or fraud.

First, defendants contend that the Amended Complaint does not state a claim for tortious conspiracy because it fails to provide any details concerning the alleged conspiracy. Plaintiffs' claim is that NJSC, acting under the direction of Von Roll, entered into a tortious conspiracy with Munson and Cassidy to usurp and appropriate the business of AMS by forming Excel while Munson and Cassidy were still officers and/or directors of MBI and AMS, in breach of Munson and Cassidy's fiduciary duties to MBI and AMS,[FN4] and also to interfere with the business and "prospective business relationships" of MBI and AMS.[FN5]

> FN4. The act of forming a new company in competition with one's current employer and depriving the employer of its principal clients and employees, in breach of one's fiduciary duty, was first recognized as a tort under New York law in *Duane Jones Co., Inc., v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (N.Y.1954). Such a tort is recognized under West Virginia law as well. *See, e.g., Barker v. Smith and Barker Oil and Gas Co., Inc.,* 170 W.Va. 502, 294 S.E.2d 919 (W.Va.1982).

> FN5. The tort of "tortious interference with business or contractual relations" is recognized under West Virginia law, *Precision Piping and Instruments, Inc. v. E.I. du Pont de Nemours and Co.,* 951 F.2d 613, 621 (4th Cir.1991).

Defendants argue that the Amended Complaint fails to allege any details concerning the purported conspiracy. While some factual basis for a finding of tortious conspiracy must be alleged, plaintiffs' tortious conspiracy allegations are properly measured under the liberal pleading requirements of Federal Rule of Civil Procedure 8(a), and not the more stringent requirements of Rule 9(b), which apply to allegations of fraud. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 (2d Cir.1990).

Under West Virginia law, to state a claim of civil conspiracy a plaintiff must allege that the defendants combined to take concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. *See Dixon v. American Indus. Leasing Co.,* 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (W.Va.1979); *Thacker v. Peak,* 800 F.Supp. 372, 385 n. 7 (S.D.W.Va.1992).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                            Page 5
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

*6 The Amended Complaint contains the barest statement of plaintiffs' claim for tortious conspiracy, alleging that

59. In 1990 and 1991, defendant New Jersey Steel, acting with the direction and authorization of Von Roll, entered into contracts, agreements and tortious conspiracies with defendants Munson, Excel and Cassidy to cause, procure, and promote the breaches of fiduciary duty and the duty of employee and officer loyalty of Cassidy and Munson owing to plaintiffs to wrongfully usurp and appropriate the business of Mountaineer Bolt, Inc., and interfere with the business and prospective business relationships of plaintiffs.

60. Defendants also secretly met with various employees and officers of plaintiff to advise them a new enterprise would be formed and offered them positions with such competitive enterprise.

Lutin I First Amendment to Complaint ¶ ¶ 59-60.[FN6]
The Amended Complaint states no factual basis for a finding of tortious conspiracy, see *Hecht, 897 F.2d at 26,* such as when the underlying agreement of the conspiracy was made, between whom, and for what precise purpose.    However, it is clear from the Proposed Second Amended Complaint that discovery in this action has provided Lutin with more details of the alleged conspiracy, which might constitute a factual basis for this claim.    Therefore, the Court dismisses the tortious conspiracy claim without prejudice and grants Lutin leave to file a Second Amended Complaint in order to cure this defect. *See* C. Wright, A. Miller & M. Kane, *6A Federal Practice and Procedure § 1505 (1990).*

FN6. In the original Complaint, plaintiffs allege in much greater detail Munson and Cassidy's alleged breaches of fiduciary duty.

Second, defendants contend that the Amended Complaint does not state a claim for tortious interference with contracts and prospective business relations.    To state a claim of tortious interference with business or contractual relations under West Virginia law, a plaintiff must plead the existence of a business relationship, intentional interference by a party outside that relationship, causation, and damages.    *See Precision Piping, 951 F.2d at 621.* Defendants argue that AMS and MBI did not plead facts in support of any of these essential elements of the claim.

The Amended Complaint merely states that

64. [u]pon information and belief defendants ... (a) induced and persuaded officers and employees to violate, breach and repudiate contractual obligations and fiduciary duties; (b) tortiously interfered with plaintiffs' existing and prospective business relations and opportunities with customers, suppliers and third parties.

65. Plaintiffs have been damaged and are entitled to recover of defendants damages in an amount to be determined at trial in excess of $12,000,000.

Lutin I First Amendment to Complaint ¶ ¶ 64-65.

Neither the Complaint nor the Amended Complaint contains any elaboration as to what business relationships were interfered with by defendants, in what manner, or with what result.    Furthermore, under West Virginia law, a plaintiff may only recover for intentional interference with *existing* business relationships, not "prospective" relationships. *See Precision Piping, supra.* In short, the Court finds that the Amended Complaint fails to state a claim for tortious interference with business relationships because the elements of the claim are not alleged. However, in the interest of justice, Lutin is granted leave to replead this claim, provided that the elements of the claim, and a sufficient factual basis therefor, can be stated.

*7 Defendants also argue that the Amended Complaint fails to state a fraud claim under Rules 12(b)(6) and 9(b).    In order to state a claim for common law fraud under West Virginia law, a plaintiff must allege "(1) [t]hat the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied upon it and was justified under the circumstances in relying upon it and (4) that he was damaged because he relied upon it." *Baker v. Wheat First Securities, 643 F.Supp. 1420, 1433 (S.D.W.Va.1986)* (quoting *Lengyel v. Lint, 167 W.Va. 272, 280 S.E.2d 66 (W.Va.1981)).* Moreover, a claim of fraud must be pleaded with particularity, pursuant to Rule 9(b).

The Amended Complaint alleges that defendants made the following misrepresentations or omissions:

68. Defendants have not disclosed to customers, including those in West Virginia, and the public at large (a) that Excel is owned in large part by New Jersey Steel; (b) that New Jersey executives and representatives are directors of defendant Excel; and (c) that New Jersey Steel has induced and imposed employment agreements upon [ ] Munson and Cassidy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70. Defendant New Jersey Steel represented to the public, government regulatory agencies, and its shareholders it had made only a passive investment in an unrelated company in 1991, without disclosing the identity of the company or the nature of the relationship which representation was false and misleading.

Lutin I First Amendment to Complaint ¶ ¶ 68, 70. The Amended Complaint further alleges that such representations were false, in that NJSC "had formed, owns and controls Excel Mining Systems." *Id.* ¶ 71. Plaintiff states that defendants made the alleged misrepresentations "for purposes of presenting [Excel] in a fraudulent manner as an independent company in order to *deceive third parties* to improperly induce them to disclose confidential information, establish relationships, produce products, provide supplies, services, and other information, and otherwise conduct themselves based on the false belief that each party was unrelated to the other." *Id.* (emphasis added). Plaintiff's allegation of reliance consists of the following statement: "Plaintiffs, the public, customers and suppliers justifiably relied upon such fraudulent misrepresentations." *Id.* ¶ 72.

The Court finds that the fraud claim is fatally deficient because plaintiff fails to state how AMS and MBI relied on the alleged misrepresentations and how such reliance resulted in their damages. "Reasonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud, and such reliance must be pleaded with particularity," pursuant to Rule 9(b). *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir.1987) (citations omitted). Thus, the bare allegation, without supporting facts, that AMS and MBI relied on defendants' alleged misrepresentations and omissions does not suffice. Moreover, in order to state a claim for fraud, plaintiff must claim that AMS and MBI sustained damages because of their own detrimental reliance on the alleged misrepresentation, not that they suffered damages due to the public's or third parties' reliance on the purported misrepresentation. *See Baker v. Wheat First Securities, supra.* The Amended Complaint does not state that the alleged misrepresentations and omissions changed AMS or MBI's behavior in any way, nor could it; clearly, AMS and MBI's lack of knowledge that NJSC and Von Roll were investors in Excel is not what

allegedly harmed them. Accordingly, the fraud claim is dismissed with prejudice.

*8 Finally, defendants argue that the Amended Complaint fails to state a claim against Von Roll on a theory of alter ego liability. In order ultimately to succeed on this theory of liability, plaintiff bears the burden of proving that NJSC is the alter ego of Von Roll.

West Virginia has adopted a totality of circumstances test in determining whether to pierce the corporate veil. *See Laya v. Erin Homes, Inc.*, 177 W.Va. 343, 348, 352 S.E.2d 93, 99 (W.Va.1986). Under this test, "decisions to look beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details." *Id.*, 177 W.Va. at 347, 352 S.E.2d at 98 (quoting *Southern Elec. Supply Co. v. Raleigh County Nat'l Bank*, 173 W.Va. 780, 320 S.E.2d 515, 523 (W.Va.1984)). A court should consider such factors as the commingling of funds, failure to maintain corporate formalities, identical equitable ownership in the two entities, identity of the directors and officers of the two entities, inadequate capitalization, use of the alleged alter ego as a mere shell to operate a venture of another corporation, failure to maintain arm's length relationships among related entities, and manipulation of assets and liabilities between the two entities. *See Laya*, 177 W.Va. at 347-48, 352 S.E.2d at 98-99.

The Court finds that the Amended Complaint does not contain allegations of fact showing that NJSC is definitely the alter ego of Von Roll. The only facts alleged in support of plaintiff's assertions that NJSC is "the alter ego of defendant Von Roll" and Von Roll "controls" NJSC are that Von Roll "purports to own 61% of [NJSC]," Von Roll's principal officers and its attorney serve as directors on the board of NJSC, and Von Roll has charged NJSC over $600,000 per year, since at least 1989, under a contract for selling, general and administrative expenses for the management of NJSC. Lutin I First Amendment to Complaint ¶ ¶ 54, 56.

However, the Court declines to dismiss the Amended Complaint against Von Roll on this ground. On a motion to dismiss pursuant to Rule 12(b)(6), the "Court is not concerned with who may ultimately bear the burden of proof; nor is it preoccupied with the evidence that must be established at trial; such concerns are apt during trial and on a motion for directed verdict. This Court merely determines whether, at this point in the litigation and based on

Not Reported in F.Supp.                                                          Page 7
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

the allegations in the complaint, plaintiffs are unable to establish any set of facts that may entitle them to relief." *Satellite Broadcasting Cable, Inc. v. Telefonica de Espana,* 786 F.Supp. 1089, 1100 (D.Puerto Rico 1992) (declining to dismiss alter ego claim on 12(b)(6) motion). Plaintiff has alleged that Von Roll exercises actual control over NJSC by virtue of its 61% ownership of NJSC and the membership of Von Roll officers on NJSC's board of directors. Moreover, plaintiff alleges that Von Roll played an active role in establishing Excel. Defendants concede that plaintiff asserts the alter ego theory as an alternative, not principal, theory of Von Roll's liability. At this stage of the litigation, it is not clear that plaintiff will be unable to establish any set of facts entitling him to relief against Von Roll.

*9 Accordingly, defendants' motion to dismiss is granted in part and denied in part. Plaintiff's fraud claim is dismissed with prejudice. Plaintiff's claims of tortious conspiracy and tortious interference with contracts and business relationships are dismissed without prejudice, and the Court grants Lutin leave to file a Second Amended Complaint asserting these causes of action with supporting facts, as noted above.

### The RICO Claims

Defendants move to dismiss the Complaint in Lutin II on the following grounds: (1) AMS did not assign to Lutin its claims, if any, against the individually named defendants or any new claims against NJSC and Von Roll, so that plaintiff lacks standing to assert such claims; (2) plaintiff may not prosecute this action *pro se;* (3) the Stipulation and Order dismissing all claims against the Excel Defendants bars plaintiff's claims against defendants, since defendants must be deemed to be in privity with the Excel Defendants; (4) the Complaint fails to state a RICO claim; and (5) because the RICO claims should be dismissed, plaintiff's claims under the New Jersey "little RICO" statutes, based on pendent jurisdiction, should also be dismissed.[FN7] The Court need not address all of the arguments raised by defendants in their motion to dismiss the Complaint in Lutin II because it is clear that plaintiff has failed to state a RICO claim.

FN7. NJSC and Von Roll oppose plaintiff's motion to amend the Complaint in Lutin I on the same grounds as those on which they move to dismiss the Complaint in Lutin II.

To state a claim under RICO, plaintiff must first allege that the defendants have violated the substantive RICO statute, 18 U.S.C. § 1962. In so doing, plaintiff

must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more ["predicate"] acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280 (1984).[FN8] Racketeering activity is defined in the statute as any act, including bribery and extortion, chargeable under State law and punishable by imprisonment for more than one year; any act indictable under numerous specific federal criminal provisions, including mail and wire fraud; and any offense involving bankruptcy, securities fraud or drug-related activities that is punishable under federal law. *See* 18 U.S.C. § 1961.

FN8. Once plaintiff has satisfied this burden, he must allege that he was "injured in his business or property by reason of a violation of section 1962." *Id.* (quoting 18 U.S.C. § 1964(c)).

Further, plaintiff must allege that each defendant "personally committed predicate acts of racketeering activity," since "aiding and abetting does not suffice under civil RICO." *Rosenheck v. Rieber,* 932 F.Supp. 626, 627 & n. 1 (S.D.N.Y.1996); *see also Morin v. Trupin,* 747 F.Supp. 1051, 1064 (S.D.N.Y.1990) ("a RICO claim must charge each named defendant with the commission of two or more predicate acts"); *Moeller v. Zaccaria,* 831 F.Supp. 1046, 1056-57 (S.D.N.Y.1993) (a RICO claim under § 1962(c) must allege that each defendant committed two or more predicate acts"); *Mead v. Schaub,* 757 F.Supp. 319, 322 (S.D.N.Y.1991) (noting that complaint failed to allege that each defendant personally committed two or more predicate acts). In order to state a claim of RICO conspiracy, plaintiff must allege that each defendant personally agreed to commit two or more predicate acts. *Mead v. Schaub,* 757 F.Supp. at 322; *United States v. Teitler,* 802 F.2d 606, 613 (2d Cir.1986).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

**\*10** Lutin's RICO claims cannot survive a motion to dismiss because the Complaint fails adequately to allege that any of the defendants committed two or more predicate acts or agreed to commit two predicate acts. First, plaintiff makes the sweeping allegation that defendants Jackson, Roik, Pasquarelli, "and others" took actions to induce Munson, Cassidy and other AMS employees to commit "breaches of duty, bribery, extortion, fraud, theft and other activities designed to injure AMS," in violation of New Jersey and Ohio State laws relating to commercial bribery and extortion. Lutin II Compl. ¶ ¶ 110, 111, 116. However, this catch-all assertion is wholly unsubstantiated by the factual allegations contained in the Complaint. The only references to bribery and extortion in the 55-page Complaint are the allegations that

According to the sworn statements of both Munson and former defendant Cassidy, Munson reported NJ Steel's proposal to Cassidy in May 1991, while Cassidy was President of AMS. Cassidy was offered the bribe of an 'ownership' interest in NJ Steel's proposed Excel enterprise if he would assist, while continuing to act as President of AMS, in Excel's development[;]

andCassidy was also aware at the time that Munson knew about a past criminal act of Cassidy, involving Cassidy's 1984 forgery of an AMS officer's signature to buy a car for himself, which had not yet been discovered by AMS's board members.

Lutin II Compl. ¶ ¶ 30, 31. Plaintiff does not state that any of the named defendants offered the alleged bribe to Cassidy or made an agreement to do so, *see Mead v. Schaub, 757 F.Supp. at 322*; rather, the paragraph indicates that Munson is the person who allegedly offered a bribe. Further, plaintiff claims that it was Munson, and not any of the named defendants, who was in a position to commit extortion by threatening to expose Cassidy's alleged forgery.[FN9] Jackson, Roik and Pasquarelli are merely alleged to have met with Munson and Cassidy to discuss the creation of Excel and to have drafted documents establishing Excel. *See* Lutin II Compl. ¶ ¶ 28, 33, 34. None of the other individually named defendants are alleged to have personally committed any acts relating to bribery or extortion or to have agreed to commit any such acts.

FN9. The Complaint does not go so far as to assert that Munson actually used this information to induce Cassidy's cooperation and, therefore, fails to allege even that

Munson committed extortion.

Plaintiff also alleges that defendants Jackson, Roik, Pasquarelli, "and others" filed with the Securities and Exchange Commission ("SEC") and distributed through the United States mail false and misleading reports on behalf of NJSC, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1952 (racketeering). Lutin II Compl. ¶ 115. Plaintiff claims that NJSC should have reported in its financial statements that Excel was a consolidated subsidiary, but instead Excel was misleadingly described as an immaterial investment which had no significant effect on NJSC's financial position or results of operation. *See id.* ¶ 53. Plaintiff does not, however, allege that this constituted a violation of the securities laws. Plaintiff further states that the "NJSC Officers, with the approval of the NJSC Directors and Von Roll" caused NJSC to file this misleading information with the SEC and send it to "numerous individuals and companies" through the United States mail. *Id.* ¶ 54.

**\*11** Even assuming that NJSC's description of its investment in Excel in its SEC filings and other mailings was false and misleading, this allegation does not state a predicate act under RICO. Clearly, such activity does not fit within the definition of "unlawful activity" under 18 U.S.C. § 1952, the racketeering statute. That section defines unlawful activity as "(1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances ..., or prostitution offenses ..., or (2) extortion, bribery, or arson...." 18 U.S.C. § 1952(b).

The wire fraud statute provides that

[w]hoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341. As is clear from the plain language of this section, "the mailing must be 'for the purpose of executing the scheme, as the statute requires.' " *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648 (1974) (quoting *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 151 (1944)). In other words, the mailing must be "sufficiently closely related to [the] scheme" to bring such conduct within the statute. *Id.*, 414 U.S. at 399,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 9
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)

94 S.Ct. at 648.

In the instant action, under the facts alleged, rather than being carried out for the purpose of executing the alleged plan, the mailing of NJSC's SEC filings was wholly incidental to any such scheme and not even "a step in the plot." *Schmuck v. United States,* 489 U.S. 705, 710-11, 109 S.Ct. 1443, 1447 (1989). Plaintiff does not, and could not sensibly, allege that NJSC's purpose in mailing its SEC filings was to further the goal of establishing Excel and driving AMS out of business. The Complaint does not even claim that NJSC concealed its interest in Excel in its filings, only that it characterized them incorrectly according to generally accepted accounting principles. The main effect that the allegedly misleading filings had, according to the Complaint, was not to further the "scheme" but merely to make it more difficult for plaintiff "to effectively determine or respond to the cause of its injuries." Lutin II Compl. ¶ 56. In short, the mailing of NJSC's SEC filings was not sufficiently closely related to defendants' alleged scheme to bring the conduct within the mail fraud statute. Accordingly, such acts cannot be predicate acts under RICO.[FN10]

> FN10. Plaintiff does allege that Munson and Cassidy made several fraudulent statements that were transmitted by wire and/or mail, which were more directly related to the alleged scheme. However, Munson and Cassidy are not defendants in this action.

The only allegations plaintiff makes with respect to the corporate defendant Von Roll concern Von Roll's alleged control of NJSC and Excel. For example, plaintiff claims that

[t]he Excel enterprise was controlled by Von Roll, through Von Roll's officers and agents acting as NJSC Directors. The activities of Excel were intended to, and did in fact, serve the purposes of Von Roll, as those purposes were defined by Von Roll's agents acting as NJSC Directors.

*12 Lutin II Compl. ¶ 72. Respondeat superior liability under RICO is appropriate where the employer allegedly benefits from the predicate acts. *Center Cadillac, Inc. v. Bank Leumi Trust Co.,* 808 F.Supp. 213, 236 (S.D.N.Y.1992); *see also Amendolare v. Schenkers Int'l Forwarders, Inc.,* 747 F.Supp. 162, 168-69 (E.D.N.Y.1990) (vicarious liability is appropriate when defendant corporation can be characterized as central or controlling figure in RICO enterprise). However, in a case such as

this, where no predicate acts are adequately alleged, there can be no respondeat superior liability either. [FN11]

> FN11. Plaintiff attempts to bolster the Complaint's allegations of predicate acts by referring to certain individuals and companies supposedly related to or controlled by NJSC, who have allegedly committed unrelated fraudulent acts. Given that these allegations have nothing whatsoever to do with defendants' alleged scheme to ruin AMS, the Court disregards them as irrelevant.

In sum, the Court finds that the Complaint in Lutin II does not state a RICO claim upon which relief may be granted because it fails to allege that any of the defendants committed two or more predicate acts under the statute. Nor does the Complaint allege "facts implying any agreement involving each of the defendants to commit at least two predicate acts," thus failing to state a claim of RICO conspiracy. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d at 25. Plaintiff's allegations simply do not describe the sort of conduct that RICO was designed to prohibit. Since plaintiff's RICO claims must be dismissed, the claims under the New Jersey "little RICO" statutes, based on pendent jurisdiction, must also be dismissed. Accordingly, defendants' motion to dismiss the Complaint in Lutin II is granted.

In addition, plaintiffs' request to amend the Complaint in Lutin I to add claims under RICO is denied. The Proposed Second Amended Complaint in Lutin I is virtually identical to the Complaint in Lutin II and, therefore, suffers from the same infirmities. Thus, the filing of such an amended complaint would be without merit and futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962).[FN12]

> FN12. Plaintiff also cross moves for partial summary judgment seeking a determination that various entities, including AMS and Excel, were "entities" as that term is defined under RICO. Since the Court grants defendants' motion to dismiss the RICO claims, plaintiff's cross motion is denied as moot.

Lutin's Pro Se Status

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
**(Cite as: Not Reported in F.Supp.)**

Defendants have argued that Lutin may not prosecute either action *pro se.* Since Lutin has been granted leave to file a Second Amended Complaint in Lutin I, in which claims for tortious conspiracy and tortious interference with contractual and business relationships may be asserted, the Court now addresses this argument.

Defendants do not contest the propriety or validity of AMS's assignment of claims to Lutin; rather, they contend that even the individual assignee of a corporate claim may not proceed *pro se.* There can be no doubt that the claims remaining in this action are corporate claims, since the damage complained of was allegedly inflicted on AMS and MBI, not Lutin himself.

It is well established and undisputed that a corporation, which is an artificial entity that can only act through its agents, cannot proceed *pro se* in federal court. Further, the Second Circuit has held that
[i]n light of the[ ] policy reasons for preventing a lay person from representing a corporation in litigation, the federal courts have, in cases governed by federal law, disapproved any circumvention of the rule by the procedural device of an assignment of the corporation's claims to the lay individual.

*13 *Jones v. Niagara Frontier Transp. Auth.,* 722 F.2d 20, 23 (2d Cir.1983); *see also Mercu-Ray Indus., Inc. v. Bristol-Myers Co.,* 392 F.Supp. 16, 20 (S.D.N.Y.), *aff'd,* 508 F.2d 837 (2d Cir.1974) ("To allow Kreager to appear pro se in this suit would be allowing him to flout a well-established and purposeful public policy by means of a procedural device"); *Palazzo v. Gulf Oil Corp.,* 764 F.2d 1381 (11th Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 799 (1986) (upholding district court's dismissal of an individual plaintiff's corporate claims, which had been assigned to him by the corporation).

Lutin argues that his case is distinguishable from those cited above because AMS's assignment of claims to him was not a "procedural device" employed to circumvent the rule that a corporation must be represented by counsel. The Court rejects this limited view of the Second Circuit's holding in *Jones, supra.* In *Ultracashmere House, Ltd. v. Nordstrom, Inc.,* 123 F.R.D. 435 (S.D.N.Y.1988), citing *Jones,* the court stated,
[i]t is well established that a corporation cannot appear personally or by one of its officers who is not an attorney. Neither can a non-attorney appear in federal court pursuant to an assignment of rights from

the corporation.

*Id.* at 436 (citations omitted). The court in *Ultracashmere* did not note any circumstances tending to show that the corporate claims had been assigned to the corporation's president for the purpose of evading the rule that a corporation may not proceed *pro se.* The purpose of this rule is "to ensure that the court has greater control over the management and administration of the case" and avert the confusion that results from "pleadings awkwardly drafted and motions inarticulately presented." *Mercu-Ray,* 392 F.Supp. at 19-20. This purpose is also well served by prohibiting individual assignees of corporate claims to proceed *pro se.*

Accordingly, the Court finds that Lutin may not proceed *pro se* in Lutin I. If Lutin wishes to go forward with Lutin I, he is directed to retain counsel within 60 days of the date of this Opinion and Order and to file a Second Amended Complaint in that action within 30 days of the date on which counsel is retained. If Lutin fails to meet these deadlines, the action referred to herein as Lutin I will be closed and removed from the Court's docket.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Amended Complaint in Lutin I is granted to the extent that the Amended Complaint is dismissed without prejudice to plaintiff's filing a Second Amended Complaint asserting only claims of tortious conspiracy and tortious interference with contractual and business relationships. Plaintiff's motion to file a Second Amended Complaint so as to add RICO claims is denied. If plaintiff wishes to pursue this action further, he is ordered to retain counsel within 60 days of the date of this Opinion and Order and to file, within 30 days of the date on which counsel is retained, a Second Amended Complaint as described above; otherwise the Court will order that the action be closed and removed from its docket.

*14 Defendants' motion to dismiss the Complaint in Lutin II is granted; plaintiff's cross-motion for partial summary judgment is denied. The Clerk of the Court is directed to close the case bearing the name and docket number *Lutin v. New Jersey Steel Corp., et al.,* 95 Civ. 4965 (AGS), and remove it from the Court's docket.

SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                     Page 11
Not Reported in F.Supp., 1996 WL 636037 (S.D.N.Y.), RICO Bus.Disp.Guide 9170
(Cite as: Not Reported in F.Supp.)


S.D.N.Y.,1996.
Lutin v. New Jersey Steel Corp.
Not Reported in F.Supp., 1996 WL 636037
(S.D.N.Y.), RICO Bus.Disp.Guide 9170

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

**C**
Citibank, N.A. v. Itochu Intern. Inc.
S.D.N.Y.,2003.

United States District Court,S.D. New York.
CITIBANK, N.A. and Citibank Canada, Plaintiffs,
v.
ITOCHU INTERNATIONAL INC., and III Holding
Inc. f/k/a Copelco Financial Services Group, Inc.,
Defendants.
**No. 01 Civ. 6007(GBD).**

April 4, 2003.

**Background:** Purchasing corporation brought action
against selling corporation and its officers and
directors alleging violation of federal securities laws
and state law.

**Holdings:** On defendants' motion to dismiss, the
District Court, Daniels, J., held that:

(1) indemnification clause was void to extent that it
only provided one remedy;

(2) purchaser stated common law fraud claim, and
federal securities fraud claim under Private Securities
Litigation Reform Act (PSLRA), with sufficient
particularity;

(3) purchaser adequately pleaded scienter against
sellers;

(4) punitive damages were not available to purchaser;
and

(5) purchaser could not state cause of action for
negligent misrepresentation against sellers for failure
to allege special relationship;

(6) purchaser stated cause of action for breach of
implied covenant of good faith and fair dealing; and

(7) purchaser could not maintain claim for unjust
enrichment.

Motion granted in part and denied in part.
West Headnotes

**[1] Securities Regulation 349B 35.24**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)1 In General
        349Bk35.24 k. Contracts in Violation of
Regulations. Most Cited Cases
Indemnification clause in agreement to purchase
stock of corporation was void to extent that it only
provided one remedy, although parties contracted for
exclusive remedy provision; under New York law,
parties could not use contractual limitation of liability
clauses to shield themselves from liability for their
own fraudulent conduct, and federal securities laws
had anti-waiver provision which specifically made
void any contractual clause that allowed party to
waive compliance with federal securities laws.
Securities Exchange Act of 1934, § 29(a), 15
U.S.C.A. § 78cc(a).

**[2] Federal Civil Procedure 170A 636**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and
Particularity
        170Ak636 k. Fraud, Mistake and
Condition of Mind. Most Cited Cases

**Securities Regulation 349B 60.53**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.53 k. Misrepresentation.
Most Cited Cases
Purchasing corporation stated common law fraud
claim under New York law, and federal securities
fraud claim under Private Securities Litigation
Reform Act (PSLRA), with sufficient particularity
against sellers of stock of acquired corporation, on
allegations that sellers warranted that financial
statements were prepared in accordance with
generally accepted accounting principles (GAAP)
and past accounting practices of acquired
corporation, and, instead, sellers devised and used
accounting plan that was contrary to GAAP, and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

proffered inflated financial results to purchasers with intent to defraud them. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Securities Regulation 349B ⟜60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 k. In General. Most Cited Cases
Purchasing corporation adequately pleaded scienter against sellers of stock of acquired corporation in accordance with Private Securities Litigation Reform Act (PSLRA), in that purchaser described set of facts and circumstances that, if proven, would have given rise to strong inference of fraud. Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4] Corporations 101 ⟜121(7)**

101 Corporations
    101VIII Capital and Stock
        101VIII(D) Transfer of Shares
            101k115 Remedies
                101k121 Remedies
                    101k121(7) k. Damages or Amount of Recovery. Most Cited Cases
Punitive damages were not available under New York law to purchasing corporation, for alleged fraud of sellers of acquired corporation, since alleged fraud was not aimed at public generally.

**[5] Corporations 101 ⟜118**

101 Corporations
    101VIII Capital and Stock
        101VIII(D) Transfer of Shares
            101k115 Sales
                101k118 k. Performance of Contract. Most Cited Cases
Purchasing corporation could not state cause of action for negligent misrepresentation under New York law against sellers of stock in acquired corporation, for failure to allege special relationship between parties; although relationship of confidence developed between parties during negotiation process and purchasers trusted sellers' representations to be accurate, purchasers' relationship with sellers was merely ordinary business relationship.

**[6] Corporations 101 ⟜118**

101 Corporations
    101VIII Capital and Stock
        101VIII(D) Transfer of Shares
            101k115 Sales
                101k118 k. Performance of Contract. Most Cited Cases
Purchasing corporation stated cause of action for breach of implied covenant of good faith and fair dealing under New York law against sellers of stock in acquired corporation, on allegations that sellers used accounting plan that was contrary to generally accepted accounting principles (GAAP) and past accounting practices of acquired corporation, that sellers knew such plan was artificially inflating acquired corporation's financial figures, and that purchasing corporation relied on sellers' representations.

**[7] Implied and Constructive Contracts 205H ⟜55**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. Most Cited Cases
Purchasing corporation could not maintain claim for unjust enrichment under New York law against sellers of stock in acquired corporation, since valid, enforceable contract governed dispute; although purchaser argued that there could have been grounds for recision of contract, purchaser did not include recision as remedy in its complaint.

*MEMORANDUM OPINION AND ORDER*

DANIELS, J.

*1 Plaintiffs brought suit against defendants alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and pendent state law claims in connection with plaintiffs' purchase from defendants of all the common stock of Copelco Capital, Inc. Defendants thereafter filed a motion to dismiss. Plaintiffs oppose that motion. For the following reasons, defendants' motion to dismiss is granted in part, and denied in part.

*Discussion*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a Complaint where the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

Complaint "fail[s] ... to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the Complaint as true and draws all reasonable inferences in favor of the non-moving party. See Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.2002). However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss. See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). Here, a motion to dismiss will only be granted if the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir.1992). A court may look at the Complaint and any documents attached to, or incorporated by reference in, the Complaint. See Dangler v. New York City off Track Betting Corp., 193 F.3d 130, 138 (2d Cir.1999).

Defendants contend that plaintiffs' securities fraud, common law fraud, and negligent misrepresentation claims are based upon statements defendants made in documents other than the Securities Purchase Agreement (the "Agreement"). Defendants argue that these claims must fail as a matter of law because the Agreement explicitly precludes plaintiffs from relying on any representations except those included in the Agreement.

By the plain language of the Agreement, plaintiffs are precluded from asserting reliance on any other statements made by defendants except those contained in the Agreement. Section 4.08 of the Agreement states that "Sellers [defendants] make no representation or warranties with respect to ... any other information or documents made available to Buyer [plaintiffs] or its counsel, accountants or advisors ... except as expressly set forth in this Agreement." Agreement at § 4.08. Plaintiffs are sophisticated business entities who were represented by counsel, and negotiated the Agreement at arm's length. This Court, therefore, will hold plaintiffs to the agreement to which they bargained. Plaintiffs' securities fraud, common law fraud, and negligent misrepresentation claims cannot be based upon representations outside of the Agreement.

Nevertheless, plaintiffs contend that their securities fraud, common law fraud, and negligent misrepresentation allegations still survive as their Complaint, in fact, also alleges violations of the Agreement. Section 3.08 of the Agreement warrants that Copelco's financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP"), while § 3.09 of the Agreement warrants that the financial statements were prepared consistent with past Copelco practices. At paragraph 21 of the Complaint, plaintiffs quote § 3.08 of the Agreement and then allege that defendants "knew, or should have known, that the 1999 audited financial statements had not been prepared in conformity with GAAP and did not fairly represent the financial position of Copelco." Complaint at ¶ 21. Further, the Complaint alleges in the next paragraph that "[d]efendants' conduct also rendered other statements made by Itochu International in the Stock Purchase Agreement deliberately false and misleading." Id. at ¶ 22. The Complaint then quotes the portion of § 3.09 of the Agreement where defendants warrant that the financial statements were prepared in accordance with past Copelco practices as an example of one such allegedly false and misleading statement in the Agreement. Id. Consequently, plaintiffs have sufficiently alleged violations of the Agreement, itself. Defendants' motion to dismiss the securities fraud, common law fraud, and negligent misrepresentation claims on the grounds that the Complaint does not allege a violation of the Agreement is therefore denied.FN1

---

FN1. As will be discussed later, plaintiffs' negligent misrepresentation claim ultimately fails on other grounds.

---

*2 [1] Next, defendants contend that plaintiffs' allegations are subject to the Agreement's exclusive remedy provision, which only provides for indemnification as a remedy in the event of a breach. Plaintiffs do not dispute the existence of the exclusive remedy provision. Rather, they argue that, regardless, a party may not contract out of liability for its own fraud.

Section 11.07 of the Agreement provides that "Sections 8.06 and 11.02 will provide the exclusive remedy for any misrepresentation, breach of warranty, covenant or other agreement ... or other claim arising out of this Agreement or the transactions contemplated hereby." Agreement at § 11.07. In turn, § § 8.06 and 11.02 of the Agreement both provide only for indemnification in the event of a breach, and the terms which trigger such indemnification. See Agreement at § § 8.06 and 11.02.

Although the parties contracted for this exclusive remedy provision, it is well settled that "parties cannot use contractual limitation of liability clauses

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
**(Cite as: Not Reported in F.Supp.2d)**

to shield themselves from liability for their own fraudulent conduct." *Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir.1994). Further, the federal securities laws have an anti-waiver provision which specifically makes void any contractual clause that allows a party to waive compliance with the federal securities laws. Pursuant to 15 U.S.C. § 78cc(a), "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc(a).

The Second Circuit has had occasion to address the scope of the federal anti-waiver policy. In *McMahan & Co. v. Wherehouse Enter., Inc.*, 65 F.3d 1044 (2d Cir.1995), the Second Circuit analyzed the effect of a "no-action" contractual clause upon the plaintiffs' securities fraud claims. The "no-action" clause at issue provided that the plaintiffs could not bring suit against defendants unless certain procedural steps were followed, such as providing written notice to the defendants of a default. Plaintiffs failed to follow the procedural steps outlined, and defendants therefore claimed that plaintiffs waived their right to bring suit under the 1933 and 1934 Securities Exchange Acts. However, the Second Circuit upheld the district court's nullification of the "no-action" clause and found that "[t]he statutory framework of the 1933 and 1934 Acts compels the conclusion that individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision." *McMahan*, 65 F.3d at 1051.

Defendants rely on *Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir.1996) for the proposition that a waiver clause is permissible under the federal securities laws. However, defendants mischaracterize *Harsco*. *Harsco* did not involve a waiver clause that prohibited any and all fraud suits under the federal securities laws or under the common law. It involved a contract that specifically outlined the representations that plaintiff was relying upon when it bought defendant's company. That plaintiff's fraud claim was based upon representations made outside the contract.

**\*3** The Second Circuit was careful to distinguish the facts of *Harsco* from a contract provision which prohibits a party from suing at all under the federal securities laws. The court found that, in light of the carefully negotiated provision in the contract detailing the representations plaintiff relied upon, plaintiff may only bring a securities fraud suit based upon those specific representations included in the

contract, and not based upon representations made outside the contract. The court found that "it is not fair to characterize [the representations agreed upon in the contract] as having prevented [plaintiff] from protecting its substantive rights. [Plaintiff] rigorously defined those rights in [the contract]." *Harsco*, 91 F.3d at 344. The Court found that "[plaintiff] has not waived its rights to bring any suit resulting from this deal." *Id.* Rather, plaintiff only waived its right to bring a federal securities suit based upon representations made *outside* the contract. *See id.*

Unlike the situation in *Harsco*, defendants here would have this court find that plaintiffs waived their right to bring any and all suits for fraud, even a suit concerning representations made within the contract. Such a broad-sweeping waiver clause is exactly the type of contractual provision that § 78cc(a) and the case law forbid. Therefore, the indemnification clause in the Agreement is void to the extent that it only provides one remedy, and defendants' motion to dismiss the securities fraud, common law fraud, and negligent misrepresentation claims based upon the indemnification clause is denied.

[2][3] Next, defendants argue that plaintiffs' fraud claims fail because the Complaint failed to both plead fraud with particularity, and adequately plead scienter, as required by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). It is well settled that a Complaint asserting securities fraud must satisfy the pleading requirements of Rule 9(b). [FN2] *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir.2000). Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Fraud allegations in a Complaint therefore must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

> FN2. Generally, Rule 8(a)'s liberal pleading standard applies. However, where fraud is alleged, a court must evaluate the allegations under Rule 9(b)'s heightened pleading standard. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

Further, a Complaint alleging fraud must also allege that the defendants acted with scienter. *See Novak v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

Page 5

_Kasaks,_ 216 F.3d 300, 306 (2d Cir.2000). A plaintiff must allege facts that give rise to a strong inference of fraudulent intent. _See Shields,_ 25 F.3d at 1128; _Novak,_ 216 F.3d at 311. A "strong inference" may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." _Ganino,_ 228 F.3d at 168-69, _quoting Shields,_ 25 F.3d at 1128. The inference may also arise where the Complaint sufficiently alleges that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." _Novak,_ 216 F.3d at 311 (internal citations omitted).

*4 In this case, plaintiffs allege in their Complaint that they purchased from defendant Itochu International ("Itochu") in May 2000 all the common stock of Copelco. Plaintiffs allege that in purchasing Copelco, plaintiffs relied upon the accuracy of § § 3.08 and 3.09 of the Agreement, which warranted that Copelco's financial statements and accounting practices were done in accordance with GAAP and consistent with past Copelco practices. Plaintiffs contend that after the closing, plaintiffs discovered that the accounting methods used by defendants artificially inflated Copelco's financial condition, in violation of GAAP and past Copelco practices.

Specifically, plaintiffs contend that, beginning in 1998 through May 16, 2000, Copelco's Chief Financial Officer and its Chief Operating Officer authorized and managed an accounting scheme by which uncollectible lease receivables were subjected to an internal charge-off limitation (the "Cap") above which no further receivables would be charged-off. Plaintiffs contend that the Cap was in violation of both GAAP and past Copelco accounting practices. The effect of the Cap was to appear to maintain Copelco's compliance with the rolling three month loss-to-liquidation rate required by its funding agreements with its various lenders. Failure to comply with this rate would have permitted Copelco's lenders to stop funding and, correspondingly, would have placed Copelco's access to financing with its various lenders at risk of termination, thereby potentially impacting the value of Copelco's stock. Simply put, plaintiffs allege that lease receivables that should have been charged-off, in compliance with GAAP and past Copelco

accounting practices, were not. Plaintiffs then contend that collections managers at Copelco engaged periodically in "horse-trading," where the total available charge-offs under the Cap were divided between the business groups. As a result of the Cap, plaintiffs contend that the overall collectibility of lease receivables was impaired.

Plaintiffs contend that the use of the Cap served not only to misrepresent actual rolling three month loss-to-liquidation rates, but also to overstate Copelco's income for the relevant period. Plaintiffs contend that the alleged misrepresentations caused Copelco's historical losses to be understated by at least $47 million at the time of the closing. Finally, plaintiffs contend that at all times relevant to the Complaint, defendants, by and through Copelco's officers and directors, knew that the Cap produced inflated numbers, and that plaintiffs relied upon the inaccurate information provided in the Agreement.

Plaintiffs' allegations are sufficiently pled to survive a motion to dismiss. First, plaintiffs have pled their fraud claims with particularity, in accordance with Rule 9(b). The Complaint identifies Copelco's allegedly fraudulent statements, namely § § 3.08 and 3.09 which warranted that the financial statements were prepared in accordance with GAAP and past Copelco accounting practices. Those statements were clearly made in the Agreement, itself. The speakers are the defendants, the direct signatories to the Agreement. Plaintiffs have further explained why the statements are allegedly fraudulent, in that the CFO and COO of Copelco authorized the Cap plan, knew the Cap plan was contrary to GAAP and past Copelco accounting practices, and proffered the inflated numbers produced to plaintiffs with the intent to defraud them. Therefore, the requirements of Rule 9(b) have been met. Plaintiffs have also adequately pled scienter in accordance with the PSLRA, in that plaintiffs have described a set of facts and circumstances that, if proven, give rise to a strong inference of fraud. Therefore, defendants' motion to dismiss the securities fraud, and common law fraud claims is denied. [FN3]

> FN3. Defendants' motion to dismiss with respect to plaintiffs' vicarious liability claim brought pursuant to § 20(a) of the Securities Exchange Act is premised solely upon their assertion that the underlying securities fraud offense, § 10(b) of the Securities Exchange Act, also fails. As discussed above, plaintiffs have met the pleading standards for their §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

Page 6

10(b) claim, and therefore, this Court accordingly denies defendants' motion to dismiss plaintiffs' § 20(a) claim.

*5 [4] With respect to the common law fraud claim, defendants alternatively argue that even if it survives, plaintiffs' demand for punitive damages should nevertheless be stricken as the alleged fraud was not aimed at the public generally. Punitive damages are available in a fraud claim where the plaintiff demonstrates that the harm was directed at the public generally. *See Rocanova v. Equitable Life Assurance Society,* 643 N.E.2d 940, 943 (N.Y.1994) (in cases evincing "a high degree of moral turpitude, and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, punitive damages are recoverable if the conduct was aimed at the public generally.") (internal quotation marks omitted); *Manning v. Utilities Mutual Ins. Co., Inc.,* 254 F.3d 387, 400 (2d Cir.2001) (quoting *Rocanova* ). Here, plaintiffs have failed to allege any conduct aimed at the public generally. This was a contract between two private parties, where the alleged harm befell one of the parties. Defendants' motion to strike plaintiffs' demand for punitive damages with respect to the common law fraud claim is therefore granted.

[5] Defendants, further, argue that plaintiffs' claim for negligent misrepresentation fails as a matter of law because plaintiffs have not alleged a "special relationship" between plaintiffs and defendants. Plaintiffs, however, argue that a "special relationship" existed in that a relationship of confidence developed between the parties during the negotiation process and that plaintiffs trusted defendants' representations to be accurate.

In a negligent misrepresentation claim, a plaintiff must establish that the defendant had a duty to use reasonable care to convey correct information due to the existence of a "special relationship," that the information provided was incorrect or false, and that the plaintiff reasonably relied upon the information. *See Fleet Bank v. Pine Knoll Corp.,* 290 A.D.2d 792, 736 N.Y.S.2d 737, 795 (App.Div.2002). "To that end, a special relationship requires a closer degree of trust than an ordinary business relationship." *Id.* (internal quotation marks omitted), *quoting Busino v. Meachern,* 270 A.D.2d 606, 704 N.Y.S.2d 690, 693 (App.Div.2000); *Butvin v. Doubleclick, Inc.,* No. 99civ4727, 2000 WL 827673, at *10 (S.D.N.Y. June 26, 2000) ("a plaintiff may only recover for negligent misrepresentation where the defendant owes him a fiduciary duty"). Here, the plaintiffs' relationship with defendants was merely an ordinary business

relationship. There is no allegation in the Complaint to support a finding that a "special relationship" existed. Therefore, defendants' motion to dismiss the negligent misrepresentation claim is granted.

[6] Defendants next argue that plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be dismissed on the grounds that there was no breach in the course of contract performance. The implied covenant of good faith and fair dealing encompasses the concept that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (N.Y.1995), *quoting Kirk La Shello Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 188 N.E. 163, 167 (N.Y.1933). Plaintiffs have alleged that defendants engaged in an accounting plan that was contrary to GAAP and past Copelco accounting practices, that defendants knew the Cap plan was artificially inflating Copelco's financial figures, and that plaintiffs relied on defendants' representations. If these allegations are proven true, it can fairly be said that defendants' conduct had the effect of destroying or injuring plaintiffs' right to enjoy the fruits of the contract. Plaintiffs have sufficiently alleged, at this stage of the proceeding, a cause of action for breach of implied covenant of good faith and fair dealing and defendants' motion to dismiss this claim is therefore denied.

*6 [7] Lastly, defendants argue that plaintiffs' claim for unjust enrichment should be dismissed on the grounds that an unjust enrichment claim can not be maintained where there is a valid, enforceable agreement that governs the dispute. Plaintiffs argue, on the other hand, that an unjust enrichment claim can be maintained where there are grounds for recision of the contract. "Under New York law, unjust enrichment is a quasi contractual claim that ordinarily can be maintained only in the absence of a valid, enforceable contract. Where a contract governs the subject matter involved, however, a claim for unjust enrichment should be dismissed ." *Ohio Players, Inc. v. Polygram Records, Inc.,* No. 99 civ 0033, 2000 WL 1616999, at *4 (S.D.N.Y. Oct.27, 2000) (citations omitted). In this case, a valid, enforceable contract (the Agreement) governs this dispute. Although plaintiffs have argued in their opposition brief to defendants' motion to dismiss that there could be grounds for recision of the contract, they did not include recision as a remedy in their Complaint. Therefore, defendants' motion to dismiss plaintiffs' claim for unjust enrichment is granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403
(Cite as: Not Reported in F.Supp.2d)

Page 7

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss is GRANTED as to plaintiffs' negligent misrepresentation and unjust enrichment claims, as well as to plaintiffs' demand for punitive damages under the common law fraud claim. The motion to dismiss is DENIED with respect to all remaining claims.

S.D.N.Y.,2003.
Citibank, N.A. v. Itochu Intern. Inc.
Not Reported in F.Supp.2d, 2003 WL 1797847 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,403

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.