# Exhibit A

704784.1

**\*41** UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No. CV 03-2567
Medimmune, Inc., Plaintiff,
v.
Genentech, Inc., City of Hope National Medical Center, and Celltech R&D Ltd.
Defendants.

PLAINTIFF MEDIMMUNE, INC.'S COMPLAINT FOR:
1. Declaratory Judgment;
2. Patent Invalidity;
3. Patent Unenforceability;
4. Non-Infringement;
5. Section 1 of the Sherman Act;
6. Section 2 of the Sherman Act;
7. The Cartwright Act;
8. Section 17200 of the Cal. Bus. & Profs. Code; and
9. Unjust Enrichment.

DEMAND FOR JURY TRIAL
JURISDICTION AND VENUE

1. Plaintiff MedImmune, Inc. ("MedImmune") seeks declaratory relief pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1338(a). This Court has jurisdiction over the state law claims asserted hereunder pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over defendant Genentech, Inc. ("Genentech") based **\*42** on its principal place of business in California. This Court has personal jurisdiction over defendant City of Hope National Medical Center ("CHNMC") based on its organization under the laws of the state of California and because its principal place of operation is in California. This Court has personal jurisdiction over defendant Celltech R&D Ltd. ("Celltech") based on its activities in this jurisdiction, including, but not limited to, Celltech's filing of a suit against Genentech under 35 U.S.C. § 146 in the Northern District of California captioned Celltech R&D Ltd. v. Genentech, Inc., Civ. Act 01-3560JCS (N.D. Cal. 2001).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), (c), (d), and 15 U.S.C. §§ 15, 22.

THE PARTIES

3. Plaintiff MedImmune, by and through its undersigned attorneys, brings this action under antitrust, patent, and unfair competition laws against defendants Genentech, CHNMC and Celltech (collectively, "Defendants") seeking to challenge an illegal and anticompetitive agreement between Genentech and Celltech to secure the issuance of an invalid and unenforceable patent. MedImmune seeks declaratory relief that the patent is invalid, unenforceable and/or not infringed by MedImmune's Synagis(R) product and that MedImmune owes no payments under license agreements with Genentech.

4. MedImmune is a Delaware corporation with its principal place of business in Gaithersburg, Maryland. MedImmune uses biotechnology to develop and produce antibody therapies.

5. MedImmune's most successful product, Synagis(R), is used for the prevention of serious lower respiratory tract disease caused by respiratory syncytial virus ("RSV") in pediatric patients at high risk of RSV disease. RSV infection can be fatal in certain high-risk pediatric patients.

**\*43** 6. Defendant Genentech is a Delaware corporation with its principal place of business in South San Francisco, California.

7. Defendant CHNMC is a California non-for-profit organization with its principal place of operation in Duarte, California. CHNMC is an assignee of the patent at issue in this case.

8. Upon information and belief, Celltech is a British company with its principal place of business in Slough, England. Through an intermediary, the Medical Research Counsel, Celltech sub-licensed MedImmune to use the technology patented in U.S. Patent No. 4,816,397 (the "Boss Patent").

## SUMMARY OF THIS ACTION

9. MedImmune has filed this action to challenge an illegal and anticompetitive agreement (the "Agreement") between Genentech and Celltech, two large biotechnology companies, which has the effect of creating a 29-year patent monopoly over what Genentech now claims is the "fundamental technology" required for the artificial synthesis of antibody molecules. MedImmune likewise seeks a declaration that the patent improperly created by this Agreement is invalid, unenforceable and/or not infringed by MedImmune's sale of its antibody product, Synagis(R), and that MedImmune owes no payments under license agreements with Genentech.

10. Genentech and Celltech have conceded the existence of the Agreement but to date have refused to make it public. Their refusal to disclose the Agreement is purportedly based on confidentiality grounds, notwithstanding the fact that the alleged "invention" at issue is already twenty years old and is described in issued patents. Nonetheless, the parties' own press releases and public filings about the terms of the Agreement have demonstrated its collusive nature and the fact that it benefits only Celltech and Genentech, while harming competition.

**\*44** 11. The Agreement between Celltech and Genentech was reached in the context of a dispute that began in the United States Patent and Trademark Office ("PTO") between Genentech and Celltech regarding priority of invention. Simply put, Genentech asserted that its assignors had invented the same subject matter claimed by the Boss Patent before Celltech's assignors. Thus, Genentech asserted that the Boss Patent held by Celltech (which had been in effect since 1989) should never have issued and that, instead, a new patent should be granted to Genentech covering this same technology. At the time the Agreement was entered into, the PTO had already rejected Genentech's assertion that it, and not Celltech, was entitled to a patent after conducting an administrative proceeding, known as an interference, that lasted seven years. Additionally, a federal court that considered Genentech's appeal had already rejected Genentech's attempts to obtain summary judgment in its favor.

12. Notwithstanding Celltech's legal victories over Genentech in this controversy, some time prior to March 16, 2001 Celltech and Genentech entered into the Agreement, pursuant to which (a) Genentech was declared the winner of the legal dispute between them and awarded priority of invention; (b) the PTO would immediately be asked to revoke Celltech's Boss Patent; and (c) the PTO would be asked to issue simultaneously a new patent to Genentech substantially identical to the Boss Patent (the "New Cabilly Patent"), but with a fresh 17- year life.

13. By entering the Agreement, Celltech obtained more benefits than it ever

could have achieved simply by prevailing in the lawsuit with Genentech. Significantly, a Celltech Annual Report revealed that Genentech agreed to provide Celltech with a "preferential" license to the New Cabilly Patent. Moreover, although Celltech agreed to an immediate revocation of its Boss Patent, upon information and belief, it suffered no monetary harm from doing so. According to a *45 Celltech press release, Genentech agreed to make Celltech whole for any royalties Celltech would have received had its Boss Patent remained in existence until 2006, when it was to expire. Thus, as part of the Agreement, Genentech agreed to pay Celltech, the nominal "loser" in the legal dispute, the royalties that Celltech would have received had Celltech won. Additionally, Celltech benefits to the extent that Genentech uses the New Cabilly Patent to harm competitors of Celltech.

14. The Agreement thus provided Genentech with monopoly power based on a brand new patent with a full 17-year life that would enable Genentech to deny competitors access to what it asserts to be fundamental technology necessary for the production of monoclonal antibodies.

15. The Agreement has profoundly and fundamentally altered the competitive landscape in the biotechnology industry. Before the Agreement, Celltech had granted its competitors broad access to this technology by liberally licensing its Boss Patent. Upon information and belief, in reliance upon the permissive licensing policy of Celltech and the expectation that the patent would expire in 2006, numerous biotechnology companies, including MedImmune, launched research programs to develop monoclonal antibody products that potentially could provide great health benefits to society.

16. Many of these health and life-enhancing products are now in clinical trials to obtain FDA approval and are being prepared for commercialization. Genentech's New Cabilly Patent is an obstacle that can prevent these new antibody products from coming to market.

17. Genentech is thus in a position to demand a much higher royalty for use of this technology until 2018 (when the New Cabilly Patent will expire). Thus, the Agreement allows Genentech to exclude competitors from the market until 2018 or reap monopoly profits from any licenses which it may *46 choose to grant. Celltech also benefits from this state of affairs because it has "preferential access" to the New Cabilly Patent and to the extent that the New Cabilly Patent may be used to exclude firms that compete with Celltech.

18. With its New Cabilly Patent in hand, Genentech immediately exercised its illegally obtained monopoly by advising MedImmune that the New Cabilly Patent covers MedImmune's Synagis(R) product. As a consequence of this assertion, MedImmune began to make and continues to make significant payments to Genentech under an agreement entered into by MedImmune and Genentech on or about June 5, 1997 (the "1997 License Agreement"). This 1997 license Agreement provided rights to various intellectual property, including the patent application that later matured into the New Cabilly Patent. After issuance of the New Cabilly Patent, MedImmune was forced to obtain additional license agreements from Genentech on or about February 7, 2003 - at substantial cost - to cover seven new products that MedImmune has been developing (the "2003 License Agreements") (collectively the 1997 and 2003 License Agreements are referred to herein as the "License Agreements").

19. MedImmune now seeks relief from Genentech and Celltech for their activities in violation of Sections 1 and 2 of the Sherman Act, Section 16720 of the California Cartwright Act, Section 17200 of the California Business &

Professions Code, and under the common law of unjust enrichment in connection with the illegal and anticompetitive Agreement.

20. MedImmune also seeks a declaration that: (a) the New Cabilly Patent (which is co-owned by Genentech and CHNMC) is invalid; (b) the New Cabilly Patent is unenforceable; (c) MedImmune's sales of its Synagis(R) product do not infringe any valid claim of the New Cabilly Patent and (d) MedImmune owes no payments to Genentech under the License Agreements.

*47 GENENTECH AND CELLTECH REACH THEIR AGREEMENT AND CREATE THE NEW CABILLY PATENT

21. On April 8, 1983, Shmuel Cabilly, Herbert L Heyneker, William E. Holmes, Arthur D. Riggs and Ronald B. Wetzel (collectively, the "Applicants") filed U.S. Patent Application No. 483,457 (the "Old Cabilly Application"). Upon information and belief, Shmuel Cabilly and Arthur D. Riggs were affiliated with CHNMC, while Herbert L Heyneker, William E. Holmes and Ronald B. Wetzel were affiliated with Genentech. Upon information and belief, interests in this application and any subsequently issued patents were assigned to Genentech and CHNMC.

22. Based on the Old Cabilly Application, on March 28, 1989 the PTO issued U.S. Patent No. 4,816,567 (the "Old Cabilly Patent") to the above named Applicants.

23. On June 10, 1988 the Applicants filed U.S. Patent Application No. 205,419 (the "New Cabilly Application") as a continuation to the Old Cabilly Application.

24. On the same day the Old Cabilly Patent was issued, March 28, 1989, Celltech was issued the Boss Patent.

25. After the Boss Patent was issued, Genentech sought to claim the purported invention of the Boss Patent as its own. Genentech therefore amended its New Cabilly Application by including claims copied from the Boss Patent, which caused the PTO Board of Patent Appeals & Interferences (the "PTO Board") to initiate an interference proceeding to determine priority of invention, i.e., who was first purportedly to invent the subject matter claimed by both Celltech and Genentech.

The Seven Year PTO Interference

26. On February 28, 1991 the PTO Board declared a patent interference between Genentech's New Cabilly Application and the Boss Patent on the basis that both claimed the same purported invention.

*48 27. Genentech and Celltech then spent the next seven years in an adversarial interference proceeding before the PTO Board, each arguing that it was the first to make the purported invention at issue.

28. On August 13, 1998 the PTO Board held that Genentech had failed to carry its burden of proving that it was the first to make the purported invention and therefore held that Celltech's Boss Patent was entitled to priority over the New Cabilly Application.

Genentech Appeals and Discovers "New" Evidence

29. Faced with its loss before the PTO Board, on October 9, 1998 Genentech commenced a civil action, Genentech, Inc. v. Celltech R & D Ltd., Case No. C98-3926 MMC ("Civil Action"), in the United States District Court for the

Northern District of California under 35 U.S.C. § 146 to appeal the decision of the PTO Board awarding priority of invention to Celltech.

30. The Civil Action lasted for more than two years, and included extensive depositions, document production and expert disclosure.

31. More than nine years into the dispute, sometime in early 2000, Shmuel Cabilly claimed to have found - for the very first time - a draft patent application dated February 25, 1983 (the "Draft Cabilly Application") in his files in Israel that, according to Genentech, established that Cabilly and his colleagues had invented the technology a mere 30 days before the invention date accorded to the Boss Patent based on its United Kingdom Patent application filing date.

32. Based on the late and highly convenient unearthing of this allegedly critical evidence, Genentech moved the District Court for summary judgment that it should be entitled to priority of invention over Celltech. Genentech argued that because the Draft Cabilly Application contained each and *49 every element of the claimed invention, and was dated earlier than the Boss priority date of March 25, 1983, Genentech should be awarded priority of invention over Boss because Genentech allegedly demonstrated "conception" of the invention by no later than the date of the draft. Further, Genentech argued that it was "reasonably diligent" in preparing and filing the application, which it conceded was a legal prerequisite to being awarded priority. However, Genentech now relied on the alleged diligence of its attorneys in preparing the patent application and "constructive" reduction to practice, which was different from the theory of inventor diligence and actual reduction to practice it had argued before the PTO Board.

Motive to Collude

33. In opposing Genentech's priority argument in the Civil Action based on the Draft Cabilly Application, Celltech asserted that the draft fell short of satisfying the legal requirements for "conception" in that it did not set forth each and every element of the invention. Additionally, Celltech argued that Genentech had changed its basic theory of the case from what it asserted before the PTO Board, a tactic which is not permitted in appeals from PTO interference proceedings.

34. Genentech responded by pointing out that Celltech's March 25, 1983 United Kingdom Boss Patent application suffered from the same deficiencies, which called into question whether Celltech had actually invented the disputed technology. Separately, Genentech also moved for summary judgment that Celltech was not entitled to the March 25, 1983 priority date because of defects in the United Kingdom Boss Patent application.

35. Thus, the dispute over the Draft Cabilly Application caused each party to argue that the other was not in possession of the "invention" at issue in early 1983. This new posture raised the possibility - which MedImmune contends *50 is the correct outcome - that neither Genentech nor Celltech was entitled to the patent in question. Genentech and Celltech, which had waged this priority dispute for nine years, should have appreciated the possibility that at the end of a protracted legal battle, neither side would end up with a valid patent. This realization provided a strong motive for the Agreement that they entered.

36. The illegal and anticompetitive Agreement was reduced to writing by

Genentech and Celltech sometime after July 31, 2000, when the Court denied Genentech's motions for summary judgment. Upon information and belief, Genentech and Celltech entered into the Agreement with a bad faith intent to limit and injure competition as illustrated by the fact that the Agreement called for Celltech to concede defeat to Genentech and sacrifice the Boss Patent. Celltech did so, notwithstanding the facts that it had just defeated Genentech's summary judgment motions based on the "newly discovered" evidence, and that Celltech had established priority in the PTO after a seven-year proceeding.

37. According to publicly available statements, the Agreement required Genentech to make Celltech whole by compensating Celltech for the royalties it would have received under the Boss Patent. Such "reverse payments" (so-called because they were made by Genentech, the nominal winner in the "settlement," to Celltech, the nominal loser) thus provided Celltech all the benefits it would have received had it preserved the victory it had earned at the PTO Board.

38. Indeed, the Agreement put Celltech in a position better than any outcome it could have obtained in litigation. Celltech has publicly admitted that Genentech agreed to give Celltech and its products "preferential access" to Genentech's New Cabilly Patent, which could keep competitors at bay, or at a competitive disadvantage, for twelve years longer than Celltech's Boss Patent could have done so.

*51 Genentech and Celltech Submit a Deficient Proposed Order to the District Court

39. The parties submitted a proposed order to the District Court in order to implement their Agreement. The proposed order contained a "finding" that Genentech won the priority controversy as a matter of law because the Draft Cabilly Application constituted evidence of "conception" prior to the Boss Patent. In fact, as Celltech had argued successfully in opposition to Genentech's summary judgment motion, the Draft Cabilly Application did no such thing in that it was missing certain key elements of the claimed invention. Having first convinced the Court that the Draft Cabilly Application did not prove conception as a matter of law, Celltech reversed course completely and asked the Court to find that it did.

40. Moreover, the findings in the proposed order were insufficient as a matter of law to declare Genentech the prevailing party. In addition to the requirement that Genentech show "conception" before the Boss priority date, it also was necessary as a matter of well established patent law for Genentech to show "reasonable diligence" during the critical period in order to pre-date the Boss Patent. Despite the fact that both Celltech and Genentech recognized and briefed this legal requirement in connection with the summary judgment motions, the proposed order contained no finding with respect to the essential requirement of "reasonable diligence." Moreover, Celltech's concession was flatly inconsistent with Celltech's previous argument that Genentech was precluded from relying on its proffered theory of "attorney diligence," having failed to raise this issue in the PTO interference proceeding.

41. Other than striking the word "proposal" in the title, the District Court on March 16, 2001 signed without change the proposed order that the parties had submitted jointly in *52 order to implement their illegal and anticompetitive Agreement (the "Order").

42. The March 16, 2001 Order (drafted by Genentech and Celltech) remanded the case back to the PTO Board for further action consistent with the Agreement. Specifically, the Order directed the PTO Board to do three things: (a) "to vacate the PTO's decision in Cabilly, et al. v. Boss et al., Patent Interference No. 102,572"; (b) "to revoke and vacate United States Patent No. 4,816,397, issued March 28, 1989 to Boss, et al."; and (c) "to grant and issue to Genentech's Inventors (with Genentech as the assignee), with the issue date being the same as the date of revocation of United States Patent No. 4,816,397 [the Boss Patent], a United States patent ..." (Emphasis added).

### PTO Board Expresses Concerns Regarding the Agreement

43. In response to the District Court's Order, the PTO Board revoked the Boss Patent, but refused to issue the New Cabilly Patent, noting that neither the parties nor the District Court had any authority to compel the PTO to issue a patent, particularly when the administrative examination process had not been completed.

44. The fact that the Agreement called for the instantaneous issuance of the New Cabilly Patent, when the parties well knew that the examination process had not been completed, is further evidence of their bad faith and their intent to prevent the PTO from examining the patentability of the alleged invention.

45. The PTO Board expressed concerns about the parties' Agreement. Among other things, the PTO Board noted that the Agreement effectively created a 29-year patent "We will note that if a patent is issued to Cabilly, its term will begin to run now and the public has already been subject to patent rights of Boss since 1989, and that the interference has been pending since 1991."

**\*53** 46. Additionally, the PTO Board expressed concern that Celltech had seemingly abandoned a winning position. In particular, there was no indication that Celltech had raised with the District Court the issue of whether Genentech's "newly discovered" Draft Cabilly Application should have been precluded from evidence because Genentech had not shown that it was diligent in locating this evidence during the more than seven year interference proceeding before the PTO Board.

47. In response to the PTO's refusal to issue the New Cabilly Patent to Genentech at the same time it revoked the Boss Patent, Celltech filed a new federal court action in the United States District Court for the Northern District of California seeking an order directing the PTO to issue a patent to Genentech. Thus, it appears that Celltech claimed to be aggrieved by the failure of the PTO to issue a patent to Genentech. Because of the Agreement, however, Celltech's concern was understandable: Not only had Genentech agreed to make Celltech whole for any "lost" royalties from the Boss Patent, but Genentech had also agreed to give Celltech "preferential access" to its New Cabilly Patent; thus, it was now in Celltech's interest to have the New Cabilly Patent issue so that it could jointly dominate the market with Genentech.

### Examination of the New Cabilly Application

48. Despite its stated reservations, the PTO Board referred the New Cabilly Application to the examiner, given that a major impediment to the issuance of the patent (namely, the Boss Patent) had now been removed by the Court Order (drafted by Genentech and Celltech) resolving the priority issue.

49. During examination of the New Cabilly Application, while under a duty of candor to the PTO, Genentech engaged in improper conduct by deluging the examiner with a stack of *54 potentially relevant prior art references and other materials, without directing the examiner to those of most direct relevance. This practice had the effect of "burying" the most relevant prior art. Moreover, Genentech either mischaracterized or failed to cite other important prior art.

50. Genentech also should have, but did not, bring to the PTO's attention the fact that Genentech had previously taken a position about one or more prior art references that contradicted the position that Genentech was then taking before the examiner in order to attempt to obtain issuance of the New Cabilly Patent.

51. For example, Genentech had submitted to the European Patent Office ("EPO") a document in a Notice of Opposition proceeding (EP-B-0120694 (84301996.9)) filed on April 19, 1994 wherein Genentech conveyed a position regarding the significance of Valle at [sic] al., 300 NATURE 71 (1982) that was contradictory to the position Genentech conveyed to the PTO regarding the significance of that same reference.

52. Had Genentech alerted the PTO to the existence of its earlier position before the EPO when it notified the PTO of the existence of the Valle reference, the examiner would have determined that the Valle prior art reference is a material reference that anticipates or renders obvious the New Cabilly Patent.

53. Moreover, Genentech attempted, by the express terms of the Agreement, to bypass the examination process altogether by requiring immediate issuance of the New Cabilly Patent. When the PTO Board rebuffed this attempt and referred the matter to the examiner, Genentech was under a duty of candor to disclose to the examiner the significant, material issues as to the patentability of the invention which became known to Genentech no later than during the course of the summary judgment briefing in the Civil Action. Not- *55 withstanding this duty of candor, Genentech never directed the examiner to these significant patentability issues. Properly considered by a reasonable examiner, these flaws in the so-called "invention" would have been material to the consideration of the examiner and would have resulted in a determination that the claims of the New Cabilly Application were unpatentable.

### Issuance of the New Cabilly Patent

54. Subsequent to Genentech's misrepresentations and material omissions to the PTO, the New Cabilly Patent, U.S. Patent No. 6,331,415B1, issued on December 18, 2001.

55. The New Cabilly Patent is titled "Methods of Producing Immunoglobulins, Vectors and Transformed Host Cells for Use Therein." It lists as inventors Shmuel Cabilly, Herbert L. Heyneker, William E. Holmes, Arthur D. Riggs and Ronald B. Wetzel and Genentech as the assignee. A Certificate of Correction issued by the PTO on June 25, 2002 added CHNMC as an additional assignee.

56. The New Cabilly Patent purports to cover "processes for producing an immunoglobulin or an immunologically functional immunoglobulin fragment ... in a single [host] cell" and, according to Genentech's press release, purportedly relates to the "fundamental methods and compositions used to

produce antibodies by recombinant DNA technology." When injected into humans, these antibody molecules (sometimes referred to as "immunoglobulins) can help prevent disease.

57. On the same day the New Cabilly Patent was issued, Celltech issued a press release revealing some of the terms of its illegal and anticompetitive Agreement with Genentech. Celltech admitted that "Celltech will be compensated by Genentech in terms of income from sales of products which would have been covered by the Boss Patent until its normal expiring date in 2006." Thus, notwithstanding the fact that the Boss patent was revoked by the PTO Board in 2000 (pursuant *56 to the Agreement of the parties), upon information and belief, Celltech effectively continues to receive royalties until 2006. Receipt of royalties after patent expiration constitutes per se patent misuse.

58. Moreover, the Celltech press release notes that Celltech is to receive favored treatment under the New Cabilly Patent. The release says that "Celltech also ... secured preferential access for its development programes to the Cabilly patent, which covers the production of a broad range of antibody or antibody fragment products, for its 17 year life." However, the parties have not disclosed the precise terms of this "preferential access."

Secrecy and Potentially Improper Filing of Agreement with the PTO
59. Pursuant to 35 U.S.C. § 135(c), any agreement to settle a patent interference proceeding must be filed with the PTO. As the Senate Report related to this legislation explains, "[i]nterference proceedings may be terminated in a manner hostile to the public interest by using patent interference settlement agreements as a means of restricting competition. To make such a practice more difficult the bill requires the filing of such agreements in the Patent Office." Defendants have filed the document under seal, preventing MedImmune and the public from determining the exact terms of the Agreement or even if it was filed within the prescribed time limits. A failure to file an agreement terminating an interference within the prescribed limits will result in a finding that the patent is permanently unenforceable.

60. In a letter dated February 13, 2002, MedImmune requested a copy of the Agreement from Genentech.

61. Genentech denied MedImmune's request for a copy of the Agreement in a letter dated March 24, 2002, stating that "the settlement agreement is a confidential document, and we cannot provide it to you."

*57 62. On May 8, 2002, MedImmune petitioned the PTO for access to this Agreement, and on July 22, 2002, continuing in their efforts to conceal the Agreement from public scrutiny, both Celltech and Genentech opposed MedImmune's petition. To the best of MedImmune's knowledge, the PTO has not yet ruled on MedImmune's request as of the date of this Complaint.

GENENTECH REAPS THE BENEFIT OF THE NEW CABILLY PATENT MONOPOLY
63. In public statements Genentech has taken the position that the New Cabilly Patent is extremely broad. For example, Genentech's vice president of intellectual property, Sean Johnston, has stated "we do not believe that the claims are limited by type of antibody (murine, humanized [90% human sequence] or human) or by host cell type" and that "the recently issued patent broadly covers the co-expression of immunoglobulin heavy and light chain genes in a single host cell." In other words, Genentech asserts that

the New Cabilly Patent broadly covers the basic method of artificially producing any monoclonal antibody using recombinant DNA technology in any type of host cell.

64. Consistent with this position, in a letter dated January 7, 2002, Genentech advised MedImmune of its "expectation that MedImmune will pay royalties on sales of its Synagis(R) antibody product pursuant to the license granted by Genentech under the recently issued U.S. Patent No. 6,331,415 [the New Cabilly Patent]."

65. In a letter dated February 13, 2002, MedImmune disputed this demand for royalty payment and requested an explanation of Genentech's "basis for believing that MedImmune's product would infringe any valid claim of the [New Cabilly] Patent such that royalties would be due" and also requested a copy of the Agreement.

*58 66. Receiving no response to its February 13, 2002 letter and fearing the commencement of patent infringement litigation by Genentech before MedImmune could complete its investigation as to the validity and/or enforceability of the New Cabilly Patent, MedImmune made the requested royalty payment, but in a letter dated March 8, 2002 stated that "[s]uch payment, however, was made under protest and with reservation of all of our rights." MedImmune continues to make such royalty payments on a quarterly basis.

INJURY TO MEDIMMUNE AND COMPETITION

67. The Agreement substantially and adversely affects MedImmune in particular and competition in the biotechnology industry in general by limiting access to what Genentech now claims is the core technology for the production of artificially synthesized antibodies.

68. Prior to the Agreement, Celltech controlled this technology through its interest in the Boss Patent, and had authorized the Medical Research Council in London ("MRC") to grant sublicenses to the Boss Patent, which it did liberally and with minimal field of use restrictions.

69. Upon information and belief, MedImmune was one of many biotechnology companies that obtained a sublicense to the Boss Patent at a previously established royalty rate.

70. However, the Agreement effectively nullified the sublicenses freely granted by MRC to technology that would lose patent protection in 2006, and now leaves companies at the mercy of Genentech to acquire new licenses to the New Cabilly Patent, a patent which will not expire until 2018.

71. Genentech is in a position to use the New Cabilly Patent to force biotechnology companies, including MedImmune, to pay substantial royalties to retain access to the same technology that Celltech (through MRC) had once licensed to them, or simply be denied access altogether.

*59 72. The New Cabilly Patent has damaged MedImmune in the form of the payments to Genentech under the 1997 License Agreement based on sales of Synagis(R). (In addition to payments to Genentech on account of the New Cabilly Patent, MedImmune continues to pay royalties to MRC despite revocation of the Boss Patent because the Boss Patent license was part of a package with another patent.) Additionally, MedImmune has, as a practical matter, been compelled - at great cost - to enter into the 2003 License

Agreements with Genentech to protect its investments in seven critically important products in various stages of pre-clinical and clinical trials, including the antibodies Vitaxin and Medi-507, and antibodies against each of EphA2, IL-9, PC-Cell-Derived Growth Factor ("PCDGF"), Human Aspartyl (Asparaginyl) BetaHydroxylase ("HAAH"), and Human Metapneumovirus ("hMPV"), which target, among other illnesses, cancer, asthma and other respiratory diseases, rheumatoid arthritis and psoriasis. These substantial payment obligations to Genentech under the License Agreements, on account of the New Cabilly Patent, harm MedImmune's ability to compete in its sale of antibody products.

### Relevant Market

73. The relevant market is the fundamental recombinant DNA technology for producing antibodies, including the process for producing an immunoglobulin or an immunologically functional immunoglobulin fragment in a single host cell that is purportedly covered by the claims of the New Cabilly Patent.

74. This technology, as interpreted by Genentech, is an essential component to the commercial manufacture of monoclonal antibodies. Upon information and belief, there is no known commercially viable method for recombinantly producing therapeutic antibody molecules without this technology, assuming that the New Cabilly Patent is as broad as Genentech says it is. If so, upon information and belief, no *60 known proven alternative to this technology exists currently, and the development of any such alternative would require substantial investment of money, resources and time, and cannot reasonably be expected in the foreseeable future.

75. The relevant geographic market is the entire United States.

### Market Effects

76. The unlawful conduct of Genentech and Celltech has required MedImmune and, upon information and belief, other users of this technology to obtain new licenses and/or pay additional and substantial royalties under extant licenses for a term beyond that contemplated under existing patent law, or to be excluded from use of this technology.

77. The unlawful conduct of Genentech and Celltech and the resulting issuance of the New Cabilly Patent has diminished the incentive of MedImmune and other users of the technology to invest in products making use of the technology.

### FIRST CAUSE OF ACTION:
### DECLARATORY JUDGMENT ON CONTRACTUAL RIGHTS AND OBLIGATIONS
### (Against Genentech)

78. MedImmune incorporates the allegations of paragraphs 1 through 77 as if fully set forth herein.

79. An actual controversy has arisen and now exists between the parties concerning the rights and obligations of MedImmune under the terms of the License Agreements. Genentech has demanded that MedImmune make payments under the 1997 License Agreement on the basis that Synagis(R) would infringe a valid claim of the New Cabilly Patent but for the 1997 License Agreement. MedImmune disputes its obligation to make payments under the 1997 *61 License Agreement because MedImmune's sale of its Synagis(R) product does not infringe any valid claim of the New Cabilly Patent. The basis for invalidity of the New Cabilly Patent arises under the patent laws of the United States, 35 U.S.C. §§ 101, 102, 103, 112, et seq. and/or the judicially created

doctrine of obviousness type double patenting.

80. MedImmune hereby seeks a declaratory judgment that it owes no payments under the License Agreements.

### SECOND CAUSE OF ACTION:
### PATENT INVALIDITY
### (Against Genentech and CHNMC)

81. Medimmune incorporates the allegations of paragraphs 1 through 80 as if fully set forth herein.

82. An actual controversy has arisen and now exists between the parties concerning the validity of the New Cabilly Patent.

83. The New Cabilly Patent is invalid because it is anticipated and/or obvious under 35 U.S.C. §§ 102 and/ or 103.

84. The New Cabilly Patent is invalid based on the judicially created doctrine of obviousness type double patenting and/or under 35 U.S.C. §§ 101 and/or 103.

85. The New Cabilly Patent is invalid under 35 U.S.C. § 112.

86. MedImmune hereby seeks a declaratory judgment that the New Cabilly Patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112, et seq. and/or under the judicially created doctrine of obviousness type double patenting.

### *62 THIRD CAUSE OF ACTION:
### PATENT UNENFORCEABILITY
### (Against Genentech and CHNMC)

87. MedImmune incorporates the allegations of paragraphs 1 through 86 as if fully set forth herein.

88. An actual controversy has arisen and now exists between the parties concerning the enforceability of the New Cabilly Patent.

89. The New Cabilly Patent is unenforceable due to the patent applicants' inequitable conduct before the PTO. Such conduct included the hiding of critical references by "burying" them in the midst of other references of minimal relevance, failing to cite certain prior art at all or to act with candor regarding the significance of certain prior art, and failing to advise the PTO of previous positions that Genentech had taken with respect to certain prior art which are inconsistent with the positions it then took with respect to that same prior art before the examiner of the New Cabilly Patent. In addition, the inequitable conduct also included the failure to direct the PTO to significant flaws in the patentability of the invention which Genentech became aware of no later than during the course of the Civil Action.

90. MedImmune hereby seeks a declaratory judgment that the New Cabilly Patent is unenforceable.

### FOURTH CAUSE OF ACTION:
### NON-INFRINGEMENT
### (Against Genentech and CHNMC)

91. MedImmune incorporates the allegations of paragraphs 1 through 90 as if fully set forth herein.

92. An actual controversy has arisen and now exists between the parties concerning whether MedImmune's **\*63** Synagis(R) product infringes any valid and enforceable claim of the New Cabilly Patent, but for the 1997 License Agreement.

93. MedImmune hereby seeks a declaratory judgment that, but for the 1997 License Agreement, its Synagis(R) product does not infringe any valid and enforceable claim of the New Cabilly Patent

### FIFTH CAUSE OF ACTION:
### SECTION I OF THE SHERMAN ACT
### (Against Genentech and Celltech)

94. MedImmune incorporates the allegations of paragraphs 1 through 93 as if fully set forth herein.

95. Genentech and Celltech conspired and reached the collusive Agreement that ultimately led to the improper issuance of the New Cabilly Patent.

96. Upon information and belief, the Agreement was entered into with the bad faith intent to harm competition.

97. The Agreement has a direct effect upon interstate trade or commerce.

98. Due to Genentech's and Celltech's anticompetitive behavior, MedImmune, among others in the industry, has been harmed by either being blocked from the market altogether or by being required to make exorbitant payments for use of the technology purportedly covered by the claims of the New Cabilly Patent.

99. The unlawful contact, combination, or conspiracy of Genentech and Celltech has no legitimate business objective and is a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, et seq.

**\*64** 100. Upon information and belief, among other things, the Agreement is a market allocation agreement between horizontal competitors that is anticompetitive and illegal per se under Section 1 of the Sherman Act, 15 U.S.C. § 1, et seq.

101. Alternatively, the unlawful contract, combination, or conspiracy of Genentech and Celltech unreasonably restrains competition in the relevant market and violates Section 1 of the Sherman Act under the Rule of Reason.

102. Genentech and Celltech are liable under Section 1 of the Sherman Act to MedImmune for damages in an amount to be proven at trial, including, without limitation, all payments made by MedImmune to Genentech on account of the New Cabilly Patent; which damages should be trebled under 15 U.S.C. § 15(a), plus interest costs and expenses, including attorney fees.

### SIXTH CAUSE OF ACTION:
### SECTION 2 OF THE SHERMAN ACT
### (CONSPIRACY TO MONOPOLIZE)
### (Against Genentech and Celltech)

103. MedImmune incorporates the allegations of paragraphs 1 through 102 as if fully set forth herein.

104. Genentech and Celltech conspired and reached the collusive Agreement that ultimately led to the improper issuance of the New Cabilly Patent

105. Upon information and belief, the Agreement was entered into with the specific intent to grant a monopoly to Genentech that consists of the exclusive rights to what is asserted to be the fundamental technology embodied in the New Cabilly Patent

106. The Agreement has a direct effect upon interstate trade or commerce.

\*65 107. Due to Genentech's and Celltech's anticompetitive behavior, MedImmune, among others in the industry, has been harmed by either being blocked from the market altogether or by being required to make exorbitant payments for use of the technology purportedly covered by the claims of the New Cabilly Patent.

108. The unlawful conspiracy of Genentech and Celltech violates Section 2 of the Sherman Act, 15 U.S.C. § 2, et seq.

109. Genentech and Celltech are liable under Section 2 of the Sherman Act to MedImmune for damages in an amount to be proven at trial, including, without limitation, all payments made by MedImmune to Genentech on account of the New Cabilly Patent; which damages should be trebled under 15 U.S.C. § 15(a), plus interest, costs and expenses, including attorney fees.

SEVENTH CAUSE OF ACTION:
SECTION 2 OF THE SHERMAN ACT
(MONOPOLIZATION BY GENENTECH)
(Against Genentech)

110. MedImmune incorporates the allegations of paragraphs 1 through 109 as if fully set forth herein.

111. Upon information and belief, Genentech has monopoly power in the relevant market (as defined above).

112. Upon information and belief, Genentech willfully acquired and/or maintained its market dominance in the relevant market by anticompetitive means.

113. Genentech's willful acquisition and/or maintenance of its monopoly power by anticompetitive means has harmed MedImmune, among others in the industry, by either blocking them from the market altogether or requiring them to make exorbitant payments for use of the technology.

\*66 114. Genentech is liable under Section 2 of the Sherman Act to MedImmune for damages in an amount to be proven at trial, including, without limitation, all payments made to date by MedImmune to Genentech on account of the New Cabilly Patent; which damages should be trebled under 15 U.S.C. § 15(a), plus interest, costs and expenses, including attorney fees.

EIGHTH CAUSE OF ACTION:
THE CARTWRIGHT ACT
(UNLAWFUL RESTRAINT OF TRADE)
(Against Genentech and Celltech)

115. MedImmune incorporates the allegations of paragraphs 1 through 114 as if fully set forth herein.

116. Genentech and Celltech improperly conspired and reached the collusive Agreement that ultimately led to the improper issuance of the New Cabilly Patent

117. Upon information and belief, the Agreement was entered into with the bad faith intent to harm competition.

118. The Agreement has a direct effect upon trade or commerce in California.

119. The collusive Agreement has no legitimate procompetitive business objective and unreasonably harms competition.

120. Due to Genentech's and Celltech's anticompetitive behavior in violation of Section 16720 of the California Cartwright Act, MedImmune has been damaged by, for example, being required to make exorbitant payments for use of the New Cabilly Patent technology. Genentech and Celltech are liable to MedImmune for damages in an amount to be proven at trial; trebled under § 16750, plus interest, costs and expenses, including attorney fees.

**\*67 NINTH CAUSE OF ACTION:**
**THE CARTWRIGHT ACT**
**(CONSPIRACY TO MONOPOLIZE)**
**(Against Genentech and Celltech)**

121. MedImmune incorporates the allegations of paragraphs 1 through 120 as if fully set forth herein.

122. Genentech and Celltech conspired and reached the collusive Agreement that ultimately led to the improper issuance of the New Cabilly Patent.

123. Upon information and belief, the Agreement was entered into with the specific intent to grant a monopoly to Genentech that consists of the exclusive rights to what is asserted to be the fundamental technology embodied in the New Cabilly Patent.

124. The Agreement has a direct effect upon trade or commerce in California.

125. Due to Genentech's and Celltech's anticompetitive behavior, MedImmune, among others in the industry, has been harmed by either being blocked from the market altogether or by being required to make exorbitant payments for use of the technology purportedly covered by the claims of the New Cabilly Patent.

126. The unlawful conspiracy of Genentech and Celltech violates Sections 16720 et seq. of the California Cartwright Act.

127. Genentech and Celltech are liable under Section 16720 of the Cartwright Act to MedImmune for damages in an amount to be proven at trial, including, without limitation, all payments made to date by MedImmune to Genentech on account of the New Cabilly Patent; which damages should be trebled under § 16720, plus interest, costs and expenses, including attorney fees.

**\*68 TENTH CAUSE OF ACTION:**
<u>**SECTION 17200 OF THE CALIFORNIA BUSINESS & PROFESSIONS CODE**</u>
**(Against Genentech and Celltech)**

128. MedImmune incorporates the allegations of paragraphs 1 through 127 as if fully set forth herein.

129. Upon information and belief, Genentech and Celltech have colluded to obtain the issuance of the New Cabilly Patent, and have engaged in unfair, illegal or fraudulent business practices in violation of Section 17200 of the California Business & Professions Code. Due to the Defendants' unfair business practices, MedImmune has been required to make exorbitant payments for use of the New Cabilly Patent's technology.

130. Genentech and Celltech are liable to MedImmune for restitution of payments made to Genentech on account of the New Cabilly Patent, which payments are continuing, and Genentech should be enjoined from attempting to enforce the New Cabilly Patent and any of the terms of the collusive Agreement.

ELEVENTH CAUSE OF ACTION:
UNJUST ENRICHMENT
(Against Genentech)

131. MedImmune incorporates the allegations of paragraphs 1 through 130 as if fully set forth herein.

132. As a result of the Agreement and improper issuance of the New Cabilly Patent, Genentech has been unjustly enriched in an amount to be proven at trial on account of payments made by MedImmune under the New Cabilly Patent, which payments are continuing.

*69 PRAYER FOR RELIEF

WHEREFORE, plaintiff MedImmune requests that judgment be entered in favor of MedImmune and against Defendants:

1. DECLARING that MedImmune has no obligation to pay royalties to Genentech under the License Agreements because the New Cabilly Patent is invalid and/or unenforceable and/or because MedImmune's sale of its Synagis(R) product does not infringe any valid claim of the New Cabilly Patent;

2. DECLARING that the New Cabilly Patent is invalid under 35 U.S.C. §§ 101, 102, 103, 112, et seq. and/or the judicially created doctrine of obviousness type double patenting;

3. DECLARING that MedImmune's sale of its Synagis(R) product does not infringe any valid and enforceable claim of the New Cabilly Patent;

4. DECLARING that the Agreement between Genentech and Celltech violates Section 1 of the Sherman Act;

5. DECLARING that the Agreement between Genentech and Celltech violates Section 2 of the Sherman Act;

6. DECLARING that the Agreement between Genentech and Celltech violates Section 17200 of the California Business & Professions Code;

7. DECLARING that the Agreement between Genentech and Celltech violates Section 16720 of the Cartwright Act;

8. ENJOINING Genentech and/or CHNMC from enforcing the New Cabilly Patent;

9. AWARDING MedImmune damages resulting from Genentech's unjust enrichment;

*70 10. AWARDING MedImmune actual and exemplary damages resulting from

Genentech's and Celltech's anticompetitive use of the New Cabilly Patent, including, without limitation, treble damages under 15 U.S.C. § 15(a), Section 16750 of the California Cartwright Act, and such other exemplary damages as are available at law, including those available on account of Genentech's and Celltech's oppression, fraud, or malice; attorney fees; and costs; and

11. PROVIDING MedImmune such other and further relief as the Court may deem just and proper under the circumstances.

Date: April 11, 2003
 DEWEY BALLANTINE LLP
 By: /s/ Jeffrey R. Witham
 Jeffrey R. Witham
 Attorneys for Plaintiff MEDIMMUNE, INC.

DEMAND FOR JURY TRIAL

Plaintiff Medimmune, Inc. hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.
 DEWEY BALLANTINE LLP
 By: /s/ Jeffrey R. Witham
 Jeffrey R. Witham
 Attorneys for Plaintiff MEDIMMUNE, INC.