# Exhibit B

704784.1

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

▶

MedImmune, Inc. v. Genentech, Inc.
C.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
MEDIMMUNE, INC, Plaintiff
v.
GENENTECH, INC., et al. Defendants
No. CV 03-2567 MRP (CTX).

April 26, 2004.

Aldo A. Badini, Bradford J. Badke, Brian S. McGrath, Harvey Kurzweil, Henry J. Ricardo, Joseph Angland, Dewey Ballantine, New York, NY, Elliot M. Olstein, Carella Byrne Bain Gilfillan Cecchi Steward & Olstein, Roseland, NJ, Jeffrey R. Witham, Tanya L. Hunter, Dewey Ballantine, Los Angeles, CA, for Plaintiff.
Christopher S. Yates, Daniel M. Wall, J. Thomas Rosch, James Kevin Lynch, Latham & Watkins, Daralyn J. Durie, John W. Keker, Jon B. Streeter, Keker & Van Nest, San Francisco, CA, Dean G. Dunlavey, Latham & Watkins, Costa Mesa, CA, Mark A. Flagel, Latham & Watkins, Los Angeles, CA, Robert J. Gunther, Jr., Latham & Watkins, New York, NY, David I. Gindler, Joseph M. Lipner, Morgan Chu, Irell & Manella, Los Angeles, CA, Gordon A. Goldsmith, Duarte, CA, for Defendants.

AMENDED MEMORANDUM OF DECISION AND ORDER RE: Motion to Dismiss for Lack of Subject Matter Jurisdiction
PFAELZER, J.
*1 The Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction came on for hearing on April 19, 2004 and this Court took the matter under submission. Having considered the parties' written and oral argument this court hereby GRANTS the Defendants' motion.

INTRODUCTION

I. Summary of Dispute

Plaintiff MedImmune is a biotechnology company whose most successful product is Synagis, a drug used to prevent serious lower respiratory tract disease in children. Amended Complaint ¶¶ 4-5. The Defendants are a biotechnology company, Genentech, Inc. (" Genentech" ) and a nonprofit organization, City of Hope, who are co-assignees of the patent in dispute.[FN1] U.S. Patent No. 6,331,415B1 (issued December 18, 2001) (" '415 patent" ).

> FN1. References to Genentech in the remainder of this memorandum are intended to indicate both Genentech and City of Hope.

The '415 patent describes a method of producing monoclonal antibodies using recombinant deoxiribonuclic acid (" DNA" ) technology. *Id.* Synagis is a monoclonal antibody; MedImmune licenses the '415 patent for the production of its Synagis product. Amended Complaint, ¶ 18. Although MedImmune continues to fulfill its obligations under the license agreement, MedImmune asserts that the '415 patent is invalid, unenforceable and not infringed, and that MedImmune therefore does not owe the royalties it is paying to Genentech. Amended Complaint, ¶ 20, ¶¶ 131-64.

II. Status of Case

MedImmune originally made antitrust and unfair competition claims in addition to seeking declaratory judgment of invalidity, unenforceability, non-infringement, and lack of royalty obligation under the license agreement. Amended Complaint, ¶¶ 131-201. The antitrust and unfair competition claims were dismissed on summary judgment holding that the *Noerr-Pennington* doctrine applied to these claims. Memorandum of Decision and Order (filed Dec. 23, 2004, amended January 14, 2004). Consequently, the only claims remaining in this case are claims for declaratory judgment.

The parties fully briefed the issue of claim construction and this Court was prepared to hold the *Markman* hearing scheduled for March 15, 2004. However, prior to the *Markman* hearing a March 5, 2004 Federal Circuit decision suggested that this Court does not have subject matter jurisdiction. *See Gen-Probe, Inc. v. Vysis, Inc.,* 359 F.3d 1376, 2004 WL 405737, *3 (Fed.Cir.2004). On March 12, 2004, this Court stayed all other matters, including claim construction, until the issue of subject matter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03159-MGC   Document 12-3   Filed 07/13/2007   Page 3 of 17

Not Reported in F.Supp.2d                                                                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

jurisdiction could be resolved. Telephonic Status Conference (held March 12, 2004).

### III. Motion to Dismiss

In the Motion at issue here, Genentech seeks dismissal of all remaining causes of action based on lack of subject matter jurisdictions. Specifically, Genentech requests that the First Cause of Action (Declaratory Judgment on Contractual Rights and Obligations), the Second Cause of Action (Patent Invalidity), the Third Cause of Action (Patent Unenforceability), and the Fourth Cause of Action (Non-Infringement) be dismissed. Genentech's Notice of Motion and Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed March 22, 2004) (" Motion" ).

*2 The parties have briefed this issue for the Court. City of Hope joined Genentech's Motion to Dismiss but did not file a separate motion. City of Hope's Notice of Motion and Motion for Joinder in the Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed March 23, 2004). MedImmune filed an Opposition and supported it with two Declarations. Plaintiff MedImmune, Inc's Opposition to Genentech, Inc.'s Motion to Dismiss (filed under seal, March 29, 2004) (" Opposition" ); Declaration of David M. Scott in Support of Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed under seal, March 29, 2004); Declaration of Tanya Hunter in Support of Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed under seal, March 29, 2004). Genentech and City of Hope filed separate Reply memoranda. Genentech's Reply Brief in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed April 5, 2004); Genentech's Request for Judicial Notice in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed April 5, 2004) (" Notice Request" ); Defendant City of Hope's Reply Brief in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction (filed April 5, 2004). This Court heard argument on April 19, 2004.

### LEGAL STANDARD

Genentech brings this Motion under Rules 12(b)(1) and 12(h)(3) of the Federal Rules of Civil Procedure (" FRCP" ). Rule 12(b)(1) gives a party the option of presenting the defense of lack of subject matter jurisdiction by motion rather than asserting it in the responsive pleading. Rule 12(h)(3) makes it clear that subject matter jurisdiction is a defense that is never waived: " Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the court *shall* dismiss the action." FRCP Rule 12(h)(3) (emphasis added). If a court lacks subject matter jurisdiction, dismissal of the action is mandatory. *See Ex parte McCardle,* 7 Wall. 506, 74 U.S. 506, 514, 19 L.Ed. 264 (1868).

### DISCUSSION

### I. The Gen-Probe Decision

Article III of the Constitution authorizes the federal judiciary to hear justiciable cases and controversies. To effectuate this requirement, the Declaratory Judgment Act requires that there be an " actual controversy" between the parties. 28 U.S.C. § 2201(a); see also *Gen-Probe,* 359 F.3d 1376, 2004 WL 405737, *3. It is therefore the rule that a declaratory judgment plaintiff must establish that the " totality of the circumstances" demonstrates that an actual controversy exists. *Gen-Probe,* 359 F.3d 1376, 2004 WL 405737 at *3.

In the past, the " actual controversy" requirement has not been interpreted as precluding a licensee from challenging a patent it licenses. *See C.R. Bard Inc. v. Schwartz,* 716 F.2d 874, 875 (Fed.Cir.1983) (" [A] patent license need not be terminated before a patent licensee may bring a declaratory judgment action" ); *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (holding that a license does not bar the licensee from challenging the validity of the patent).

*3 In *Gen-Probe,* however, the Federal Circuit limited the ability of licensees to challenge the patents they license. The Court held that no actual controversy existed between a patentee and a licensee in good standing. *Gen-Probe,* 359 F.3d 1376, 2004 WL 405737 at *4 (noting that the " license, unless materially breached, obliterated any reasonable apprehension of a lawsuit based on the prior circumstances cited by the district court for jurisdiction." ).

*Gen-Probe* distinguished prior cases as involving plaintiff-licensees who were not in good standing. The plaintiff-licensee in Gen-Probe, like MedImmune in this case, sought declaratory judgment of patent invalidity, unenforceability or

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

non-infringement. See Gen-Probe, 359 F.3d 1376, 2004 WL 405737. As is true of the plaintiff in this case, the plaintiff in Gen-Probe made these challenges while continuing to fulfill its obligations under the license agreement. Gen-Probe, 359 F.3d 1376, 2004 WL 405737 at *4. The Federal Circuit found the Gen-Probe plaintiff's continued performance of the license agreement to be a critical factor that destroyed jurisdiction by eliminating any reasonable apprehension of suit by the licensor for infringement.

## II. Controlling Law

MedImmune essentially admits that under Gen-Probe this Court does not have jurisdiction, but argues that Gen-Probe is not controlling. MedImmune contends that this Court has jurisdiction because Ninth Circuit precedent does not require that a license be breached before the licensee can seek declaratory relief. Opposition at 10 (citing Hal Roach Studios, Inc. v. Feiner & Co., 896 F.2d 1542 (9th Cir.1987)).

For issues not unique to patent law, this Court must apply the law of the Ninth Circuit. MedImmune seeks to characterize subject matter jurisdiction as a procedural matter that is unrelated to patent law and thus to have this Court apply Ninth Circuit law rather than that of the Federal Circuit. Opposition at 5-7 (citing Toxgon Corp. v. BNFL, Inc., 213 F.3d 1379, 1380 (Fed. Cir.2002; Molins PLC v. Quigg, 837 F.2d 1064, 1066 (Fed.Cir.1988); Vanguard Research, Inc. v. Peat, Inc., 304 F.3d 1249, 1254 (Fed.Cir.2002)).

Federal Circuit precedent controls the Court's decision in this case. Determination of whether an actual controversy exists under these facts requires evaluation of whether a licensee has a reasonable apprehension of a claim of infringement. This decision clearly implicates patent law, and is well within the purview of the Federal Circuit. See Shell Oil Company v. Amoco Corp., 970 F.2d 885, 887-888 (Fed.Cir.1992) (" The reasonable apprehension of a threat of patent infringement " clearly implicates" the patent law; the law of this circuit therefore applies." ).

The cases that MedImmune cites do not support the application of anything other than the law of the Federal Circuit. Toxgon, Molins, and Vanguard Research do indicate that the law of the regional circuit should govern procedural issues, but they also support the proposition that when jurisdictional questions are intertwined with patent law considerations, the law of the Federal Circuit applies.

*4 In Toxgon the Federal Circuit reviews a District Court's decision to dismiss the case for lack of subject matter jurisdiction. The court applies Ninth Circuit law to decide the correct standard under which it will review the dismissal; regional circuit law is applied to this procedural question. 312 F.3d at 1380-81. However, when deciding whether the District Court correctly interpreted the jurisdictional implications of a statute immunizing federal contractors from patent infringement suits, the Toxgon Court looked to Supreme Court and Federal Circuit precedent. 312 F.3d at 1381-82. When resolving a jurisdictional issue that involved patent concerns, the Toxgon court used the law of the Federal Circuit.

Like Toxgon, Vanguard Research states that the regional circuit is the appropriate source of law for " procedural issues not unique to patent law." 304 F.3d at 1254. However, in considering whether the plaintiff had a reasonable apprehension of suit that would create an actual controversy, the question at issue before this Court, the Vanguard Research court applied Federal Circuit law. 304 F.3d at 1254-55. When the Vanguard Research Court faced the situation that this Court now faces-determining whether a plaintiff has an actual controversy with a patentee-the Vanguard Research Court looked to the law of the Federal Circuit.

Similarly, in Molins the court held that the law of the regional circuit will apply to a question, like the ripeness question being considered in Molins, " which does not pertain to patent law issues and has no effect on this court's jurisdiction." 837 F.2d at 1066. Far from indicating that regional law applies in this case, the above-quoted statement in Molins suggests its converse: that application of regional law is inappropriate when considering questions that do pertain to patent law issues.[FN2] Molins thus further supports the conclusion that when a jurisdictional issue involves patent law concerns-such as the threat of infringement litigation between a patentee and a licensee-Federal Circuit law controls.

> FN2. Ripeness was also the issue in Shell Oil; because the ripeness question in that case depended on interpretation of a statute relevant to patent law, the Shell Oil Court applied the law of the Federal Circuit. Shell

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 4
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

<u>Oil,</u> 970 F.2d at 888, n. 10.

This Court's jurisdiction over this case depends on whether a patent licensee in good standing has an actual controversy with a patentholder whose patent the plaintiff-licensee believes is invalid, unenforceable, or not infringed. This jurisdictional issue is intertwined with patent law considerations, thus the law of the Federal Circuit controls. <u>28 U.S.C. § 1295</u> (giving the Federal Jurisdiction over appeals if the jurisdiction of the District Court was based on <u>28 U.S.C. § 1338</u>, which grants exclusive jurisdiction to the federal courts in cases arising under the patent laws).

III. Subject Matter Jurisdiction

Federal Circuit precedent dictates that this case be dismissed. *Gen-Probe* held that a licensee in good standing cannot seek relief under the Declaratory Judgment Act.2004 WL 405737 at *6. Because MedImmune is a licensee in good standing, and because the relief MedImmune seeks is for declaratory judgment, this Court has no choice but to dismiss this case for lack of subject matter jurisdiction.

A. MedImmune is a Licensee in Good Standing

*5 MedImmune is a licensee of the '415 patent and is in good standing. MedImmune's First Amended Complaint says:
With its New Cabilly Patent in hand, Genentech immediately exercised its illegally obtained monopoly by advising MedImmune that the New Cabilly Patent covers MedImmune's <u>Synagis®</u> product. As a consequence of this assertion, MedImmune began to make and continues to make significant payments to Genentech under an agreement entered into by MedImmune and Genentech on or about June 5, 1997 (the " 1997 License Agreement" ). This 1997 License Agreement provided rights to various intellectual property, including the patent application that later matured into the New Cabilly patent. After issuance of the New Cabilly Patent, MedImmune was forced to obtain additional license agreements from Genentech on or about February 7, 2003-at substantial cost-to cover seven new products that MedImmune has been developing (the " 2003 License Agreements" ) (collectively the 1997 and 2003 License Agreements are referred to herein as the " License Agreements" ).

FAC ¶ 18. There is no dispute that MedImmune is a licensee in good standing of the patent it seeks to challenge.

B. MedImmune Seeks Declaratory Judgment

Each of the claims remaining in this case are for declaratory judgment. The First Amended Complaint (" FAC" ) states:
MedImmune also seeks a declaration that: (a) the New Cabilly Patent (which is co-owned by Genentech and COH) is invalid; (b) the New Cabilly Patent is unenforceable; (c) MedImmune's sales of its <u>Synagis®</u> product do not infringe any valid claim of the New Cabilly Patent; and (d) MedImmune owes no payments to Genentech under the License Agreements.

FAC ¶ 20; see also ¶¶ 131-33 (seeking declaratory judgment on contractual rights and obligations); ¶¶ 134-39 (seeking declaratory judgment that the New Cabilly patent is invalid); ¶¶ 140-61 (seeking declaratory judgment that the New Cabilly patent is unenforceable); ¶¶ 162-64 (seeking declaratory judgment that the <u>Synagis®</u> product does not infringe any valid and enforceable claim of the New Cabilly patent). As is indicated by the foregoing, the claims that remain at issue in this case are all claims for declaratory judgment.

C. Mandatory Dismissal

In *Gen-Probe* the Federal Circuit determined that controversies over patent validity, enforcement, infringement would not be recognized while license agreements protected the licensee from suit for infringement. The *Gen-Probe* panel was concerned by the " undesirable result" that licensors would bear more risk and be less likely to grant licenses if licensees were permitted to challenge the patents they license. <u>359 F.3d 1376, 2004 WL 405737, *6</u>. The panel was apparently more persuaded by this concern than by the potential that invalid or unenforceable patents will stand because licensees will be too risk-averse to challenge them.

Requiring licensees to violate their license agreements and subject themselves to infringement suits before recognizing that they have an actual controversy with their licensors forces licensees to take a tremendous risk to challenge a patent, one that some with valid claims will likely be unwilling to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 5
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

take. The Federal Circuit has commented on the chilling effect this will have on patent challenges:

*6 To always require the termination of a license agreement as a precondition to suit would mean that a licensee must then bear the risk of liability of infringement. This would discourage licensees from contesting patent validity and would be contrary to the policies expressed in *Lear.*

C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed.Cir.1983).

The public has a strong interest in ferreting out invalid or unenforceable patents and in ensuring that the owners of valid patents monopolize only the technology claimed by the patent. The Supreme Court has described the importance of allowing licensees to challenge the patents they license:

Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification.

Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Licensees may champion the public interest in eliminating the monopoly over subject matter that is not rightfully acquired; stifling their challenges risks losing to private parties property that actually belongs to the public.

Even if it has serious misgivings about the panel's conclusion, this Court is not free to reconsider policy ramifications that *Gen-Probe* rejected. There are no relevant facts that distinguish this case from the facts of *Gen-Probe.* *Gen-Probe* is controlling law, and it dictates that this case be dismissed for lack of an actual controversy. Because *Gen-Probe* ruled that no subject matter jurisdiction exists under these facts, this Court must grant Genentech's Motion. FRCP Rule 12(h)(3).

CONCLUSION

Because the *Gen-Probe* decision dictates that this Court does not have subject matter jurisdiction over MedImmune's suit for declaratory judgment, Genentech's Motion is GRANTED and the First, Second, Third, and Fourth Causes of Actions are dismissed as to both Genentech and City of Hope.

IT IS SO ORDERED.

C.D.Cal.,2004.
MedImmune, Inc. v. Genentech, Inc.
Not Reported in F.Supp.2d, 2004 WL 3770589 (C.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.                                                                                                          Page 1
Not Reported in F.Supp., 1997 WL 148643 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

C
Fight For Children, Inc. v. Fight Night, Inc.
D.D.C.,1997.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
FIGHT FOR CHILDREN, INC., Plaintiff,
v.
FIGHT NIGHT, INC., Defendant.
No. CIV. A. 96-1818-LFO.

March 26, 1997.

*MEMORANDUM*
OBERDORFER, District Judge.
*1 This lawsuit involves a trademark dispute over the name "Fight Night" and its use in promoting charitable fund-raising events. Currently pending is a Motion to Dismiss or, Alternatively, to Stay or Transfer [5-I] filed by defendant Fight Night, Inc. ("FNI"). FNI raises several contentions: (1) that there is no subject matter jurisdiction, (2) that there is no personal jurisdiction, (3) that the case should be stayed pending resolution of proceedings before the Trademark Trial and Appeal Board ("TTAB"), and (4) that the case should be transferred to the Northern District of Texas. For the following reasons, the motion will be denied in part, and the issue of personal jurisdiction will remain under advisement.

I.

FNI is a Texas corporation that organizes charitable fund-raising events under the name "Fight Night" and has done so ever since 1989. Fight Night events are centered around a cocktail hour, dinner, and subsequent boxing match. In 1990, Joseph Robert, Jr., the founder of plaintiff Fight for Children, Inc. ("Fight for Children"), attended a Fight Night fundraiser in Texas and sought to conduct a similar event in the District of Columbia. Thereafter, Roberts incorporated Fight for Children as an organization holding annual fund-raising events, also known as "Fight Nights," where the proceeds would go to children's charities in Washington, D.C.

Initially, since Fight for Children had no experience in organizing Fight Night events, it hired FNI in 1990 and again in 1991 to assist with the organization and promotion of events in Washington, D.C. In 1992, however, Fight for Children decided not to renew its contractual relationship with FNI. Subsequently, FNI filed a trademark application with the United States Patent and Trademark Office ("USPTO"), asserting rights over the "Fight Night" trademark. In 1993, the USPTO approved the trademark application by FNI, and thereafter, Fight for Children filed an opposition before the Trademark Trial and Appeal Board ("TTAB"). That litigation is currently pending.

On August 19, 1992, FNI sent a letter to Fight for Children, demanding that it cease using the Fight Night name. On November 11, 1993, FNI again dispatched a letter to Fight for Children indicating that it intended to file an infringement suit once the TTAB ruled and the registration issued. In August 1996, Fight for Children filed this pending lawsuit seeking a declaratory judgment of non-infringement.

II.

The first issue to be addressed is whether subject matter jurisdiction is appropriate here. FNI contends that there is no "actual controversy" within the meaning of the Declaratory Judgment Act, *see* 28 U.S.C. § 2201 (1994), since Fight for Children has no "real and reasonable apprehension" of litigation. *See Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 396 (9th Cir.1982). As FNI concedes, however, its letters dated August 19, 1992 and November 11, 1993 contain language threatening litigation against Fight for Children. That language, on its face, apparently justifies a "real and reasonable apprehension" of liability on the part of Fight for Children.

*2 FNI contends nonetheless that those letters should be discounted since they were written nearly three years ago, and since that time, no action has been taken by FNI. During that three-year period, however, the parties were engaged in settlement negotiations. Thus, it appears that the threat of litigation did not dissipate between 1993 and 1996. This pending complaint was filed only after negotiations broke down. Moreover, although FNI has not sued for infringement yet, it has made threats to the effect that it intends to sue Fight for Children once its registration with the USPTO issues. *See* Robert Aff. ¶ 18. That contingency may now occur in

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 148643 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

the near future, since FNI has indicated that it recently filed a dispositive motion before the TTAB. Therefore, Fight for Children has a " real and reasonable apprehension" of being sued for trademark infringement. Subject matter jurisdiction is appropriate here.

### III.

Next, FNI contends that there is no basis for personal jurisdiction in this case. FNI asserts that it is a Texas corporation, whose only place of business is in Texas. *See* Alcorn Aff. at 1. Similarly, all of FNI's employees are located in Texas, and it currently has no officers, employees, or agents operating in the District of Columbia. *See id.* at 2. As FNI concedes, however, it has had previous contact with the District " in connection with ... services provided to [Fight for Children] in 1990 and 1991." *See id.* at 1. The D.C. long-arm statute provides for personal jurisdiction over " a person ..., as to a claim for relief arising from the person's transacting any business in the District of Columbia...." D.C.Code § 13-423(a)(1) (1996). Under that provision, personal jurisdiction is appropriate if Fight for Children can establish (1) that FNI engaged in activities that were purposefully directed towards residents of the District of Columbia, and (2) that the pending claim " ar[o]se out of or relate[d] to those activities." *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

There is no question here that the first requirement has been satisfied. It is undisputed that, in 1990 and 1991, FNI entered into contractual relations with Fight for Children in the District of Columbia. Pursuant to those agreements, FNI made arrangements with suppliers, sponsors, boxers, and promoters-all or many of whom were residents of the District.[FN1] Turning then to the second requirement, the crucial question is whether this lawsuit involves claims arising out of or relating to those activities. Unfortunately, the answer to that question is not so clear. This case is atypical of those normally brought under the " transacting business" provision. The usual case, often a breach of contract action, will arise directly out of the business that was transacted. In this case, however, there is no claim that the pending lawsuit originated from the consequences of unlawful actions taken by FNI in 1990 and 1991.

> FN1. Fight for Children also notes that FNI sent two letters into the District of Columbia, threatening to sue for trademark infringement. Those two letters were mailed in August 1992 and November 1993. Although several courts have found the mailing of threatening letters to be indicative of contacts with the forum state, *See Nova Biomedical Corp. v. Moller,* 629 F.2d 190, 194-96 (1st Cir.1980); *B & J Manuf. Co. v. Solar Indus. Inc.,* 483 F.2d 594, 598 (8th Cir.1973)," the mailing of an infringement notice-standing alone-has rarely been deemed sufficient to satisfy the constitutional standard." *Nova,* 629 F.2d at 197; *see also Cascade Corp. v. Hiab-Foco AB,* 619 F.2d 36, 38 (9th Cir.1980).
> In this case, it is not clear that FNI and Fight for Children are direct competitors, which is one prerequisite to a finding of personal jurisdiction based on the mailing of threatening letters. *See Nova,* 629 F.2d at 164-66; *B & J,* 483 F.2d at 598. Moreover, the letters are too remote in time, such that FNI could not have reasonably anticipated being haled into court on the basis of that correspondence.

*3 Fight for Children nonetheless proposes a novel legal argument. It contends that the basic issue raised by this declaratory judgment lawsuit is a determination of the rights relating to the " Fight Night" trademark. One ancillary question, then, that must be resolved is whether the use of the " Fight Night" name in Washington, D.C. from 1990 to 1991 inured to the benefit of FNI or Fight for Children. In that sense, this lawsuit " relates to" the prior business transactions conducted by FNI in Washington, D.C.[FN2]

> FN2. It does not escape notice that the agreements between FNI and Fight for Children expressly state that " FNI shall retain exclusive worldwide rights in perpetuity to all ... merchandising and program rights in connection with or based on the Event...." Nonetheless, the claim raised by Fight for Children may be sufficient to sustain personal jurisdiction, even if it is ultimately unsuccessful on the merits.

Legal research has uncovered only one published opinion that appears to be on point. *See Anheuser-Busch, Inc. v. International Battle of the Bands, Inc.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1997 WL 148643 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

731 F.Supp. 927 (E.D.Mo.1990). In that case, there was a trademark dispute between the parties, and the court considered the question of whether the defendant's prior use of the trademark in the forum state was sufficient to establish personal jurisdiction. Without a detailed analysis, the court simply held that " [t]he alleged business transactions conducted by defendant IBB within Missouri prior to 1988 are unrelated to the present request for a declaratory judgment of non-infringement, and thus are insufficient to permit this Court to exercise personal jurisdiction over defendants." *Id.* at 927. [FN3]

> FN3. One possible reason for the lack of analysis in *Anheuser-Busch* is that the plaintiff there appears not to have articulated the point raised by Fight for Children here-e.g., that the defendant's prior business transactions had an ancillary, trademark-related effect in the forum state.

In *Anheuser-Busch,* however, the facts were slightly different. The defendant had acted previously in the forum state with no contractual relationship to the plaintiff. Therefore, there was no question about whether there may have been a trademark-related effect that inured to the benefit of the plaintiff. In that respect, the court was correct in holding that the present lawsuit for a declaratory judgment of non-infringement was unrelated to the prior business transactions of the defendant. By contrast, in this case, FNI's prior business transactions in 1990 and 1991 are substantially intertwined with the claim raised by Fight for Children.

In any event, it is unclear whether allowing personal jurisdiction on that rationale would satisfy the dictates of due process. The acts of FNI in 1990 and 1991 are somewhat remote in time. It may be fundamentally unfair to hale FNI into court in the District of Columbia, based solely on its admittedly lawful acts committed over five years ago. Accordingly, the issue of personal jurisdiction will remain under advisement.[FN4]

> FN4. At oral argument, counsel for both parties indicated a willingness to submit this lawsuit to mediation. That procedure will hopefully be able to provide an amicable resolution; however, if not, then the issue of personal jurisdiction will be decided.

IV.

Third, FNI contends that this lawsuit should be stayed pending the outcome of proceedings before the TTAB. Those proceedings, however, involve substantially different questions than the ones at issue here. The TTAB litigation concerns the *registration* of the Fight Night trademark, whereas this suit concerns the use of that mark. The great weight of precedent indicates that an infringement case should not be stayed pending decision by the TTAB. *See PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 79-81 (1st Cir.1996) (noting that " the Board cannot give relief for an infringement claim, either injunctive or by way of damages" ); *Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848, 853 (2d Cir.1988) (" [T]he outcome of the PTO registration proceeding would not affect the legal standard applied in the infringement claim or the scope of the required fact-finding." ). Since any decision of the TTAB would be reviewed virtually *de novo* by the courts, and since the issues of use and infringement are not present before the TTAB, it would provide little or no benefit to stay this case. *See PHC,* 75 F.3d at 80; *Goya,* 846 F.2d at 854.

V.

*4 Lastly, FNI moves to transfer this case to the Northern District of Texas for the convenience of the parties and in the interest of justice. *See* 28 U.S.C. § 1404(a) (1994). Such a course of action seems particularly attractive, especially in light of the serious concerns about personal jurisdiction here. Nonetheless, a transfer is unwarranted at this time. Fight for Children's choice of forum is entitled to substantial deference. It is not enough for FNI to claim simply that a number of its witnesses are located in Texas. It appears that a significant number of witnesses are also located in the District of Columbia. Thus, FNI has not borne its burden of establishing that a transfer is appropriate.

D.D.C.,1997.
Fight For Children, Inc. v. Fight Night, Inc.
Not Reported in F.Supp., 1997 WL 148643 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                              Page 1
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
**(Cite as: Not Reported in F.Supp.)**

H
Beverly Hills Design Studio (N.Y.) Inc. v. Morris
S.D.N.Y.,1989.

United States District Court, S.D. New York.
The BEVERLY HILLS DESIGN STUDIO (N.Y.)
INC. and Stevi Brooks, Plaintiffs,
v.
James MORRIS; Morris Sales, Inc.; Quality Life Products, Inc.; Shamrock Sportswear, Inc.; Name Brands, Inc.; CPTO Industries, Inc.; Cover Story, Ltd.; K & K Action Sports, Inc. and Jacques Moret, Inc., and Ralph Oman, in his official capacity as Register of Copyrights, Defendants.
No. 88 Civ. 5886 (LLS).

July 26, 1989.

OPINION and ORDER
STANTON, District Judge.
*1 Defendants James Morris, Morris Sales, Inc., Quality Life Products, Inc., Shamrock Sportswear, Inc., and Name Brands, Inc. move under Fed.R.Civ.P. 9(b) and 12(b)(6) for an order dismissing plaintiffs' fraud and RICO claims. Defendant Ralph Oman, in his official capacity as Register of Copyrights, moves for summary judgment upholding his decision that plaintiffs' paper patterns are useful articles not eligible for copyright registration. Endorsing and joining in that motion, the defendants ask for summary judgment that the patterns are not copyrightable and dismissing the copyright infringement claims.

The motions are granted.

BACKGROUND

Plaintiff Stevi Brooks is a designer of exercise clothing. She is president of plaintiff The Beverly Hills Design Studio (N.Y.) Inc. (" Design Studio" ) which markets her designs.

Plaintiffs allege [FN1] that defendant James Morris owns and controls: defendant Morris Sales, Inc. (" Morris Sales" ) which manufactures and sells apparel; defendant Quality Life Products, Inc. (" Quality Life" ) which manufactures apparel and linen; defendant Shamrock Sportswear, Inc. (" Shamrock" ) which manufactures apparel; and defendant Name Brands, Inc. (" Name Brands" ) which sells apparel. First Amended Complaint, ¶¶ 6-10. Plaintiffs refer to those defendants as the " Morris defendants" .

Plaintiffs claim that in 1986 Brooks and Morris agreed that " Morris individually and on behalf of one or more of the Morris defendants" would manufacture and distribute her designs. *Id.* at ¶ 23. The Morris defendants were to pay for all the manufacturing costs, bill the customers, and pay Design Studio a commission on the sales. Plaintiffs submit as evidence of the agreement two letters written by Morris on behalf of Morris Sales, Inc. Exhibit A to the First Amended Complaint.[FN2]

" Morris and one or more of the Morris Defendants" began to manufacture Brooks' designs, but disputes arose over production and the allocation of costs. *Id.* at ¶ 28. In an effort to resolve these disputes Brooks and Morris revised their agreement to provide that Design Studio would pay the Morris defendants on a per garment basis for the cost of manufacturing.[FN3] *Id.* ¶ 29. The disputes, however, continued.

Plaintiffs commenced this action seeking relief for alleged copyright infringement, trademark infringement, violations of the Racketeering Influenced and Corrupt Organizations Act (" RICO" ), 18 U.S.C. §§ 1961-68 (1982 and Supp. IV 1986), common law fraud, and various other pendent state law claims.

The Morris defendants moved for an order under Fed.R.Civ.P. 9(b) and 12(b)(6) dismissing plaintiffs' fraud and RICO claims. Plaintiffs and the Morris defendants agreed that the Morris defendants would withdraw their motion and plaintiffs would file an amended complaint.

Plaintiffs filed their amended complaint. They claim that the defendants infringed Brooks' copyright in paper patterns she created to aid in the cutting of fabric for her designs. Specifically, they say the Morris defendants reproduced the patterns in making unauthorized copies of Brooks' exercise clothes for the label of another Morris line of clothing, " Kim of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
(Cite as: Not Reported in F.Supp.)

the Carolinas." The Morris defendants allegedly sold the copies to one or more of their customers: defendants CPTO Industries, Inc., Cover Story, Ltd., K & K Action Sports, Inc., and Jacques Moret, Inc., who then retailed them. Id. ¶¶ 43, 44.

*2 Plaintiffs' allege that the Morris defendants violated Sections 1962(a)-(d) of RICO. To state a claim for a violation of Section 1962, plaintiff must allege the existence of seven constituent elements: " (1) that the defendant (2) through the commission of two or more acts (3) constituting a " pattern" (4) of " racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an " enterprise" (7) the activities of which affect interstate or foreign commerce." Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983), cert. denied sub nom., Moss v. Newman, 465 U.S. 1025 (1984).

Racketeering activity is the commission of certain predicate acts, specified in the statute, for which a defendant could be convicted, Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 488 (1985), and a pattern of activity requires proof of at least two such acts, 18 U.S.C. § 1961(5).

Plaintiffs contend that the predicate act violations include mail and wire fraud, 18 U.S.C. §§ 1341, 1343, extortion, 18 U.S.C. § 1951, interstate transportation of stolen property, 18 U.S.C. § 2314, and receipt of stolen property transmitted across state lines, 18 U.S.C. § 2315.

Plaintiffs also claim that the Morris defendants defrauded them by filing false documents with certain governmental entities, improperly billing them, improperly documenting fabric usage, converting fabric for their own use, and misrepresenting plaintiff's merchandise as its own. First Amended Complaint, at ¶ 97.

As noted above, the Morris defendants now renew their motion for an order under Fed.R.Civ.P. 9(b) and 12(b)(6) dismissing plaintiffs' fraud and RICO claims. At the same time, defendant Ralph Oman, in his official capacity of Register of Copyrights, moves for summary judgment upholding his decision that plaintiffs' patterns are useful articles not eligible for copyright registration. Adopting the theory of that motion, the defendants also ask for summary judgment that the patterns are not copyrightable and dismissing the copyright infringement claims.

DISCUSSION

1. Rule 9(b)

Fed.R.Civ.P. 9(b) provides " In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The rule has three goals: " (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of a defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987).

a. Common Law Fraud

Plaintiffs' claim of common law fraud is based on the conduct alleged in paragraphs 51-54 and 63 of the First Amended Complaint.

Paragraph 51 states " On October 23, 1986, one or more of the Morris Defendants filed or caused to be filed two Uniform Commercial Code Financing Statements (UCC-1) with the North Carolina Secretary of State." The UCC-1 Statements were signed by Morris on behalf of Morris Sales. See exhibits to the Amended Complaint.

*3 Paragraph 52 states " The statements filed by or on behalf of the Morris Defendants were false and fraudulent in that they stated that [Morris] Sales was ' trading as' ... Design Studio and that ... Design Studio was a ' trade style' of [Morris] Sales."

Paragraph 53 states

On October 28, 1986 Morris on behalf of the Morris Defendants filed a Certificate of Assumed Name in Rockingham County, North Carolina. Said certificate was false and fraudulent in that it stated that [Morris] Sales was ' conducting business as' ... Design Studio and that [Morris] Sales owned ... Design Studio.

The Certificate was signed by Morris on behalf of Morris Sales. See exhibits to the Amended Complaint.

The UCC-1 Statements and the Certificate of Assumed Name were allegedly filed " without Plaintiff's knowledge, authorization, or consent."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First Amended Complaint, ¶ 54.

Paragraph 63 states

Upon information and belief, one or more of the Morris defendants, at various times relevant hereto, knowingly engaged, *inter alia,* in the following wrongful, improper, false and fraudulent acts, all without Plaintiff's authorization or consent ...

a. Failed to supervise manufacturing subcontracted to Peter Rogers Mfg., resulting in unusable and/or inadequate fabric and inferior quality garments;

b. Failed to timely produce and deliver Design's goods;

c. Failed to account for payments received from Design's customers;

d. Withheld, delayed and failed to make payments due to Design;

e. Failed and refused to provide documentation concerning payments due to Design;

f. Improperly filled orders by, *inter alia,* using colors, styles and fabrics not ordered by Design's customers;

g. Placed incorrect size labels inside garments (i.e. placing a ' large' size label in a ' small' size garment), thus causing returns of thousands of garments;

h. Improperly cut and sewn garments;

i. Improperly and negligently estimated yardage yields of fabric;

j. Improperly documented fabric usage;

k. Falsely charged Design for certain fabric purchases;

l. Wrongfully charged Design for the cost of shipment by air of late deliveries which costs were mandated by defendants late deliveries;

m. Falsely invoiced Design for labor costs in fact *not* incurred by plaintiff;

n. Wrongfully increased Production Charges;

o. Threatened to and did wrongfully withhold invoices for Production Charges from Design;

p. Improperly withheld and converted for defendants' use fabric manufactured for and owned by Design;

q. Knowingly and falsely stated that said wrongfully withheld fabric had been lost by Design's supplier and was not in Defendants' possession or control;

r. Delivered orders late;

s. Delivered orders incomplete;

t. Wrongfully coerced payment of disputed sums from Plaintiff by illegally threatening to close and, on occasions, in fact, closing the facility which manufactured Design's garments;

*4 u. Failed to fill the orders of Design's customers pursuant to Design's specific written directions;

v. Improperly and wrongfully utilized Plaintiff's patterns; and

w. Manufactured unauthorized ' pattern checks' (samples of garments used to solicit orders).

Rule 9(b) requires that a complaint alleging fraud identify " 1) precisely what statements were made, and 2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendant ' obtained as a consequence of the fraud.' " *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981), aff'd, 697 F.2d 296 (2d Cir.1982) (quoting three other cases).

Defendants assert that plaintiffs' complaint violates Rule 9(b) because it fails to satisfy the above listed requirements and paragraph 63 is based on information and belief. See *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972) (general rule that pleadings alleging fraud cannot be based upon information and belief.)

Plaintiffs respond that: 1) " the alleged misrepresentations have been identified, *Complaint* ¶¶ 51-54, ¶ 63, ..., and the manner in which the statements were false or misleading have been set

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 4
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
**(Cite as: Not Reported in F.Supp.)**

forth, *id.*", Plaintiffs' memo in opposition to motion to dismiss, p. 17-18, 2) they need not identify which of the Morris defendants made the misrepresentations since the " Morris Defendants ... are companies are all owned and/or operated by defendant James Morris, and only he is in a position to know which of the Morris Defendants committed which of the fraudulent acts set forth in the First Amended Complaint", *Id.* at 19-20, and 3) paragraph 63 can be based on information and belief because the matters alleged there are particularly within the defendants' knowledge.

Paragraphs 51 and 53 specify the time, place, content, and signer of the allegedly fraudulent UCC-1 Statements and Certificate of Assumed Name. They fail, however, to state how those allegedly fraudulent documents misled plaintiffs or how the defendants benefitted from them. Accordingly, paragraphs 51 and 53 fail to comply with Rule 9(b).

Paragraph 63 fails to specify the time, place, or (except for subdivision q) the content of the misrepresentations, or which defendant allegedly made them. Plaintiffs justify their failure to identify which defendants made the alleged misrepresentations by citing several cases involving claims of securities fraud against corporate insiders and affiliates where the plaintiffs were not required to identify which defendants made the misrepresentations. See *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) (" no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question." ); *Pellman v. Cinerama, Inc.,* 503 F.Supp. 107, 111 (S.D.N.Y.1980) (" The defendants here are all insiders, however, and numerous courts have held that the conduct of such individuals need not be specified if the complaint sufficiently describes the fraudulent acts and provides the individuals with sufficient information to answer." ) Those cases are based on the premise that the allegations against the corporate insiders or affiliates involve misstatements or omissions in documents that may be presumed to entail their collective actions, see *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 910 (S.D.N.Y.1983), and, thus, the defendants are " in a position to comprehend the nature of [their] conduct from which plaintiff has drawn an inference of fraud and each will be able to answer the charge and defend against it." *Helfant v. Louisiana & Southern Life Ins. Co.,* 82 F.R.D. 53, 57 (E.D.N.Y.1979).

*5 Here, the Morris defendants are not corporate insiders or affiliates. " Basic principles of corporate law presume that absent a rather egregious disregard of corporate formalities, one corporate entity or an individual with a substantial interest in the corporation is not automatically or readily responsible for the acts of another entity." *The Limited, Inc. v. McRory Corp.,* 645 F.Supp. 1038, 1044 (S.D.N.Y.1986). While plaintiffs assert that Morris acted on behalf of the other Morris defendants, their complaint does not allege such an " egregious disregard of corporate formalities" as would justify their failure to identify which of the Morris defendants made the misrepresentations. Moreover, the exhibits attached to their pleadings contradict plaintiffs' assertion that Morris acted on behalf of the Morris defendants. On the contrary, those exhibits show that Morris appeared to be acting only on behalf of Morris Sales.[FN4]

Accordingly, paragraph 63 violates Rule 9(b) because it fails to specify the time, place, and content of the misrepresentations, or which defendant allegedly made them.

Paragraph 63 also violates Rule 9(b) because it is based on information and belief. Plaintiffs claim that *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *cert. denied,* 421 U.S. 976 (1975) authorizes them to plead on information and belief. There the court held " the rule relating to information and belief may be relaxed as to matters particularly within the opposing party's knowledge, as where the complaining stockholders in a derivative suit have little information about the manner in which the corporation's internal affairs are conducted and hence are rarely able to provide details as to the alleged fraud...." *Id.* at 379 citing Wright & Miller, *Federal Practice and Procedure,* § 1298 at 416 (5th ed. 1969). However, this exception to Rule 9(b) requires that the pleading include a statement of the facts upon which the belief is founded. *Id.* at 379. Such a statement is lacking here.

Moreover, plaintiffs admit that they are in possession of documents which detail the allegedly fraudulent acts: " There is indeed a weighty mass of documentation that could have been attached to the First Amended Complaint...." Plaintiffs' memo in opposition to motion to dismiss, p. 27 n. 15. Thus, plaintiffs' reliance on information and belief in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
(Cite as: Not Reported in F.Supp.)

pleading paragraph 63 violates Rule 9(b).

Since paragraphs 51-54, and 63 fail to comply with Rule 9(b), the claim of common law fraud must be dismissed.

### b. RICO

Rule 9(b)'s requirements also apply to plaintiff's allegations of mail and wire fraud under RICO.[FN5] *Moss v. Morgan Stanley, Inc.,* 719 F.2d at 19. Those allegations are based on the conduct inadequately pleaded in paragraphs 51-53 and 63 (see Complaint par. 78a). Since the RICO mail and wire fraud predicate acts are premised upon inadequate pleading of common law fraud, they must also be dismissed. *River Plate Reinsurance Co., Ltd. v. Jay-Mar Group, Ltd.,* 588 F.Supp. 23, 25-27 (S.D.N.Y.1984).

*6 Defendants argue that Rule 9(b) also applies to plaintiffs' predicate acts of extortion,[FN6] interstate transportation of stolen goods [FN7], and receipt of stolen property transmitted across state lines [FN8] because they are based on fraud. See *Gregoris Motors v. Nissan Motor Corp. In USA,* 630 F.Supp. 902, 912 (E.D.N.Y.1986) (" it is settled that the pleading of predicate acts for a RICO claim must meet the particularity requirements of Rule 9(b) ... where the acts are based in fraud." )

While none of those three crimes requires a showing of fraud, plaintiffs allege that the Morris defendants committed them through fraudulent acts. Specifically, plaintiffs allege that the Morris defendants 1) committed extortion " by devising and utilizing a scheme to defraud money" , First Amended Complaint ¶ 78b, 2) transported across state lines goods that they knew had been stolen or taken by fraud from plaintiff, *Id.* ¶ 78c, and 3) received such goods. *Id.* ¶ 78d. Accordingly, Rule 9(b) requires that the plaintiffs plead these predicate acts with particularity. See *Seville Industrial Machinery Corp. v. Southmost Machinery,* 742 F.2d 786 (3rd Cir.1984), *cert. denied,* 469 U.S. 1211 (1985) (affirming district court holding that Rule 9(b) applied to allegations of fraud inherent in Section 2314 and Section 2315 claims); *Construction Technology, Inc. v. The Lockformer Co., Inc.,* 704 F.Supp. 1212, 1230, n. 12 (S.D.N.Y.1989) (*Seville* " explicitly endorsed the principle that the fraud element of §§ 2314 and 2315 must be pleaded with particularity." ); *Gregoris Motors,* 630 F.Supp. at 913 (dismissing extortion claim based on fraud for failure to comply with Rule 9(b)).

These three predicate acts are based on the conduct alleged in paragraphs 51-53 and 63. For the reasons stated above, plaintiffs have failed to plead them with particularity.

Since none of the alleged predicate act offenses satisfy the requirements of Rule 9(b), plaintiffs' RICO claim must be dismissed.

### c. Leave to Replead

Defendants urge that since they " have put the Plaintiffs on notice of the pleading deficiencies and voluntarily agreed to an amended pleading giving Plaintiffs a second chance to properly plead their complaint, it is respectfully submitted that this motion should be granted without leave to Plaintiffs' filing of another amended complaint." Defendants' memo in support, p. 4.

That argument has equitable appeal, but it is only when a court dismisses a complaint for failure to plead fraud with particularity, and the plaintiff's amended complaint again fails to comply, that the complaint should be dismissed without leave to replead. See *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982) (" we find no abuse of discretion in the district court's refusal to give plaintiff's attorneys a third attempt to restate the defective allegations.)

Accordingly, plaintiffs are granted leave to replead their fraud and RICO claims within twenty days.

### 2. Copyright

*7 Plaintiffs allege that the defendants infringed their copyright in paper patterns of Brooks' design. These paper patterns were used to cut fabric for the garments or to create templates for cutting multiple layers of fabric. In April 1988 Brooks filed applications with the Copyright Office for registration of claims to copyright in the patterns. In June 1988 the Copyright Office refused registration. Brooks asked for reconsideration, and the Copyright Office again refused registration on the basis that the patterns were " useful articles" which are not copyrightable under Sections 101 and 102 of the Copyright Act of 1976, 17 U.S.C. §§ 101, 102 (" Copyright Act" ).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 6
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
(Cite as: Not Reported in F.Supp.)

Section 101 defines a "useful article" as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." It further provides that "the design of a useful article ... shall be considered a pictorial, graphic, or sculptural work [subject to copyright protection under Section 102] only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

The Copyright Office found that the paper patterns

do not merely portray the appearance of the drawings or convey information. They are two dimensional designs of useful articles, i.e. template type tools for use in the manufacturing process of making clothing. As such, the drawings are an integral part of the cut and shape of the clothing being made. The drawings merely follow the outline of the various pieces of clothing to be manufactured without the author adding a separable authorship on which registration can be based.

Your ... works are clearly distinguishable from clothing "patterns" which are registrable in our office.... Registrable "patterns" contain copyrightable textual expression in the form of instructions, and artistic pictorial expression depicting the appearance of the article of clothing. [Your] works ... lack this expression.

Exhibit E to Defendant Ralph Oman's Notice of Motion.

Although the Copyright Office refused to register plaintiffs' patterns, rejection of the application does not bar plaintiffs' copyright claim. 17 U.S.C. § 411(a). However, the plaintiffs must

establish that the items were properly subject to copyright. That burden is heavy: the determinations of the Copyright Office ... are entitled to "considerable weight." That is especially so here where the same applications were rejected ... on two separate occasions. Moreover, the decision to register an article rests in the sound discretion of the Register of Copyrights, and the scope of judicial review is limited to whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Gemveto Jewlery Co. v. Jeff Cooper, Inc., 568 F.Supp. 319, 330 (S.D.N.Y.1983) (footnotes omitted).

*8 In this Circuit, a useful article is copyrightable if it contains a conceptually separate aesthetic element. Brandir International, Inc. v. Cascade Pacific Lumber Co., 834 F.2d 1142, 1144 (2d Cir.1987). Such an element is present "where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences...." Id. at 1145. Conversely, there is no conceptually separate aesthetic element where "design elements reflect a merger of aesthetic and functional considerations." Ibid.

Plaintiffs argue that these patterns are copyrightable drawings of utilitarian objects, the apparel, and are not useful articles themselves. They liken them to architectural plans, which are copyrightable, while the useful article depicted by those plans, the house, is not. See Demetriades v. Kaufman, 680 F.Supp. 658, 664 (S.D.N.Y.1988) ("although an owner of copyrighted architectural plans is granted the right to prevent the unauthorized copying of those plans, that individual, without benefit of a design patent, does not obtain a protectable interest in the useful article depicted by those plans.")

The analogy is off the mark. Architectural plans are copyrightable because they are "technical drawings, diagrams, and models" under 17 U.S.C. § 101. Nimmer, The Law of Copyright, § 2.08[d][2][a] at p. 112. Such works " 'include diagrams of models illustrating scientific or technical works or formulating scientific or technical information in linear or plastic form, such as, for example: a mechanical drawing, an astronomical chart, an architect's blueprint, an anatomical model, or an engineering diagram.' " Id. at 110 (quotation omitted). The architectural plans are not "useful articles because the intrinsic function of an architectural plan is precisely to 'convey information' as to the manner in which a building may be constructed...." Id. at 114.

Here, the patterns are not "technical drawings, diagrams, and models", nor do they either portray the appearance of the garments or convey information about them. They are simply used to cut fabric for the manufacture of garments.[FN9] Because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
**(Cite as: Not Reported in F.Supp.)**

the patterns are intrinsically utilitarian and functional, they are not eligible for copyright protection. Accordingly, the motion for summary judgment dismissing plaintiffs' copyright claim is granted.

Conclusion

The Morris defendants' motion to dismiss plaintiffs' fraud and RICO claims is granted, with leave to plaintiffs to replead within twenty days. Defendants' motion to dismiss plaintiffs' claim of copyright infringement is granted.

So ordered.

FN1. On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Dwyer v. Regan,* 777 F.2d 825, 828-829 (2d Cir.1985), *reh'g denied,* 793 F.2d 457 (2d Cir.1986).

FN2. The pleading is deemed to include any document attached to it. *See* Fed.R.Civ.P. 10(c) " A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."

FN3. Plaintiffs also entered into a Confidentiality Agreement with " the Morris defendants" . First Amended Complaint, ¶ 35. The agreement provides that Morris Sales would use Design Studio's " patterns, markers, grades, samples, and designs ... [only] in connection with the manufacturing of garments for" Design Studio. Exhibit C to the First Amended Complaint. The agreement was signed by Morris on behalf of Morris Sales.

FN4. Attached as exhibit B to the Amended Complaint is a letter written by Morris to J.C. Penney on Quality Life Products, Inc. letterhead. The letter states " I am President of Morris Sales which owns Quality Life Products, J.C. Penney vender # 172031-0. This is to confirm that we are working with and providing the manufacturing and financial backing for the Beverly Hills Design Studio (New York) Inc. for J.C. Penney orders presently in house."
Morris signed the letter " Jim Morris, President" .

FN5. To prove the predicate offenses of mail and wire fraud, defendants must establish: (1) " ' a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme.' A scheme to defraud is a plan whose object is ' to deprive one of property through fraudulent or deceptive means, such as material misrepresentation [or] concealment.' " *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 512 (S.D.N.Y.1987) quoting *Tryco Trucking Co. v. Belk Stores Services,* 634 F.Supp. 1327, 1333 (W.D.N.C.1986).

FN6. 18 U.S.C. § 1951 defines extortion " as the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

FN7. 18 U.S.C. § 2314 provides " Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

FN8. 18 U.S.C. § 2315 provides
Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

FN9. Plaintiffs claim that " [c]reation of the drawings at issue involved numerous detailed decisions as to proportion, form, contour, configuration, confirmation, size, scale, angles and width. Determinations such as these have been held sufficiently demanding of skill and independent judgment as to render the works the proper

Not Reported in F.Supp.   Page 8
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889
**(Cite as: Not Reported in F.Supp.)**

subject of any copyright." Plaintiffs' memo in opposition to summary judgment, at 9. However, " to the extent the forms possess aesthetically pleasing features, even when these features are considered in the aggregate, they cannot be conceptualized as existing independently of their utilitarian function." *Carol Barnhart Inc. v. Economy Cover Corp.,* 773 F.2d 411, 418 (2d Cir.1985).

S.D.N.Y.,1989.
Beverly Hills Design Studio (N.Y.) Inc. v. Morris
Not Reported in F.Supp., 1989 WL 85867 (S.D.N.Y.), 1989 Copr.L.Dec. P 26,447, RICO Bus.Disp.Guide 7265, 13 U.S.P.Q.2d 1889

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.